Edwin A. Zipf (EZipf@bressler.com)
**BRESSLER, AMERY & ROSS**
A Professional Corporation
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932
Telephone: (973) 514-1200
Facsimile: (973) 514-1660

Marshall H. Fishman (Marshall.Fishman@freshfields.com) (*Pro Hac Vice* Application Pending)
Timothy P. Harkness (Timothy.Harkness@freshfields.com) (*Pro Hac Vice* Application Pending)
Cheryl L. Howard (Cheryl.Howard@freshfields.com) (*Pro Hac Vice* Application Pending)
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., on behalf of its series Lord Abbett High Yield Municipal Bond Fund, a Maryland corporation,<br><br>                                  Plaintiff,<br><br>v.<br><br>CITIGROUP GLOBAL MARKETS, INC., a New York corporation, and JOHN DOES 1-10,<br><br>                                  Defendants. | Civil Action No. 2:11-cv-05550-CCC-JAD<br>Oral Argument Requested<br>Motion Date: April 2, 2012 |

**DEFENDANT CITIGROUP GLOBAL MARKETS INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ....................................................................3

    A.    The Early Years: The Feasibility of the Las Vegas Monorail
          Project and Its Public Opponents ........................................3

    B.    2000: The Monorail Bonds are Issued.................................5

    C.    2004 Construction Delays, 2005 Opening, and Poor
          Performance.........................................................................8

    D.    Lord Abbett Reviews the Monorail's Dismal Performance
          and Decides to Purchase the Second Tier Bonds Over Its Own
          Analyst's Objections .........................................................10

    E.    The Downgrade, Default, and Bankruptcy ........................12

ARGUMENT .....................................................................................12

  I.    THE FIRST AND THIRD CLAIMS FOR STATUTORY AND
       COMMON LAW FRAUD SHOULD BE DISMISSED .............13

    A.    Plaintiff Fails Adequately To Allege Claims For Common
          Law Fraud and Violation of New Jersey Securities Law..................14

       1.  The Complaint Fails Adequately to Allege The Existence
           of a Material Untrue Statement or Omission ................................16

          a.  The Outdated Cox Report Was Not Material .........................16

          b.  CGMI Had No Duty to Disclose the Cox Report ...................20

       2.  The Complaint Fails Adequately to Allege Scienter ...................22

       3.  The Complaint Fails Adequately to Allege Loss Causation .........24

       4.  The Complaint Fails Adequately to Allege Reasonable  or
          Justifiable Reliance by Plaintiff ........................................26

    B.    The Statute of Limitations Bars The New Jersey Securities
          Law Claim .......................................................................29

  II. THE SECOND CLAIM FOR NEGLIGENT
      MISREPRESENTATION SHOULD BE DISMISSED ..............32

CONCLUSION .................................................................................38

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alexander v. Cigna Corp.*,
   991 F. Supp. 427 (D.N.J. 1998) ........................................................................35

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................12, 13

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
   80 A.D.3d 293, 915 N.Y.S.2d 7 (N.Y. App. Div. 2010)..................................36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................12, 13

*Benak v. Alliance Capital Mgmt L.P.*,
   349 F. Supp. 2d 882 (D.N.J. 2004)......................................................... 30, 31, 32

*Bramblewood Investors, Ltd. v. C&G Assoc.*,
   262 N.J. Super. 96 (N.J. Super. Ct. Law Div. 1992)........................................29

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   528 F. Supp. 2d 206 (S.D.N.Y. 2007) ..............................................................33

*CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*,
   78 A.D.3d 562 (N.Y. App. Div. 2010) ..............................................................36

*Columbia Sav. and Loan Ass'n v. Forum Ins. Co.*,
   Civ. A. No. 89-700, 1990 WL 235660 (D.N.J. Dec. 26, 1990).............26, 27, 28

*Commerce Bancorp, Inc. v. BK International Ins. Brokers*, *Ltd.*,
   490 F. Supp. 2d 556 (D.N.J. 2007)...................................................................35

*Coyle v. Mathai*,
   Civil Action No. 11-5185 (JEI/JS), 2011 U.S. Dist. LEXIS 133170
   (D.N.J. Nov. 18, 2011)........................................................................................1

*DeBenedictis v. Merrill Lynch & Co.*,
   492 F.3d 209 (3d Cir. 2007)......................................................... 13, 20, 31, 32

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
  945 F.2d 1226 (2d Cir. 1991) ........................................................................18

*DeRobbio v. Harvest Cmtys. of Sioux City, Inc.*,
  Civil Action No. 01-1120 (MLC), 2002 U.S. Dist. LEXIS 26706 (D.N.J.
  Oct. 30, 2002) ........................................................................................*passim*

*Diebold, Inc. v. Continental Casualty Co.*,
  Civ. Action No. 07-1991 (JEI), 2008 U.S. Dist. LEXIS 29308 (D.N.J.
  April 10, 2008) ..............................................................................................35

*Dow Corning Corp. v. BB & T Corp.*,
  Civil Case No. 09-5637 (FSH)(PS), 2010 WL 4860354 (D.N.J. Nov. 23,
  2010) ..............................................................................................................24

*Farris v. Cnty. of Camden*,
  61 F. Supp. 2d 307 (D.N.J. 1999) ..................................................................22

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007) ................................................................ 14, 15, 26

*Fuscellaro v. Combined Ins. Group*,
  Civil Action No. 11-723, 2011 U.S. Dist. LEXIS 111470 (D.N.J. Sept.
  29, 2011) ..................................................................................................15, 16

*Goodman v. Goldman, Sachs & Co.*,
  Civil No. 10-1247 (FLW), 2010 U.S. Dist. LEXIS 132593 (D.N.J. Dec.
  14, 2010) .............................................................................................. 1, 14, 34

*Greenberg v. Pro Shares Trust*,
  2011 N.J. Super. Unpub. LEXIS 1789 (N.J. Super. July 7, 2011). ..................28

*Hosiery Corp. of Am., Inc. v. Int'l Data Processing, Inc.*,
  Civ. A. No. 89-115, 1991 WL 30015 (D.N.J. Feb. 28, 1991) ..........................16

*Hubbard v. Gen. Motors Corp.*,
  No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996) ........................33

*In re Beacon Assoc. Litig.*,
  745 F. Supp. 2d 386 (S.D.N.Y. 2010) ........................................................36, 37

*In re Discovery Labs Sec. Litig.*,
   Case No. 06-1820, 2006 U.S. Dist. LEXIS 79823 (E.D. Pa. Nov. 1, 2006) 17, 19

*In re House of Drugs, Inc.*,
   251 B.R. 206 (Bankr. D.N.J. 2000) .................................................................27

*In re Kantor*,
   Nos. 84-30402, 84-7116, 1986 WL 28904 (Bankr. S.D.N.Y. Oct. 1,
   1986) ...............................................................................................................28

*In re Kidder Peabody Sec. Litig.*,
   No. 94 CIV. 3954, 1995 WL 590624 (S.D.N.Y. Oct. 4, 1995) ........................18

*In re Tremont Sec. Law, State Law and Ins. Litig.*,
   703 F. Supp. 2d 362 (S.D.N.Y. 2010) ......................................................36, 37

*JP Morgan Chase Bank v. Winnick*,
   350 F. Supp. 2d 393 (S.D.N.Y. 2004) *leave to appeal* granted M-6308,
   slip op. (N.Y. App. Div. 2011) ........................................................................34

*Karu v. Feldman*,
   119 N.J. 135 (1990) ........................................................................................33

*Kaufman v. I-State Corp.*,
   165 N.J. 94 (2000) ....................................................................................14, 26

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
   652 F. Supp. 2d 576 (E.D.Pa. 2009)................................................................21

*McCabe v. Ernst & Young, LLP.*,
   494 F.3d 418 (3d Cir. 2007)......................................................................24, 25

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
   No. Civ 94-5522 (RBK), Civ. 96-2318 (RBK), 2005 WL 3500032
   (D.N.J. Dec. 20, 2005) ....................................................................................32

*Mill Bridge V, Inc. v. Benton*,
   Civ. No. 08-2806, 2009 U.S. Dist. LEXIS 113566 (E.D. Pa. Dec. 3,
   2009) ..........................................................................................................17, 18

*N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*,
   725 A.2d 1133 (N.J. Super. 1998)..............................................................21, 22

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)............................................................................17

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
  354 F. Supp. 2d 357 (S.D.N.Y. 2005) ..........................................................33

*Premier Pork L.L.C. v. Westin, Inc.*,
  Civil Action No. 07-1661, 2008 WL 724352 (D.N.J. March 17, 2008)...........20

*Rand v. Cullinet Software, Inc.*,
  847 F. Supp. 200 (D. Mass. 1994).............................................................18, 19

*Roll v. Singh*,
  Civil Action No. 07-cv-04136, 2008 WL 3413863 (D.N.J. June 26, 2008)
  ......................................................................................................................30

*Ross v. Celtron Int'l, Inc.*,
  494 F. Supp. 2d 288 (D.N.J. 2007)................................................................20

*Salovaara v. Jackson Nat'l Life Ins. Co.*,
  66 F. Supp. 2d 593 (D.N.J. 1999)............................................................20, 21

*Scalp & Blade, Inc. v. Advest, Inc.*,
  281 A.D.2d 882 (N.Y. App. Div. 2001) .........................................................36

*Shogen v. Global Aggressive Growth Fund*,
  Civ. Action No. 04-5695 (SRC), 2007 U.S. Dist. LEXIS 31093 (D.N.J.
  April 26, 2007) ..............................................................................................23

*Wiatt v. Winston & Strawn LLP*,
  Civil Action No. 10-6608 (JLL), 2011 WL 2559567 (D.N.J. June 27,
  2011) .............................................................................................................14

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005)..........................................................................21

**STATUTES**

15 U.S.C. § 78j(b).............................................................................. 15, 23, 25, 33

17 C.F.R. § 240.10b-5.........................................................................................25

Martin Act, N.Y. Gen. Bus. Law, Art. 23-A, § 352-c *et seq.*..................................36

N.J.S.A. 49:3-71(g)..........................................................................................29

Securities Act of 1933.....................................................................................7, 8

**OTHER AUTHORITIES**

Fed. R. Civ. Rule 8 ...................................................................... 12, 13, 37

Fed. R. Civ. Rule 9 .......................................................................*passim*

Fed. R. Civ. Rule 12 .....................................................................*passim*

Defendant Citigroup Global Markets Inc. ("CGMI") respectfully submits this Memorandum of Law in support of its motion (the "Motion") to dismiss in its entirety the complaint filed by Plaintiff Lord Abbett Municipal Income Fund, Inc. ("Lord Abbett" or "Plaintiff") on September 23, 2011 (the "Complaint" or "Compl.") pursuant to Rules 12(b)(6), 8(a) and 9(b) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Over a decade ago, Las Vegas developers proposed extending and updating the monorail that runs down one side of the Las Vegas Strip (the "Monorail") and financing this project with three "tiers" of risky, high-yield, "junk" bonds, including the bonds at issue in this case (the "Second Tier Bonds"), which were issued in 2000.   Six years later, and after the Monorail extension became operational, Lord Abbett – a high-yield bond fund specializing in trading risky

---

[1] For purposes of this Motion only, CGMI draws its statement of facts from the Complaint and certain documents which are "'integral to or explicitly relied upon in the complaint.'" *Goodman v. Goldman, Sachs & Co.*, Civil No. 10-1247 (FLW), 2010 U.S. Dist. LEXIS 132593, at *9 (D.N.J. Dec. 14, 2010); *Coyle v. Mathai*, Civil Action No. 11-5185 (JEI/JS), 2011 U.S. Dist. LEXIS 133170, *8–9 (D.N.J. Nov. 18, 2011) ("When evaluating a *Rule 12(b)(6)* motion to dismiss, the Court considers "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.   A document that forms the basis of a claim is one that is 'integral to or explicitly relied upon in the complaint.'") (citations omitted).   Accordingly, true and correct copies of the documents referenced herein are attached as Exhibits A to M to the accompanying Declaration of Cheryl L. Howard ("Howard Ex."), dated December 12, 2011.

bonds such as these – acquired $13 million of the Second Tier Bonds from CGMI. As Lord Abbett alleges, it purchased the Second Tier Bonds in 2006 only after CGMI provided it with the Monorail's 2005 audited financial statements (the "2005 Audited Financials"),[2] which disclosed that:

- the Monorail suffered a nearly $45 million total loss in 2005;

- the Monorail's liabilities exceeded its assets by $90 million;

- in 2005, Moody's downgraded the more highly-rated (and insured) tier of Monorail bonds (the "First Tier Bonds"); and

- Fitch downgraded the First Tier Bonds in February 2006.

The 2006 Fitch downgrade, which was referenced in the 2005 Audited Financials, went further, pronouncing that the Monorail's "rating outlook" was "negative" and predicting that "the second-tier bonds would encounter payment problems in less than two years."[3]

        The Complaint further alleges that Lord Abbett's own bond analyst concluded that Lord Abbett should not purchase the Second Tier Bonds. Notwithstanding the recommendation of its analyst, the Moody's and Fitch downgrades, and the Monorail's poor performance, Lord Abbett purchased the

---

[2] A copy of the 2005 Audited Financials, to which the Complaint refers, is annexed as Howard Ex. A.  *See supra* n. 1 (explaining that courts may consider documents integral to or relied upon in a complaint in determining a motion to dismiss).

[3] A copy of the publicly-available Fitch downgrade, to which the 2005 Audited Financials refer, is annexed as Howard Ex. B.

Second Tier Bonds.  As Plaintiff alleges, only weeks after its purchase, the rating agencies further downgraded the First Tier Bonds.  As Plaintiff further alleges, ultimately the Second Tier Bonds defaulted and the promoter and developer of the Monorail filed for bankruptcy.

Now, five years since its purchase and over two years since the Second Tier Bonds defaulted, Lord Abbett contends that CGMI should have informed it about a feasibility report which was drafted before the Monorail was even constructed, six years prior to Plaintiff's purchase of the Second Tier Bonds, and which contained mere financial *projections* and not the actual and accurate financial results which CGMI admittedly provided.

The Complaint is implausible on its face.  The 2005 Audited Financials which Plaintiff admittedly reviewed disclosed the Monorail's dire finances and its own analyst recommended against the purchase.  Simply put, the Complaint – contrived years after the fact and beyond the New Jersey Securities Act's two-year limitations period – fails to state a claim for common law fraud, negligent misrepresentation, or violation of New Jersey's Securities Act.

## STATEMENT OF FACTS

A.    **The Early Years: The Feasibility of the Las Vegas Monorail Project and Its Public Opponents**

In the late 1990s, members of the Las Vegas community sought to upgrade and extend an existing monorail that ran along the Las Vegas Strip.

Howard Ex. C (OS) at 3.[4]  Like any municipal project, the proposed extension had supporters and opponents.

The supporters of the project ultimately formed the Las Vegas Monorail Company ("LVMC") which became the primary promoter and developer of the Monorail.  Compl. ¶ 8.  LVMC commissioned a consultant, URS Greiner Woodward Clyde, Inc. ("URS Greiner"), to conduct a ridership study to project expected revenues from paying riders and from advertisers (the "URS Greiner Study").  *Id.* ¶ 11.  The URS Greiner Study was completed in August 2000.  *Id.*

The project's opponents, which included the Venetian Casino, Hotel & Resort in Las Vegas, hired its own consultant, Wendell Cox Consultancy ("Cox"), to analyze the revenue projections published by LVMC's URS Greiner Study.  Compl. ¶ 9.  Ultimately, Cox wrote a report (the "Cox Report") which contained rider and advertising revenue projections that differed from those found in the URS Greiner Study.  Compl. ¶¶ 9, 11–12.

The URS Greiner Study and the Cox Report were published in 2000, six years before Lord Abbett purchased the bonds at issue here.  Compl. ¶¶ 9, 11.  As such, they both contained only *projections – i.e.*, estimates of future ridership –

---

[4] Acting as underwriter, Salomon Smith Barney prepared an "Official Statement" prospectus for the Second Tier Bonds ("Official Statement" or "OS") that is referred to and incorporated by reference into the Complaint.  Compl. ¶ 8.  For ease of reference, the underwriter will be referred to in this Motion as CGMI, which acquired the assets and liabilities of Salomon Smith Barney in 1998.

and not actual data (which CGMI provided to Plaintiff when it purchased the Second Tier Bonds in 2006). *Id.* ¶¶ 9–12, 19, 116.

Both reports were readily available to the public. The draft and final versions of the Cox Report were regularly reported during 1999 and 2000. For example, in November 1999, the *Las Vegas Sun* reported that "an Illinois firm, Wendell Cox Consultancy, has found that the monorail system's plans are too optimistic and could result in a net loss of $1.5 billion over 30 years." Howard Ex. D. Similarly, a November 28, 1999 article in the *Kingman Daily Miner* reported that the Cox Report "says a 'highly optimistic' projection would be 22,700 riders in 2003 and a net loss of $860 million in 30 years." *See* Howard Ex. E. In February 2000, the *Las Vegas Sun* discussed the Cox Report's view that the ridership estimates were "overly optimistic." *See* Howard Ex. F. Further, in July/August 2000, the *Nevada Journal* published a 12-page article about the Monorail, which devoted a significant portion of its discussion to the findings in the Cox Report. *See* Howard Ex. G at 11–12.

**B.    2000: The Monorail Bonds are Issued**

In September 2000, the State of Nevada issued over $600 million in First, Second and Third Tier bonds (together, the "Monorail Bonds") for purposes of financing the design, construction, and operation of the Monorail. Compl. ¶ 7.

As part of the issuance of the Monorail Bonds in 2000, CGMI

prepared the Official Statement, which included a copy of the URS Greiner Study and provided a detailed discussion of the Second Tier Bonds, including their characteristics, the risks involved in purchasing them, and the fact that they were unrated.  *See*, *e.g.*, Howard Ex. C (OS) at 81.  For example, the Official Statement contained an 11-page section titled "Risk Factors," which explicitly warned, among other things, that "[i]nvestment in the 2nd Tier Bonds involves significant risk."  *Id.* at 32; *see also id.* at 9 (same).  The Official Statement's discussion of the risk factors – which the Official Statement said "does not purport to be either comprehensive or definite" – disclosed, among other things, URS Greiner's assumptions regarding construction of connecting facilities for the Monorail, the fare collection system, and operation and maintenance costs, among other variables.  *See id.* at 32, 34–35.  With respect to those assumptions, the Official Statement further cautioned that a failure of one or more of those assumptions "could have a material and adverse affect" on:  (i) "the operation of the Monorail"; (ii) "the level of Project Revenues generated by the Monorail"; (iii) "the payment by the Company of Senior Loan Repayments under the Financing Agreement"; or (iv) "insufficient Net Project Revenues to pay Senior Loan Payments under the Financing Agreement."  *Id.* at 34–35.

Further, the section on risk factors in the Official Statement contained a detailed discussion of the ridership projections that were used in the URS Greiner

Study.  *See* Howard Ex. C (OS) at 37–39.  For instance, it stated:

- "The ridership projections contained in the URS Greiner Report, while presented with numerical specificity, are based upon a number of **estimates and assumptions** which, though considered reasonable by the Company and URS Greiner, are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Company."  Howard Ex. C (OS) at 37 (emphasis added).

- "**[T]he ridership projections of URS Greiner for the Monorail are significantly higher than many newer urban mass transit or internal circulation systems** in the United States or elsewhere."  *Id.* (emphasis added).

- "Other than ridership on the Existing Monorail for which no fare is charged, there is **no historical basis** on which to base the projections set forth in the URS Greiner Report."  *Id.* (emphasis added).

- "The projections set forth in the URS Greiner Report are forward-looking statements, as such term is defined in the Securities Act of 1933, as amended, and reflect certain significant assumptions concerning future events and circumstances."  *Id.*

- "If one or more of these URS Greiner assumptions proves incorrect, the levels of Project Revenues generated by the Monorail and the payment by the Company of Senior Loan Repayments could be materially adversely affected."  *Id.* at 38.

- "**Actual operating results** achieved during the projection period **may vary** from those presented in the forecast, and such variations may be material."  *Id.* (emphasis added).

- "[N]o assurances are given and no representations are made that any of the assumptions are correct, that the projections will be achieved or that the beliefs and the forward-looking statements expressed herein (or included in the URS Greiner Report) will correspond to actual results."  *Id.*

Similarly, the Official Statement contained detailed information regarding the projected advertising revenue.  It explicitly provided:

- "The projected advertising revenues contained in the Report of the Advertising Consultant are significantly higher than any comparable public transportation system in the United States or elsewhere."  Howard Ex. C (OS) at 40.

- "The Company has determined as a business matter that advertising revenues can be maximized by not entering into a long-term advertising contract at this time.  As a result, there can be no assurance that projected advertising revenues can be realized."  *Id.*

- "Furthermore, the projections contained in the Advertising Reports are based upon a number of assumptions.  If one or more of such assumptions prove incorrect, actual advertising revenues may be lower than the projections contained in the Advertising Reports.  Inability to achieve projected advertising revenues could have a material and adverse effect on the level of Project Revenues and the payment by the Company of Senior Loan Repayments under the Financing Agreement."  *Id.*

- "Since projected advertising revenues are directly related to projected ridership, if ridership on the Monorail is lower than projected, advertising revenues could be materially adversely affected."  *Id.*; *see also id.* at 75 ("Actual advertising revenues generated by the Monorail may vary from the projections contained in the Advertising Reports and such variation may be material.").

### C.    2004 Construction Delays, 2005 Opening, and Poor Performance

When LVMC issued the Monorail Bonds, it was expected that the Monorail would take over three years to build and would begin operations in January 2004.  Compl. ¶¶ 15, 98.  Instead, LVMC encountered construction delays and did not begin Monorail operations until mid-2004.  *Id.* ¶¶ 16, 98–99.  Due to operational problems, which were fully disclosed in the 2005 Audited Financials, the Monorail was shut down for much of the remainder of 2004.  *Id.*; *see* Howard Ex. A (2005 Audited Financials) at 2 ("The first revenue riders were carried in July

of 2004.   However, there were difficulties sustaining the operations of the Monorail and accordingly the operations were halted for a period of time to make modifications and adjustments to the Monorail vehicles.   Revenue operations resumed December 29, 2004.").   Accordingly, 2005 was the first full year of operations for the Monorail.  Compl. ¶ 100.

The Monorail's first full year of operations went poorly:  ridership was lower than hoped and advertising revenue anemic.  Compl. ¶ 102.  In March 2006, LVMC issued the 2005 Audited Financials for the Monorail project. Howard Ex. A (2005 Audited Financials) at 1.   The 2005 Audited Financials revealed that the Monorail's revenue from riders and its revenue from advertising were far below the projections from the URS Greiner Study.  Compl. ¶ 102.  The 2005 Audited Financials disclosed that:

- during 2005, the Monorail carried 10,264,000 riders – about 9.2 million fewer riders than projected in the URS Greiner Study in 2000 (Compl. ¶ 102; Howard Ex. A at 3);

- the Monorail generated approximately $30,303,000 in fare revenue in 2005, which was approximately $18.5 million less than projected in the URS Greiner Study (Compl. ¶ 102; Howard Ex. A at 7); and,

- advertising revenue for the Monorail for 2005 was approximately $5.8 million less than had been predicted five years earlier in the URS Greiner Study.  Compl. ¶ 102; Howard Ex. A at 7.

**D.    Lord Abbett Reviews the Monorail's Dismal Performance and Decides to Purchase the Second Tier Bonds Over Its Own Analyst's Objections**

In September and October 2006, Lord Abbett purchased $13 million of the Second Tier Bonds in four transactions.  Compl. ¶¶ 3–4.  According to the Complaint, prior to purchasing the Second Tier Bonds, Lord Abbett reviewed a number of pieces of information.

First, CGMI provided Lord Abbett with the 2000 Official Statement which attached the URS Greiner Study.  Compl. ¶ 116.  This Official Statement contained the same warnings that it had contained for six years and, as detailed above, expressly explained that the Second Tier Bonds were risky, high-yield,[5] non-rated, "junk" bonds.  *See* cover page of Howard Exhibit C (OS) ("AN INVESTMENT IN THE 2ND TIER BONDS INVOLVED SIGNIFICANT RISKS."); *id.* at 9 (same); *id.* at 81 ("No application to any rating agency has been made or is intended to be made for the assignment of a rating to the 2nd Tier Bonds.").

Second, as discussed above, CGMI provided Plaintiff with LVMC's 2005 Audited Financials.  Compl. ¶ 116.  Although the Complaint alleges that the 2005 Audited Financials disclosed that the Monorail's revenue from riders and its

---

[5] Plaintiff provides the following definition of "High-yield Bonds":  "According to Fitch, high-yield bonds are rated 'BB' or lower because of high default risk.  They often pay a higher yield to compensate for greater risk.  These bonds are also known as 'junk bonds' or 'speculative bonds.'"  Howard Ex. H.

revenue from advertising were far below the projections from the URS Greiner Study (*id.* ¶ 102), the Complaint omits just how serious the Monorail's financial difficulties disclosed in the 2005 Audited Financials were – *e.g.,* a $16 million operating loss in 2005 (Howard Ex. A at 17), a 2005 "excess of expenses over revenues" – in other words, a total loss – of nearly $45 million (*id.*), and a $90 million deficit (*id.*).

The Complaint also omits that Fitch downgraded the First Tier Bonds in early 2006, and wrote:

> With some ridership growth and periodic fare increases at around inflationary levels, Fitch estimates that fare revenues combined with internal liquidity should be sufficient to meet first-tier bonds debt service obligations for the next five to seven years, while *the second-tier bonds would encounter payment problems in less than two years.*

Howard Ex. B (emphasis added).

Lord Abbett – a sophisticated counterparty which was an expert in trading high-yield bonds – had its own analyst analyze the potential purchase. Compl. ¶ 122. Recognizing that the 2005 financial performance of the Monorail was dismal, the Lord Abbett analyst recommended that Lord Abbett decline to purchase these unrated Second Tier Bonds:

> This was not an easy decision for Lord Abbett given the poor performance of the system in 2005 and a decision was almost made based on the recommendation of the Lord Abbett bond analyst to not purchase any Second Tier Bonds.

*Id.*

### E.   The Downgrade, Default, and Bankruptcy

Less than two weeks after Plaintiff's final purchase, Fitch downgraded the First Tier Bonds (which had been rated) to CCC, "indicating a significant probability of default, but for the bond insurance."  Compl. ¶ 125.  Shortly thereafter, on November 21, 2006, Moody's issued a similar downgrade of its stand-alone credit rating for the First Tier Bonds.  *Id.*[6]

In January 2008, the Second Tier Bonds experienced an event of default, and in July 2009, they had their first payment default.  Compl. ¶¶ 128, 132. Approximately six months later, in January 2010, LVMC filed for Chapter 11 bankruptcy protection.  *Id.* ¶ 134.  More than two years after the Second Tier Bonds defaulted, Lord Abbett filed this suit.

### ARGUMENT

To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8(a) specifically requires that a plaintiff plead claims "showing that the

---

[6] After the rating agency downgrades, the Cox Report again received significant attention in the media.  *See, e.g.*, Howard Exs. I through K.  A simple Google search of the combined terms "'Las Vegas Monorail' financial projection" reveals that two of the first three non-paid advertised matches are links that lead to either the draft or final Cox Report itself.  *See* Howard Decl. ¶ 4; Howard Ex. L.

pleader is entitled to relief." Fed. R. Civ. P. 8(a). Thus, "a court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss," *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007) (citation omitted), and dismissal under Rule 12(b)(6) is warranted where a complaint's factual allegations fail to raise "a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief'" and Plaintiff's claims must therefore be dismissed. *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

From the face of the Complaint (and the documents integral to the Complaint), the claims against CGMI cannot survive this Motion and the Complaint should be dismissed.

## I.    THE FIRST AND THIRD CLAIMS FOR STATUTORY AND COMMON LAW FRAUD SHOULD BE DISMISSED

Claims I and III of the Complaint seek to recover damages from CGMI based on allegations of common law fraud and violation of the New Jersey Uniform Securities Law ("NJUSA"), 49:3-47 *et seq.*, but Plaintiff's allegations fail to plead the necessary elements of common law fraud and violation of the NJUSA. Both of the claims also fail under Rule 9(b) because fraud is not pleaded with the

requisite degree of specificity.[7]   In addition, the claim based on a violation of the

NJUSA is barred by the applicable two-year statute of limitations.

### A.  Plaintiff Fails Adequately To Allege Claims For Common Law Fraud and Violation of New Jersey Securities Law

Plaintiff's general allegations of fraud in this case fail to state the

basic elements the law requires to plead fraud properly.   To state a claim for

common law fraud,[8] a plaintiff must allege "(1) a material misrepresentation of

fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the

other person rely on it; (4) reasonable reliance thereon by the other person; and (5)

resulting damage."  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007);

*see also DeRobbio v. Harvest Cmtys. of Sioux City, Inc.*, Civil Action No. 01-1120

---

[7] Common law fraud and a violation of the NJUSA are similar and, therefore, are analyzed together in this Motion.  The primary difference between the two claims is that a claim of common law fraud requires proof of reasonable reliance, whereas the NJUSA does not contain such a requirement.  *See*, *e.g.*, *Kaufman v. I-State Corp.*, 165 N.J. 94, 112 (2000) ("The USL's drafters *rejected* any 'requirement that the buyer prove reliance on the untrue statement or the omission.  He must show only that *he did not know of it*.") (emphasis in original).  A claim for violation of the NJUSA also requires privity between the parties.  *See id.* at 112–13.

[8] New York law is the more appropriate law to apply because CGMI is alleged to be a New York corporation (Compl. ¶ 1) that made a secondary market in the Monorail Bonds (*id.* ¶ 4).  *See*, *e.g.*, *Goodman*, 2010 U.S. Dist. LEXIS 132593, at *11 ("New Jersey generally applies the Restatement's 'most significant relationship' test to tort claims.").  For the common law fraud claim, however, this is a moot point because there is no actual conflict between New York and New Jersey law.  *See Wiatt v. Winston & Strawn LLP*, Civil Action No. 10-6608 (JLL), 2011 WL 2559567, at *6 (D.N.J. June 27, 2011) (applying New Jersey law to claims including common law fraud "[b]ecause the parties do not dispute that there is no conflict of law between New York and New Jersey").

(MLC), 2002 U.S. Dist. LEXIS 26706, at *18 (D.N.J. Oct. 30, 2002) (same). Similarly, a claim for a violation of the NJUSA is essentially the same as a Section 10(b) claim and requires a plaintiff to plead "(1) an untrue material statement or omission; (2) scienter; (3) causation; and (4) injury to a plaintiff." *DeRobbio*, 2002 U.S. Dist. LEXIS 26706, at *20. A failure to plead even one of the elements of the common law fraud claim or violation of the NJUSA is fatal to that claim.

In this case, Plaintiff fails to adequately allege the core elements of both fraud claims at all, and certainly not with the particularity required by the "stringent pleading requirements" of Fed. R. Civ. P. 9(b). *Frederico*, 507 F.3d at 200. Under Federal Rule of Civil Procedure 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," although "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (dismissing common law fraud complaint where plaintiff's complaint failed to "meet the stringent pleading requirements of Rule 9(b)"); *see also Fuscellaro v. Combined Ins. Group*, Civil Action No. 11-723, 2011 U.S. Dist. LEXIS 111470, at *11 (D.N.J. Sept. 29, 2011) ("A plaintiff [alleging fraud] must also allege who made a representation to whom and the

general content of the misrepresentation."). This, Lord Abbett has failed to do. Accordingly, both fraud claims should be dismissed.

1.  The Complaint Fails Adequately to Allege The Existence of a Material Untrue Statement or Omission

Plaintiff's fraud claims — which are based on the allegations that, in 2006, CGMI failed to disclose the 2000 Cox Report to Plaintiff prior to Plaintiff's purchase of the Second Tier Bonds (Compl. ¶ 23) and that this alleged failure to disclose is "material" (*id.* ¶¶ 115, 138) — fail. The stale Cox Report was not material and, moreover, CGMI owed Lord Abbett no duty to disclose it even if it had been material.

a.   *The Outdated Cox Report Was Not Material*

A misrepresentation or omission is not actionable as fraud under New Jersey law unless such misrepresentation or omission is "material." *See Hosiery Corp. of Am., Inc. v. Int'l Data Processing, Inc.*, Civ. A. No. 89-115, 1991 WL 30015, at \*7 (D.N.J. Feb. 28, 1991) ("To be the basis for a fraud claim, a misrepresentation must not only concern a presently existing or past fact; the misrepresentation must be material."); *see also DeRobbio*, 2002 U.S. Dist. LEXIS 26706, at \*20 (element of NJUSA claim is "an untrue material statement or omission"). "Generally, undisclosed information is considered material if 'there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having '*significantly altered* the *'total mix' of information'*

available to that investor.'"  *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (emphasis added).  Moreover, an omission is not material where the information allegedly omitted was already available in the marketplace.  *See In re Discovery Labs Sec. Litig.*, Case No. 06-1820, 2006 U.S. Dist. LEXIS 79823, at *32 (E.D. Pa. Nov. 1, 2006) (holding that omissions were not material where "the information was already available in the marketplace").

In this case, the allegation that CGMI failed to disclose the Cox Report prior to Lord Abbett's purchase of the Second Tier Bonds cannot constitute a material omission or misrepresentation in light of the "total mix" of information available to Plaintiff.  *Oran*, 226 F.3d at 282.  Specifically, as discussed above, CGMI provided Plaintiff with LVMC's 2005 Audited Financials, which revealed all of the Monorail's financial issues.  *See supra* pp. 2, 8–9.  Thus, as a matter of law, the projections contained in the publicly-available six-year-old Cox Report were not material.

In *Mill Bridge V, Inc. v. Benton*, Civ. No. 08-2806, 2009 U.S. Dist. LEXIS 113566, at *61 (E.D. Pa. Dec. 3, 2009), another District Court in the Third Circuit faced a set of facts similar to those set forth in the Complaint and reached the conclusion that a *two-year-old* valuation was not "even remotely" material.  In *Mill Bridge*, the plaintiff alleged that the defendants violated federal securities laws in connection with their purchase of 600 shares of stock in the Philadelphia Stock

Exchange ("PHLX") from the plaintiff in December 2004 (after the PHLX was demutalized on January 21, 2004), in part because the defendants did not disclose to the plaintiff an October 2002 valuation (the "Kwok Li valuation") that valued PHLX between $250 and $350 million (prior to the demutalization of the PHLX). *Id.* at *2, 4. The *Mill Bridge* court rejected the plaintiff's assertion that the failure to provide the Kwok Li valuation could possibly form the basis for the plaintiff's fraud claim. *Id.* at *61. The court explained:

> As noted above, however, the Kwok Li valuation was performed in October of 2002, more than two years prior to the trade at issue, and well before [one of the defendants] joined the Board [of the PHLX]. Plaintiff fails to allege how such a valuation, *particularly in the face of subsequent events including demutualization, could even remotely be material two years later.*

*Id.* (emphasis added). Likewise, Plaintiff in this case fails to sufficiently plead that the alleged omission of the Cox Report – which was drafted six years prior to Plaintiff's purchase of the bonds and long before the Monorail began operating and actual financial data was available – could be material to its junk bond acquisition in 2006, particularly given the actual 2005 financial information CGMI provided. *See In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954, 1995 WL 590624, at *5 (S.D.N.Y. Oct. 4, 1995) ("Stale information is not material as a matter of law") (citing *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 210 (D. Mass. 1994)); *see also Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1240 (2d Cir. 1991) (holding that "stale" financial projections in February 1982

report would not have been material for purposes of June 1983 balance sheet*); see also Rand*, 847 F. Supp. at 210 (holding as a matter of law that statements made in August and September 1985 regarding company's pipeline of prospective business were not material seven months later when plaintiff invested in the company, especially where information was publicly available regarding the outcome of such sales prospects prior to the time plaintiff invested).

Additionally, the alleged omission of the Cox Report was not material as a matter of law because both the existence and content of the Cox Report were available and widely reported in the public marketplace. *See In re Discovery Labs Sec. Lit.*, 2006 U.S. Dist. LEXIS 79823, at *32 (holding that omissions were not material where "the information was already available in the marketplace"); *see supra* pp. 5, 12 n. 6 (citing news articles from 1999 and 2000 discussing the Cox Report and recent Google searches showing widespread availability of the Cox Report). Moreover, the Official Statement acknowledged the existence of reports other than the URS Greiner Study. Specifically, the Official Statement provided:

> In the course of preparing its study, URS Greiner was provided with copies of reports prepared by consultants retained by various parties that oppose construction of the Monorail. At a hearing held on June 8, 2000 before the Issuer, the Monorail sponsor and various supporters and opponents made formal presentations and submitted additional written information.

Howard Ex. C at 69. Plaintiff never alleges that it requested any of the original reports referenced in the Official Statement, so it has no basis to complain that it

was not provided with such publicly-available information. *See*, *e.g.*, *DeBenedictis,* 492 F.3d at 216 ("For purposes of [a determination regarding inquiry notice], 'investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments.'").  Because Plaintiff has not sufficiently alleged a material omission, the Complaint should be dismissed.

### b.    CGMI Had No Duty to Disclose the Cox Report

Where, as here, a claim of fraud is based on an alleged omission, there can be no liability for fraud unless the defendant had a duty to disclose the allegedly omitted information.  *See Premier Pork L.L.C. v. Westin, Inc.*, Civil Action No. 07-1661, 2008 WL 724352, at *12 (D.N.J. Mar. 17, 2008) (holding that plaintiff did not sufficiently allege elements of common law fraud claim, in part because it did not sufficiently allege that any defendant owed it a duty to disclose the information at issue); *see also Ross v. Celtron Int'l, Inc*., 494 F. Supp. 2d 288, 299 (D.N.J. 2007) (explaining, in context of federal securities claim, that "[o]missions, however, can give rise to liability only where the defendant had an affirmative duty to disclose the information in question").  "[W]here a claim for fraud is based on silence or concealment, 'New Jersey courts will not imply a duty to disclose . . . .'"  *Salovaara v. Jackson Nat'l Life Ins. Co.*, 66 F. Supp. 2d 593, 602 (D.N.J. 1999).  For two independent reasons, CGMI did not have a duty to

disclose the Cox Report, even if that report had been material (which it was not).

First, only three categories of relationships give rise to a duty to disclose, none of which is alleged to exist here.[9]  CGMI and Lord Abbett were counterparties to this trade.  *See*, *e.g.*, Compl. ¶ 112.  CGMI's arms-length relationship with Plaintiff did not confer on CGMI a duty to disclose publicly-available reports, and the relationship between the parties does not fall within any of the three recognized categories of relationships that may give rise to such a duty.  Accordingly, because "[t]he sale was an arms length transaction between parties experienced in the volatile debt securities market," *Salovaara,* 66 F. Supp. 2d at 602, CGMI did not have a duty to disclose the Cox Report and, therefore, it cannot be liable for any such omission.[10]

---

[9] The three categories giving rise to a duty to disclose are:  "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties."  *Salovaara*, 66 F. Supp. 2d at 602; *see also N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Super. 1998) ("[A] party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'").

[10] In fact, because this was a secondary market private transaction, CGMI did not even have a duty to disclose or provide the Official Statement (which was outdated in its own right).  *See Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 597 (E.D. Pa. 2009) ("[T]here is no 'obligation' to distribute a document that describes a public offering to a private purchaser.") (citation omitted); *see also Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) ("[S]ection

Second, the Cox Report was publicly known and publicly available. *See supra* pp. 5, 12 n. 6 (citing news articles discussing the Cox Report and results of Google searches concerning the same). Therefore, CGMI had no obligation to make an independent disclosure because a party to a transaction has no duty to disclose information that is equally available to both parties. *See N.J. Econ. Dev. Auth.*, 725 A.2d at 1139 ("Further, where information is equally available to both parties, neither party has a duty to disclose that information to the other.").

2.    The Complaint Fails Adequately to Allege Scienter

Both of Plaintiff's fraud claims require Plaintiff to demonstrate that CGMI acted with scienter, *i.e.*, that CGMI had "(1) knowledge of the falsity of the representation; and (2) 'an intention to obtain an undue advantage therefrom,'" *Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 345 (D.N.J. 1999); *see also id*. (claim for common law fraud requires proof of scienter); *DeRobbio*, 2002 U.S. Dist. LEXIS 26706, at *20 (claim under NJUSA requires plaintiff to plead scienter); but, Plaintiff's Complaint does not adequately plead either element of scienter. Rather, it consists of nothing but conclusory allegations.

For example, Plaintiff does not allege any specific facts suggesting that CGMI knowingly and intentionally made a decision to "conceal" the existence

---

12(a)(2) liability cannot attach unless there is an 'obligation to distribute a prospectus,' and there is no 'obligation' to distribute a document that describes a public offering to a private purchaser.") (citation omitted).

of the Cox Report six years after it was first published.  There are no allegations regarding the individual at CGMI who allegedly made the decision not to provide the Cox Report to Lord Abbett, when that decision was made, or why the decision was made.  Indeed, there is not even a specific allegation in the Complaint that anyone at CGMI considered whether to provide the Cox Report to Plaintiff and then decided against doing so.  Thus, even if Citigroup were required to provide Plaintiff with the Cox Report (which it was not, for the reasons discussed above), there is no allegation of "an actual intention to deceive. . . ."  *Shogen v. Global Aggressive Growth Fund*, Civ. Action No. 04-5695 (SRC), 2007 U.S. Dist. LEXIS 31093, at *40–41 (D.N.J. Apr. 26, 2007) (explaining that to prevail on a claim for common law fraud, a plaintiff "must be able to show an actual intention to deceive on the part of the Defendants, rather than mere recklessness.").

Contrary to Rule 9, Plaintiff's scienter allegations consist of mere conclusory assertions that "Citigroup knowingly and intentionally provided Lord Abbett with [information including the URS Greiner Study], but concealed both the existence and content of the Cox Report from Lord Abbett" and that "Citigroup made the decision to not disclose either the existence or the content of the Cox Report to Lord Abbett."[11]  Compl. ¶¶ 23, 119.  These bare allegations do not

---

[11] At best, Plaintiff asserts that CGMI attempted to establish a high secondary market trading price for the Second Tier Bonds because CGMI allegedly "wanted to facilitate financing for the proposed extension, wanted to be selected as an

satisfy the stringent pleading requirements of Fed. R. Civ. P. 9(b).

### 3.   The Complaint Fails Adequately to Allege Loss Causation

To state a claim for violation of the NJUSA and common law fraud, a plaintiff must demonstrate that the alleged harm was caused by the alleged wrongdoing.  *See*, *e.g.*, *DeRobbio*, 2002 U.S. Dist. LEXIS 26706 at *18, 20 (element of NJUSA claim is causation and element of common law fraud claim is "resulting damage").  Importantly, it is not enough to just allege "transaction causation" ("i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security").  *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007).  Rather, a plaintiff must also plead loss causation, meaning that "the fraudulent misrepresentation or omission actually caused the economic loss suffered."  *Id.*

While the concepts of "transaction causation" and "loss causation"

---

underwriter for any issuance of new bonds and wanted to be paid what would be a very substantial underwriting fee."  Compl. ¶ 111.  This bare allegation, however, is insufficient to satisfy the stringent pleading requirements for scienter.  *See, e.g., Dow Corning Corp. v. BB & T Corp.*, Civil Case No. 09-5637 (FSH)(PS), 2010 WL 4860354, at *9 (D.N.J. Nov. 23, 2010) (explaining, in context of claim alleging violation of Section 10(b) of the Exchange Act, that plaintiff's allegation "that defendants' actions were undertaken because they wish to earn commissions and fees . . . and to maintain favorable business relationships with various market players . . . ." was "insufficient, without more, to give rise to a strong inference of scienter" because those "motives are common to all for-profit enterprises"); *see also DeRobbio,* 2002 U.S. Dist. LEXIS 26706 at *20 (explaining that "the basic elements of a cause of action under the NJUSA are substantially the same as those of Section 10(b) of the Exchange Act.").

often arise in 10b-5 cases, they apply equally to claims for common law fraud and violation of the NJUSA.  *See*, *e.g.*, *id.* at 439 ("The § 10(b) loss causation standard we have reiterated here is similar to the 'substantial contributing factor' test of proximate causation under New Jersey law.  Accordingly, for the same reasons that the [] Plaintiffs failed to create a genuine issue as to loss causation (as required for their § 10(b) claim), they also failed to create a genuine issue as to proximate causation (as required for their common law fraud and negligent misrepresentation claims).") (citation omitted); *see also DeRobbio*, 2002 U.S. Dist. LEXIS 26706, at *20 ("Plaintiffs have failed to allege material statements, causation, and scienter to satisfy a cause of action under Rule 10b-5.  Therefore, they have failed for the same reasons to support a claim under [New Jersey's Uniform Securities Act], as well.").

Here, the Complaint fails to plead loss causation, as it is devoid of any suggestion that the alleged untimely disclosure of the Cox Report somehow caused the decline in value of the Second Tier Bonds.  Instead, Plaintiff merely alleges that, "[h]ad Lord Abbett been told about the Cox Report or the factual basis for the conclusions in the Cox Report it would not have purchased the Bonds."  Compl. ¶ 24.  At most, this allegation pleads "transaction causation," not the requisite "loss causation."  Thus, Plaintiff's fraud claims must be dismissed.

4.     The Complaint Fails Adequately to Allege Reasonable
       or Justifiable Reliance by Plaintiff

To state a claim for common law fraud, a plaintiff also must demonstrate that it reasonably relied on the alleged misrepresentation or omission. *Frederico*, 507 F.3d at 200 ("To state a claim for fraud under New Jersey law, a plaintiff must allege . . . (4) reasonable reliance thereon by the other person"); *see also Columbia Sav. and Loan Ass'n v. Forum Ins. Co.*, Civ. A. No. 89-700, 1990 WL 235660, at *5 (D.N.J. Dec. 26, 1990) (holding that cross-claimant "cannot demonstrate reasonable reliance on [cross-defendant's] investigation, an essential element of a misrepresentation claim"). As a matter of law, Plaintiff is unable to demonstrate reasonable reliance on the alleged omission, and thus its common law fraud claim should be dismissed.[12]

First, the courts have held that a party cannot demonstrate reasonable reliance where that party undertook its own investigation into the facts at issue. For example, in *Columbia Savings & Loan Ass'n v. Forum Ins. Co.*, after the cross-claimant provided surety bonds to the cross-defendant, which bonds insured the cross-defendant against any losses that it might face as a result of providing financing to certain limited partnerships, the cross-claimant alleged that the cross-

---

[12] CGMI's argument on this point is limited to Plaintiff's common law fraud claim because the NJUSA does not include reasonable reliance as an element. *See*, *e.g.*, *Kaufman*, 165 N.J. at 112 ("The USL's drafters *rejected* any 'requirement that the buyer prove reliance on the untrue statement or the omission. He must show only that *he did not know of it*.") (emphasis in original).

defendant had committed fraud by failing to disclose its underwriting practices to the cross-claimant.  *Id.* at *4.  In rejecting the cross-claimant's fraud claim, the court considered that the cross-claimant had "performed its own detailed underwriting of the limited partnership ventures" and never inquired into the cross-defendant's underwriting.  *Id.* at *5.  The court explained:  "[Cross-claimant's] alleged reliance on [cross-defendant's] investigation would be unreasonable under these circumstances.  When a party investigates a state of facts for himself, 'he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he should have discovered by a reasonable investigation.'"  *Id.* at *5; *see also In re House of Drugs, Inc.*, 251 B.R. 206, 211 (Bankr. D.N.J. 2000) ("A party that elects to make an independent investigation, however, will be accountable for everything such party could have discerned by employing reasonable diligence.").

From the face of the Complaint, it is clear that Plaintiff conducted its own due diligence, including a review of accurate and actual financial results for the LVMC for 2005.  Compl. ¶ 116.  This review – by a Lord Abbett analyst – resulted in a recommendation by Plaintiff's own analyst that the bonds *not* be purchased.  *Id.* ¶ 122.  Lord Abbett ignored the advice of its own analyst and that analyst's diligence when it decided to purchase the bonds.  *Id.*  Accordingly, as a matter of law, the Complaint fails to allege the requisite reliance.  *See, e.g.,*

*Columbia Sav. & Loan Ass'n v. Forum Ins. Co*., 1990 WL 235660, at *5 (holding that cross-claimant "cannot demonstrate reasonable reliance on [cross-defendant's] investigation, an essential element of a misrepresentation claim," where cross-claimant performed its own due diligence).

Second, any argument that Lord Abbett reasonably relied on CGMI to provide it with a six-year-old report containing projections fails because CGMI provided Lord Abbett with accurate, current audited financial statements.  Compl. ¶¶ 19, 116.  There is no basis for Plaintiff to now feign the need to rely upon outdated projections.  *See In re Kantor*, Nos. 84-30402, 84-7116, 1986 WL 28904, at *6 (Bankr. S.D.N.Y. Oct. 1, 1986) (analyzing whether Bank's reliance on financial information was reasonable in context of determining whether claim against debtor was nondischargeable, and explaining that Bank's failure to obtain updated financial statements "would render unreasonable the Bank's reliance on the outdated financial statements it held [from two years prior] at the time the loan was approved").

In addition, the extensive disclosures in the Official Statement further negate any claim by Plaintiff of reasonable reliance.  *See Greenberg v. Pro Shares Trust*, 2011 N.J. Super. Unpub. LEXIS 1789, at *19–20 (N.J. Super. July 7, 2011) (affirming lower court decision finding absence of reasonable reliance in light of available prospectus and information contained therein).  Indeed, as discussed

above, the Official Statement detailed the risks related to the purchase of the Second Tier Bonds, including the assumptions on which the projections in the URS Greiner Study were based (*see supra* pp. 6–8) and expressly stated that "[i]nvestment in the 2nd Tier Bonds involves significant risk" and "any prospective purchaser of the 2nd Tier Bonds should undertake an independent investigation through its own advisors regarding the desirability and practicability of the investment in the 2nd Tier Bonds."  Howard Ex. C (OS) at 32, 81.  Accordingly, viewed from any perspective, as a matter of law the Complaint fails to plead the requisite reliance.

### B.    The Statute of Limitations Bars The New Jersey Securities Law Claim

Plaintiff's New Jersey Securities Law claim is untimely and should be dismissed because it was filed more than two years after Plaintiff's purchase of the Second Tier Bonds in 2006.  Under the NJUSA, "[n]o person may bring an action under [the NJUSA] more than two years after the contract of sale or the rendering of the investment advice, or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later."  N.J.S.A. 49:3-71(g).  In other words, a plaintiff alleging a violation of the NJUSA must file the complaint within two years of either the contract of sale or having received inquiry notice of the claim.  *See Bramblewood Investors, Ltd. v. C&G Assoc.*, 262 N.J. Super. 96, 101–02 (N.J. Super. Ct. Law

Div. 1992) (dismissing counterclaim under NJUSA where the "defendants knew or should have known of the existence of a cause of action, if any" more than two years prior to the filing of the complaint).

Moreover, "[u]nder the inquiry notice standard, the limitations period commence[s] when the plaintiff[], in the exercise of reasonable diligence, should have discovered the basis for [its] claim." *Benak v. Alliance Capital Mgmt L.P.*, 349 F. Supp. 2d 882, 887 (D.N.J. 2004).[13]   "The test is an objective one and focuses on whether a 'reasonable investor of ordinary intelligence' would have discovered the questionable conduct and identified it as a storm warning.'" *Id.* "Plaintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period; instead, the period begins to run from the 'time at which plaintiff[s] should have discovered the general fraudulent scheme.'" *Id.* (citations omitted).   Importantly, "[w]hen the limitations period is triggered by sufficient storm warnings, plaintiffs are charged with constructive knowledge of all information discoverable through diligent research during that period." *Id.*

Here, Plaintiff was on inquiry notice at the time it acquired the Second Tier Bonds and at least as of November 2006.  First, the 2005 Audited Financials –

---

[13] Although *Benak* involved a claim under the federal securities laws, the same standard for inquiry notice applies to the NJUSA claim.  *See Roll v. Singh*, Civil Action No. 07-cv-04136, 2008 WL 3413863, at *16–17 (D.N.J. June 26, 2008) (dismissing New Jersey securities law claim as time-barred where plaintiff was on inquiry notice more than two years before the complaint was filed).

including the Monorail's nearly $45 million loss in 2005 – should have alerted Plaintiff to the Monorail's dire financial straits even before Plaintiff's purchases. Compl. ¶¶ 19, 116. Second, less than two weeks after Plaintiff's final purchase of the Second Tier Bonds (in October 2006), "Fitch announced its downgrade of the stand-alone credit rating for the First-Tier Bonds to CCC indicating a significant probability of default, but for the bond insurance." *Id.* ¶ 125. Shortly thereafter, on November 21, 2006, Moody's issued a similar downgrade for the First Tier Bonds. *Id.*

Later events further placed Plaintiff on inquiry notice of the facts forming the basis of the Complaint. For instance, the Cox Report was widely reported again in 2007, when numerous news articles cited to its earlier projections. *See supra* p. 12 n. 6 (citing news articles that discussed the Cox Report in 2007). And, the Second Tier Bond events of default in 2008 and 2009 also placed Plaintiff on inquiry notice of the facts giving rise to the Complaint. Compl. ¶¶ 128, 132. *See DeBenedictis*, 492 F.3d at 217–18 (affirming dismissal of case as time-barred where publicly available information, including information in news articles, constituted sufficient "storm warnings" to trigger inquiry notice); *Benak*, 349 F. Supp. 2d at 889–90 (dismissing claim as time-barred where publicly available information put plaintiff on constructive notice of its claims).

In short, Plaintiff was on inquiry notice of the facts forming the basis

of its Complaint before it ever purchased the Second Tier Bonds and then a few weeks later when the rating agencies downgraded the credit rating of the First Tier Bonds.   Subsequent events, including the newspaper articles in 2007 and the defaults in 2008 and 2009, leave no doubt that a "reasonable investor of ordinary intelligence" would have "identified [these events] as a storm warning'" prior to September 2009.  *See DeBenedictis*, 492 F.3d at 217–18 ("A plaintiff in a securities fraud action is put on inquiry notice when a ''reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.''"); *Benak*, 349 F. Supp. 2d at 887.  Accordingly, Plaintiff's claim for violation of the NJUSA is barred by the statute of limitations.

## II.   THE SECOND CLAIM FOR NEGLIGENT MISREPRESENTATION SHOULD BE DISMISSED

Plaintiff's second claim, for negligent misrepresentation, should be dismissed for many of the same reasons as its other claims:  the Complaint fails to adequately allege the existence of a material untrue statement or omission because CGMI had no duty to disclose the publicly-available and outdated Cox Report, and any alleged omission was not material in light of the other information CGMI provided to Plaintiff.   Additionally, the Complaint fails to adequately allege reasonable or justifiable reliance and loss causation.  Any one of these failings dooms the Complaint, regardless of whether New York or New Jersey law applies. *See McKowan Lowe & Co. v. Jasmine, Ltd.*, No. Civ. 94-5522 (RBK), Civ. 96-

2318 (RBK), 2005 WL 3500032, at *5 (D.N.J. Dec. 20, 2005) ("Plaintiffs concede that claims for 'negligent misrepresentation under New Jersey common law require substantially the same showing of causation as required for a § 10(b) claim . . ."); *Karu v. Feldman*, 119 N.J. 135, 147 (1990) (explaining that a claim for negligent misrepresentation requires "[t]he aggrieved party [to] be a reasonably foreseeable recipient of the company's statements for its proper business purpose, who relies on the statements, and the statements must be a proximate cause of the plaintiff's damages."); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 232 (S.D.N.Y. 2007) (dismissing negligent misrepresentation claim in part because plaintiff "failed to raise a triable issue of fact as to the reasonableness of its reliance on an alleged false representation made by any of Defendants"); *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *7 (S.D.N.Y. May 22, 1996) ("In order to state a claim for fraud or negligent misrepresentation, plaintiff must allege, *inter alia*, the misrepresentation *of a material fact*.") (emphasis in original); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 380 (S.D.N.Y. 2005) (dismissing negligent misrepresentation claim where plaintiff failed to "allege facts giving rise to a duty to disclose").  Moreover, under either New York or New Jersey law, because Plaintiff is a sophisticated counterparty and CGMI owed Plaintiff no special duty, the Complaint on its face fails to allege a negligent misrepresentation claim.

Under New York law, Plaintiff fails to plead a claim for negligent misrepresentation because Plaintiff fails to sufficiently allege the existence of a "special relationship" between Lord Abbett and CGMI, as New York law requires.[14]   *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 400 (S.D.N.Y. 2004) (explaining that liability is imposed "'only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified'").   Indeed, there is no allegation of CGMI's "unique" or "specialized expertise" at the time of the transaction as compared to Lord Abbett, a high-yield bond fund specializing in these types of bonds.  Nor does the Complaint allege, for it cannot, that there was any "special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."  *JP Morgan*, 350 F. Supp. 2d at 400.  Without any allegation of the requisite "special relationship," Plaintiff's negligent

---

[14] A claim for negligent misrepresentation under New Jersey law is similar to one under New York law, but New Jersey does not require a plaintiff to plead the existence of a "special relationship" between the plaintiff and defendant.  *See Goodman*, 2010 U.S. Dist. LEXIS 132593, at *18–19.  Accordingly, the court in *Goodman* stated that there is an actual conflict between New York and New Jersey law and the Court must look to the Restatement of Conflict's "most significant relationship test."  *Id.*   Section 148 of the Restatement (Second) of Conflicts applies to claims for negligent misrepresentation.  Pursuant to § 148, New York law should govern Plaintiff's claim for negligent misrepresentation because CGMI is based in New York, and the Complaint alleges that CGMI was creating a secondary market for the Second Tier Bonds in New York.  Compl. ¶¶ 1, 4.

misrepresentation claim fails.

Although New York law applies, the Complaint would also fail to state a negligent misrepresentation claim under New Jersey law because Plaintiff is a sophisticated counterparty in an arms-length transaction. *See Diebold, Inc. v. Continental Casualty Co.*, Civ. Action No. 07-1991 (JEI), 2008 U.S. Dist. LEXIS 29308, at *25 (D.N.J. Apr. 10, 2008) (dismissing negligent misrepresentation claim where the parties, "both of which ha[ve] substantial bargaining power, had a direct contractual relationship with one another. [Plaintiff] is not a non-contracting third party, as generally contemplated by the Restatement, who might foreseeably rely on a misrepresentation by [Defendant], yet not be expected to independently evaluate such misrepresentation."); *Commerce Bancorp, Inc. v. BK Int'l Ins. Brokers, Ltd.*, 490 F. Supp. 2d 556, 564 (D.N.J. 2007) ("This case simply is not a negligent misrepresentation case. This dispute involves two parties to a contract, who negotiated at arms-length to achieve the acquisition of a business. [Plaintiff] and [Defendant] had a direct relationship, and no special duty of care existed between them."); *Alexander v. Cigna Corp.*, 991 F. Supp. 427, 440 n. 21 (D.N.J. 1998) ("The parties effectively concede that their respective independent research failed to locate a single New Jersey case in which a cause of action for negligent misrepresentation was successfully asserted between commercial entities who were parties to an arms-length contractual arrangements [sic].").

Finally, the negligent misrepresentation claim is preempted under New York law by the Martin Act, N.Y. Gen. Bus. Law, Art. 23-A, § 352-c *et seq*.[15] The "overwhelming majority" of courts to consider whether the Martin Act preempts common law claims "falling within its purview" have held that such claims are preempted. *In re Beacon Assoc. Litig.*, 745 F. Supp. 2d at 431; *see also In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 372 (S.D.N.Y. 2010) ("Courts routinely dismiss common-law securities claims under the Martin Act based on conduct that is 'within or from' New York sounding in fraud or deception that do not require pleading or proof of intent.").[16]  Moreover, negligent misrepresentation claims fall within the "purview" of the Martin Act when they are "based on deceptive acts committed in connection with the sale of securities within or from New York." *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. at 372–73 (dismissing claim for negligent misrepresentation as

---

[15] The Martin Act gives the New York Attorney General "the exclusive authority to enforce its provisions and grants him investigatory, regulatory, and remedial powers aimed at preventing and prosecuting fraudulent securities practices." *In re Beacon Assoc. Litig.*, 745 F. Supp. 2d 386, 431 (S.D.N.Y. 2010).

[16] Some New York courts have rejected the preemption argument and held that the Martin Act does not preclude certain common law claims, including those for negligent misrepresentation. *See, e.g., Scalp & Blade, Inc. v. Advest, Inc.*, 281 A.D.2d 882, (N.Y. App. Div. 2001); *CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 78 A.D.3d 562, 563–64 (N.Y. App. Div. 2010).  The New York Court of Appeals has accepted an appeal to consider this issue.  *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 80 A.D.3d 293, 915 N.Y.S.2d 7 (N.Y. App. Div. 2010), *leave to appeal* granted, M-6308, slip op. at 1–2 (N.Y. App. Div. 2011).

preempted by the Martin Act); *see also In re Beacon Assoc. Litig.*, 745 F.Supp.2d at 431, 434 (same).

In this case, it is indisputable that Plaintiff's negligent misrepresentation claim alleges "deceptive acts committed in connection with the sale of securities" because Plaintiff is alleging that CGMI did not provide it with information related to the sale of the Second Tier Bonds.  *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. at 373.  Further, the acts forming the basis of the alleged negligent misrepresentation substantially occurred in New York, where CGMI is based.  Accordingly, Plaintiff's claim for negligent misrepresentation is preempted by the Martin Act and should be dismissed.

<u>**CONCLUSION**</u>

In view of the foregoing, CGMI respectfully submits that, pursuant to Rules 12(b)(6), 9(b) and 8(a) of the Federal Rules of Civil Procedure, the Complaint should be dismissed with prejudice.

Dated: Newark, NJ                BRESSLER, AMERY & ROSS, P.C.
　　　　December 12, 2011

By: _____/s/ Edwin A. Zipf_____
　　　　　　　　Edwin A. Zipf

Edwin A. Zipf (EZipf@bressler.com)
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932

Marshall H. Fishman
(Marshall.Fishman@freshfields.com)
Timothy P. Harkness
(Timothy.Harkness@freshfields.com)
Cheryl L. Howard
(Cheryl.Howard@freshfields.com)
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, NY 10022

*Attorneys for Defendant Citigroup Global Markets, Inc.*