**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **LORD ABBETT MUNICIPAL INCOME FUND, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITIGROUP GLOBAL MARKETS, INC.,**<br><br>**Defendant.** | **Civil Action No. 11-5550 (CCC)**<br><br>**OPINION** |

**CECCHI, District Judge.**

This matter comes before the Court on the motion of Defendant Citigroup Global Markets, Inc. ("Citigroup" or "Defendant") to dismiss the Complaint of Plaintiff Lord Abbett Municipal Income Fund, Inc. ( "Plaintiff" or "Lord Abbett") pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. After careful review of the parties' submissions,[1] the Court denies Defendant's motion for the reasons set forth below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The gravamen of Plaintiff Lord Abbett's claims in this case is that Defendant Citigroup omitted material information in connection with Plaintiff's purchase of municipal bonds. The pertinent facts are as follows. In September 2000, the state of Nevada issued over $600 million in three tiers of bonds to finance the design, construction and operation of a monorail system

---

[1] The Court considers any new arguments not presented by the parties in their papers to be waived. See Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise as issue in the district court constitutes a waiver of the argument.").

running behind seven hotels on the east side of the Las Vegas Strip (the "Monorail"). (Compl. ¶ 7). Prior to the issuance of the bonds, the Monorail project was the source of some controversy. (Compl. ¶ 30). The supporters of the Monorail project formed the Last Vegas Monorail Company (the "LVMC"), which became the primary promoter and developer of the Monorail. (Compl. ¶ 8, Def.'s Mov. Br. 4). In that regard, the LVMC commissioned a consultant, URS Greiner Wood Clyde, Inc. to prepare a ridership study (the "URS Greiner Study") to project expected revenues from rider fares and from advertisers for 2004, the first expected year of operations for the Monorail. (Compl. ¶ 11, Def.'s Mov. Br. 4). The URS Greiner Study, dated August 23, 2000, projected that the Monorail could successfully repay its debts based on such revenue. (Compl. ¶ 11). The URS Greiner Study further found that ridership would increase on a yearly basis, including years with projected fare increases. (Compl. ¶ 11).

The opponents of the Monorail, led by the Venetian Casino, Hotel and Resort in Las Vegas, hired their own consultant, Wendell Cox Consultancy, to analyze the revenue projections propounded by the LVMC. (Compl. ¶ 9, Def.'s Mov. Br. 4). On June 6, 2000, Wendell Cox Consultancy issued a ridership report (the "Cox Report") which analyzed the LVMC's ridership and advertising projections.[2] (Compl. ¶ 9, Def.'s Mov. Br. 4). The conclusions set forth in the Cox Report differed from those presented by the URS Greiner Study. (Compl. ¶ 12). The Cox Report projected substantially lower ridership and advertising revenue and predicted that ridership would drop in response to even modest fare increases. (Compl. ¶ 12). Consequently, in contrast to the URS Greiner Study, the Cox Report predicted that the Monorail could not generate sufficient revenue to repay its debts, including the Second Tier Bonds. (Compl. ¶ 12).

---

[2] Although the Cox Report analyzed the LVMC's projections (as opposed to the projections contained in the URS Greiner Study), the parties do not appear to dispute that the LVMC's projections do not differ materially from the projections set forth in the URS Greiner Study.

The Monorail bonds were ultimately issued by the state of Nevada in September 2000, with Defendant Citigroup acting as underwriter. In connection with its underwriting activities, Citigroup prepared an Official Statement[3] prospectus for the issuance of $149 million of Second Tier Bonds (the "Second Tier Bonds"). (Compl. ¶ 8, Pl.'s Opp. Br. 1). Attached to the Official Statement, which included a detailed discussion of the Second Tier Bonds, was the URS Greiner Study. (Compl. ¶¶ 8, 13; Def.'s Mov. Br. 6). The Cox Report was neither attached to, nor discussed in, the Official Statement. (Compl. ¶ 13).

Due to construction delays, the Monorail did not begin operating until mid-2004. (Compl. ¶¶ 16, 98, 99; Def.'s Mov. Br. 8). The Monorail encountered operational problems and was shut down for much of the remainder of that year. (Compl. ¶ 16; Def.'s Mov. Br. 8-9). As a result, 2005 was the first full year of uninterrupted operations of the Monorail. (Compl. ¶ 16; Def.'s Mov. Br. 9). The first year of operation went poorly. The Monorail did not achieve the level of ridership projected in the URS Greiner Study, and advertising revenue was likewise substantially below the LVMC's expectations. (Compl. ¶ 16; Def.'s Mov. Br. 9). In 2005, the Monorail generated only about half of the revenue projected in the Official Statement. (Pl.'s Opp. Br. 2).

Nonetheless, in addition to its underwriting activities at the time of issuance, Citigroup continued to make a secondary market in the bonds. (Compl. ¶ 4). In that regard, in September 2006, Defendant Citigroup approached Plaintiff Lord Abbett regarding its interest in purchasing the Second Tier Bonds. (Compl. ¶ 113 ). Plaintiff, a Maryland corporation that maintains its principal place of business in New Jersey, is a high-yield bond fund that specializes in trading risky bonds. (Compl. ¶ 1, Pl. Opp. Br. 5). Plaintiff ultimately decided to purchase $13 million

[3] The Official Statement was originally prepared by Salomon Smith Barney, which was acquired by Citigroup in 1998. For ease of reference, the Court will refer to Citigroup as the underwriter of the bonds.

of the Second Tier Bonds from Citigroup, and did so through four transactions occurring between September 21, 2006 and October 4, 2006. (Compl. ¶ 123).

In connection with the purchase of the Second Tier Bonds, Citigroup provided Plaintiff with several pieces of information. In addition to the Official Statement (and the attached URS Greiner Study), Citigroup provided Plaintiff with LVMC's 2005 audited financial statements, which demonstrated that the Monorail was experiencing serious financial difficulties, as revenue from ridership and advertising fell far below the predictions in the URS Greiner Study. (Compl. ¶¶ 102, 116; Def.'s Mov. Br. 10). Citigroup also presented Plaintiff with the LVMC's 2006 Budget, which predicted a substantial improvement in performance for the Monorail for 2006. (Compl. ¶ 104). The presentation explained why the Monorail did not achieve projected ridership in its early years and contained updated ridership and revenue projections for 2006. (Compl. ¶ 117). According to Plaintiff, the presentation conveyed the message that an increased marketing budget and joint promotions with hotels would put the Monorail ridership "back on track" for 2006. (Compl. ¶ 117). The 2006 Budget specifically contemplated a significant revenue increase due to a large fare hike of 45 percent and greater advertising revenue. (Compl. ¶¶ 19, 103). The 2006 Budget further projected that the LVMC would have enough revenue available to repay the Monorail's debts on the First and Second Tier Bonds. (Compl. ¶ 104). Lastly, Citigroup informed Plaintiff of the LVMC's proposal to extend the Monorail to McCarren Airport and down the west side of the Las Vegas Strip, which would require the issuance of over a billion dollars in new bonds and could result in the pre-funding (and repayment) of the First and Second Tier Bonds. (Compl. ¶ 19).

It is undisputed that Citigroup did not disclose the existence or content of the Cox Report to Plaintiff. (Compl. ¶ 23). However, according to Plaintiff, at the time it purchased the Second

Tier Bonds in 2006, the predictions contained in the Cox Report had proven accurate. (Compl. ¶ 22). Plaintiff asserts that, had it been told about the Cox Report or the factual basis for the conclusions therein, it would not have purchased the Second Tier Bonds. (Compl. ¶ 24).

From 2006 - 2008, a series of events unfolded which culminated in the default of the Second Tier Bonds. First, less than two weeks after Plaintiff's final purchase of the Second Tier Bonds, Fitch downgraded the credit rating of the First Tier Bonds to CCC, indicating a significant probability of default, but for the bond insurance. (Compl. ¶ 125; Def.'s Mov. Br. 12). Shortly thereafter, on November 21, 2006, Moody's, another major credit rating agency, issued a similar downgrade of its stand-alone credit rating for the First Tier Bonds. (Compl. ¶ 125; Def.'s Mov. Br. 12). The Monorail's ridership further decreased (by 32 percent) after the rate hike in 2006, and both farebox and advertising revenue fell below the projections contained in the 2006 Budget. (Compl. ¶¶ 125, 126). Nonetheless, the Monorail covered its debts during 2006 and 2007. (Compl. ¶ 127). However, in January 2008, the Second Tier Bonds experienced an event of default when the debt service reserve fund was used to make an interest payment, and in July 2009, the first payment default on the Second Tier Bonds occurred. (Compl. ¶¶ 128, 132; Def.'s Mov. Br. 12). According to Plaintiff, it learned of the existence of the Cox Report shortly thereafter, in November 2009. (Compl. ¶ 133). In January 2010, LVMC filed for Chapter 11 bankruptcy protection. (Compl. ¶ 134; Def.'s Mov. Br. 12).

On September 23, 2011, Plaintiff filed a Complaint in this Court against Citigroup, asserting that it has suffered damages as a result of Citigroup's alleged wrongful conduct in failing to disclose the Cox Report in connection with the Second Tier Bonds. Specifically, Plaintiff alleges that Citigroup failed to disclose the Cox Report prior to Plaintiff's purchase of the Second Tier Bonds in 2006 (Compl. ¶ 23) and that knowledge of the Cox Report would have

been material to Plaintiff's purchase. (Compl. ¶¶ 115, 138.) In its Complaint, Plaintiff asserts claims for common law fraud, a violation of the New Jersey Securities Act, and negligent misrepresentation. Defendant Citigroup now moves to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief can be granted. For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Independent of the foregoing standard, the heightened pleading requirements of Rule 9(b) apply to allegations sounding in fraud. Specifically, Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), the circumstances surrounding the alleged fraud must be sufficiently pled so as to put the defendant on notice of the "precise misconduct with which [it is] charged." Lum v. Bank of America, 361 F.3d 217, 223–24 (3d Cir.

2004). A plaintiff can meet this requirement by specifying "the who, what when, where, and how: the first paragraph of any newspaper story." In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quotation omitted). "Although Rule 9(b) falls short of requiring every material detail of the fraud, such as date, location, and time, plaintiffs must use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. (quotation omitted); see also Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007); Lum, 361 F.3d at 223-24. This pleading standard not only gives defendants notice of the claims against them, but also combats "frivolous suits brought solely to extract settlements" from defendants and "provides an increased measure of protection for their reputations." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

## III. DISCUSSION

### A. Common Law Fraud

To state a claim for common law fraud under New Jersey law[4], a plaintiff must allege "(1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." Frederico, 507 F.3d at 200. "The stringent pleading restrictions of Rule 9(b), Fed. R. Civ. P., apply to such a claim." Id.

#### 1. Materiality

Material information is "information that would be important to a reasonable investor in making his or her investment decisions." In re Lucent Tech., Inc. Secs. Litig., 217 F. Supp. 2d

[4] Defendant Citigroup argues that New York law should apply to Plaintiff's common law fraud claim. As the elements of fraud are the same under the law of both states, the Court would reach the same result under New York law. See, e.g., Wiatt v. Winston & Strawn LLP, No. 10-6608, 2011 WL 2559567, at *6 (D.N.J. June 27, 2011) (applying New Jersey law to claims including common law fraud "[b]ecause the parties do not dispute that there is no conflict of law between New York and New Jersey.").

529, 543 (D.N.J. 2002) (quoting In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997)). Generally, undisclosed information is considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available to that investor." Id. (quotation omitted). Importantly, materiality is a mixed question of law and fact. In re Craftmatic Secs. Litig., 890 F.2d 628, 641 (3d Cir. 1990). The Third Circuit has cautioned that "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." Id.; see also TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). Accordingly, "the delicate assessment of inferences is generally best left to the trier of fact." Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000).

*i. Duty to Disclose*

As an initial matter, the Court must address Citigroup's contention that it did not owe Plaintiff a duty to disclose the Cox Report in connection with Plaintiff's purchase of the Second Tier Bonds, even if it was material. Citigroup's argument in this regard is twofold.

The Court first turns to Citigroup's contention that it did not owe Plaintiff a duty to disclose because the Cox Report was publicly available and widely reported, rendering it equally available to both parties. In support of its contention, Citigroup points to newspaper articles referencing the Cox Report, published between 1999 and 2000, in the *Las Vegas Sun*, the *Kingman Daily Miner* and the *Nevada Journal*.[5]

---

[5] Citigroup asserts that the Court may consider the articles because they are "integral to or explicitly relied upon in the complaint." In re Rockefeller Center Props., Inc. Secs. Litig., 184 F.3d 280, 287 (3d Cir. 1999). Plaintiff objects, stating that the articles were not mentioned, much less relied upon, in the Complaint. Because the Court finds that such articles do not render the omission immaterial for pleading purposes, it need not reach whether the articles are integral to the complaint. The Court will not, however, consider the results of a "Google search"

In response, Plaintiff counters that publication in "remote, local newspaper articles" does not render information "reasonably available to investors." (Pl.'s Opp. Br. 29). The Court agrees. "The fact that information may be found publicly if one knows where to look does not make the information 'public' for securities trading purposes unless it is broadly disseminated, or the like." United States v. Royer, 549 F.3d 886, 897 (2d Cir. 2008). The reference to the Cox Report in a handful of articles published between 1999 and 2000 in local or regional news sources in the southwestern United States does not render the Cox Report publicly available or widely reported such that Plaintiff's common law fraud claim should be dismissed. See e.g., Dolphin & Bradbury, Inc. v. S.E.C., 512 F.3d 634, 641 (D.C. Cir. 2008) (finding duty to disclose because information was not reasonably available despite its publication in a local newspaper article); United Paperworkers Int. Union v. Int. Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (stating that the mere presence in the media of sporadic news reports did not give shareholders sufficient notice that proxy statements sent directly to them may be misleading).

Citigroup also argues that its relationship with Lord Abbett, as counterparties in an arms-length transaction, is not the type of relationship that gives rise to a duty to disclose. "[W]here a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993) (quotation omitted); In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 274 (3d Cir. 2004) (stating that, to avoid committing misrepresentation, a defendant must disclose information necessary to make other statements not misleading). Thus, regardless of the parties' relationship, "one who elects to speak must tell the truth when it is apparent that another may reasonably rely

performed by Defendant in 2011, as such information is clearly beyond what is contained or referenced in the Complaint.

on the statements made." Voilas v. Gen. Motors Corp., 170 F.3d 367, 378 (3d Cir. 1999) (quoting Strawn v. Canuso, 271 N.J.Super. 88 (App. Div. 1994)). In addition, the Third Circuit has made clear that under New Jersey law there is a duty to disclose when such disclosure is necessary to make a previous statement true or not misleading. Id. (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993)). Thus, "a partial disclosure may amount to fraud." City of Millville v. Rock, 683 F. Supp. 2d 319 (D.N.J. 2010) (citation omitted).

Citigroup elected to provide Plaintiff with the Official Statement, the Monorail's 2005 audited financials and the 2006 Budget. Thus, unlike the cases cited by Citigroup, this is not a situation in which no disclosures were made. See Premier Pork, LLC v. Westin, Inc., No. 07-1661, 2008 WL 724352 (D.N.J. 2008); Salovaara v. Jackson Nat'l Life Ins. Co., 66 F. Supp. 2d 593 (D.N.J. 1999). Here, Citigroup chose to provide Plaintiff with certain information regarding the Second Tier Bonds, including the 2006 Budget which Plaintiff avers was misleading given the information contained in the withheld Cox Report. In light of those partial disclosures, Plaintiff has sufficiently pled, for purposes of surviving a motion to dismiss, that Citigroup owed a duty to disclose.[6]

*ii. Staleness*

Citigroup asserts that its failure to disclose the Cox Report does not constitute a material omission because it was "stale" inasmuch as it was drafted six years before the Monorail

[6] Plaintiff also points to Municipal Securities Rulemaking Board ("MSRB") Rule G-17 which prohibits deceptive, dishonest or unfair practices, to demonstrate Citigroup's duty to disclose the Cox Report. The MSRB is a regulatory board promulgated by the Exchange Act that creates rules relating to the purchase and sale of municipal securities. See 15 U.S.C. § 78o–4(b)(2). MSRB Rule G-17 requires a broker-dealer of municipal securities to disclose in all markets, including secondary market transactions, "all material facts about the transaction known by the dealer…" MSRB Interpretive Notice (March 20, 2002); see also MSRB Interpretive Notice 2009-42 (July 14, 2009). While the MSRB Rules have not been interpreted to provide a private right of action, see Prager v. FMS Bonds, Inc., No. 09-80775, 2010 WL 2950065, at *7 (S.D.Fl. July 26, 2010), they do evidence Citigroup's *regulatory* duty to disclose.

commenced operations and was superseded by the data provided in the Monorail's 2005 financials. Plaintiff, on the other hand, alleges that "[a]s of 2006, the fact based predictions in the Cox Report leading to Cox's conclusion that the Monorail was doomed would be highly material to a reasonable investor because the Cox Report indicated the ridership base was not sufficient, the price increase would result in a substantial drop in ridership and the increased advertising revenues could not be achieved." (Compl. ¶ 22). Plaintiff asserts that if Citigroup had disclosed the Cox Report in conjunction with the Monorail's 2005 financials and the 2006 Budget, it would have known that the Monorail was not economically feasible and would not have purchased the Second Tier Bonds. (Compl. ¶ 23). As such, Plaintiff contends that the Cox Report was not "stale" and that Citigroup's failure to disclose constitutes a material omission that gives rise to a common law fraud claim.

Accepting the factual allegations of the Complaint as true, the Court finds that Plaintiff has adequately pled that the omission of the Cox Report was material. Although the Monorail's 2005 audited financials revealed its failing revenues, the 2006 Budget predicted an improved financial outlook for the Monorail based on a large fare increase and an expected increase in advertising revenue. Plaintiff has sufficiently alleged that the Cox Report's prediction that the Monorail would fail due to insufficient ridership and advertising revenues cast doubt on the 2006 Budget and "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." In re Lucent Techn., Inc. Secs. Litig., 217 F. Supp. 2d at 543 (quotation omitted). Such allegations adequately plead, for purposes of a motion to dismiss, that the omission of the Cox Report was material inasmuch as it contained "information that would be important to a reasonable investor in making his or her investment decision." Id.

Moreover, the cases cited by Citigroup for the proposition that valuations performed years prior to the purchase of stock are not material, including Mill Bridge V, Inc. v. Benton, No. 08-2806, 2009 WL 4639641 (E.D. Pa. 2009), are distinguishable from the circumstances presented here. In Mill Bridge, the defendants purchased from the plaintiff shares of stock in the Philadelphia Stock Exchange after it was demutualized. The plaintiff alleged that the defendants violated federal securities laws in connection with that purchase, in part because the defendants did not disclose an October 2002 valuation performed prior to the demutualization. Id. at *21. The court found that the plaintiff did not allege how the valuation was material because it was performed two years prior to the trade at issue, prior to subsequent events and to the demutualization, and because the plaintiff did not even allege how the defendant would have known of the valuation's existence. Id. In the instant matter, however, Plaintiff alleges that Citigroup had the Cox Report in its possession, yet failed to disclose it. Plaintiff further avers that the Cox Report was material both because it was proven accurate by the Monorail's poor economic performance and because it predicted that the improved revenue contemplated by the 2006 Budget would not be realized. Accordingly, the facts of Mill Bridge are distinct from those alleged by Plaintiff.

The Court further notes that Mill Bridge and Rand v. Cullinet Software, Inc., 847 F. Supp. 200 (D.Mass 1994), on which Citigroup also relies, addressed the respective plaintiffs' claims in the context of motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, not a motion to dismiss pursuant to Rule 12(b)(6). On the instant motion, this Court must determine whether Plaintiff has sufficiently pled materiality, not whether Plaintiff has ultimately proven its case. See, e.g. In re Kidder Peabody Secs. Litig., No. 94-3954, 1995 WL 590624 (S.D.N.Y. 1995) (rejecting defendant's argument that a three-month old misleading

interview was immaterial as a matter of law and denying motion to dismiss). "Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." In re Adams Golf, Inc. Sec. Litig., 381 F.3d at 274 (citations omitted). At this stage, the Court cannot conclude that the alleged omission of the Cox Report was "so obviously unimportant to an investor, that reasonable minds [could] not differ on the question of materiality." TSC Industries, 426 U.S. 450. Accordingly, for the reasons set forth above, the Court finds that Plaintiff has adequately alleged that Citigroup's failure to disclose the Cox Report constituted a material omission for purposes of common law fraud.[7]

2. Intent

Although Federal Rule of Civil Procedure 9(b) requires fraud to be pled with particularity, it provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiff has alleged that, despite possessing the Cox Report since 2000 and witnessing the Monorail's financial turmoil, Citigroup intentionally provided it with information, including the URS Greiner Study, while concealing the existence and content of the Cox Report. (Compl. ¶ 23). According to Plaintiff, at the time Citigroup decided not to disclose the Cox Report, Citigroup was fully aware of Cox's findings, including his "ultimate conclusion that the Monorail was not economically feasible." (Compl. ¶ 119). Plaintiff further avers that Citigroup was attempting to "establish a high secondary market trading price for the Second Tier Bonds" because Citigroup "wanted to facilitate financing for the proposed extension, wanted to be selected as an underwriter for any issuance of new bonds and wanted to be paid what would be a very substantial underwriting fee." (Compl. ¶ 111). The

[7] Citigroup further argues that the alleged omission of the Cox Report is not material because its existence and content were publicly available and widely reported in the marketplace. For the reasons discussed in connection with the Court's discussion of Citigroup's duty to disclose, the Court disagrees.

Court finds that such allegations adequately allege intent for purposes of pleading a common law fraud claim.

3. Reasonable Reliance

A plaintiff bringing a claim for common law fraud must demonstrate reasonable reliance. Frederico, 507 F.3d at 200. "For purposes of surviving a motion to dismiss, the concept of reasonable reliance does not contemplate an objective test." Roll v. Singh, No. 07-4136, 2008 WL 3413863, at *19 (D.N.J. Apr. 12, 2010). Accordingly, "[c]ommon law fraud requires a showing of actual reliance, but not objectively reasonable reliance, since the perpetrator of a fraud may not urge that the victim should have been more circumspect or astute." Id.; see also Union Ink Co., Inc. v. AT&T Corp., 352 N.J.Super. 617, 646 (App. Div. 2002) (same). Like materiality, the determination of whether a plaintiff has reasonably relied on an alleged misrepresentation is a fact-intensive inquiry that often cannot be decided at the early stage of a litigation. See Roll, No. 07-4136, 2008 WL 3413863, at *19; Richie and Pat Bonvie Stables, Inc. v. Irving, 350 N.J.Super. 579, 589 (App. Div. 2002).

Citigroup contends that Plaintiff cannot establish reliance because it reviewed the disclosures in the Official statement, as well as the Monorail's 2005 audited financials and 2006 Budget, all of which revealed the Monorail's financial difficulties. Citigroup also points to Plaintiff's allegation that its own analyst reviewed the bonds to evidence that Plaintiff's reliance was not reasonable. However, Plaintiff has alleged that by providing the 2006 Budget and information on the planned extension of the Monorail, Citigroup misled it into purchasing the Second Tier Bonds. In that regard, Plaintiff argues that it purchased the Second Tier Bonds in reliance on the 2006 Budget and Citigroup's alleged misrepresentations as to the Monorail's expected financial improvement. As the Court has noted, the determination of whether

Plaintiff's reliance was reasonable is a fact-based inquiry. See Roll, 2008 WL 3413863, *19 (D.N.J. Apr. 12, 2010). At this early stage of the litigation, the facts alleged by Plaintiff, supplemented by additional discovery, may lead a finder of fact to conclude that Plaintiff reasonably relied on the information provided by Citigroup. Accordingly, the Court declines to dismiss Plaintiff's claim for failure to plead reasonable reliance.

4. Causation and Resulting Damage

To adequately plead causation for a common law fraud claim, a plaintiff must allege that the defendant's misrepresentations proximately caused its loss. McCabe v. Ernst & Young, LLP, No. 01-5747, 2006 WL 42371, at * 12-13 (D.N.J. Jan. 6, 2006). Like materiality and reliance, proximate cause is typically an issue of fact. Geherty v. Moore, 238 N.J.Super. 463, 479 (App. Div. 1990).

Plaintiff avers that Citigroup intentionally withheld the Cox Report, which set forth in detail the facts underlying Cox's prediction that the Monorail would be economically infeasible due to inadequate ridership. Plaintiff further alleges that the Monorail ultimately failed as a result of insufficient rider demand for the reasons described in the Cox Report. For purposes of surviving a motion to dismiss, such a nexus proffers "enough fact to raise a reasonable expectation that discovery will reveal evidence" that Citigroup's omission of the Cox Report was a proximate cause of Plaintiff's losses. Twombly, 550 U.S. at 556.

**B. Statutory Fraud**

The New Jersey Uniform Securities Act ("NJUSA"), 49:3-47 et seq., provides civil liability against any person who, inter alia, "offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not

misleading (the buyer not knowing of the untruth or omission)." N.J.S.A. 49:3-71(a)(2). To state a claim under the NJUSA, a plaintiff must allege: "(1) an untrue material statement or omission; (2) scienter; (3) causation; and (4) injury to a plaintiff." Derobbio v. Harvest Cmtys. of Sioux City, Inc., No. 01-cv-1120, 2002 U.S. Dist. LEXIS 26706, at *20 (D.N.J. Oct. 30, 2002). In contrast to common law fraud, reliance is not an element of a NJUSA claim and causation is established by privity. See Kaufman v. I-State Corp., 165 N.J. 94, 112-13 (2000). Because Plaintiff has sufficiently pled materiality and intent for common law fraud, as discussed extensively above, Plaintiff has likewise adequately pled these elements under the NJUSA. As reliance is not required, and the parties do not dispute privity, the Court finds that Plaintiff's NJUSA claim is sufficiently pled.

Citigroup contends, however, that Plaintiff's NJUSA claim is time-barred. The NJUSA provides that "[n]o person may bring an action ... more than two years after the contract of sale or the rendering of the investment advice, or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later." N.J.S.A. 49:3-71(g). Under this inquiry notice standard, "the limitations period commences when the plaintiffs, in the exercise of reasonable diligence, should have discovered the basis for their claim." Benak v. Alliance Capital Mgmt. L.P., 349 F. Supp. 2d 882, 887 (D.N.J. 2004). Thus, the statute of limitations on a NJUSA claim begins to run when a plaintiff is on inquiry notice of the existence of a fraudulent scheme. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1326 (3d Cir. 2002). In other words, a cause of action under the NJUSA begins to accrue when a plaintiff has "sufficient information of possible wrongdoing to put [it] on 'inquiry notice' or to excite 'storm warnings' of culpable activity." Id. at 1325. (quotation omitted). Such a fact-intensive determination is "often inappropriate for resolution on a motion to dismiss

under Rule 12(b)(6)." In re Lucent Techs., Inc. Secs. Litig., 217 F. Supp. 2d at 542; see also Nappier v. Pricewaterhouse Coopers LLP, 227 F. Supp. 2d 263, 274 (D.N.J. 2002).

Citigroup contends that Plaintiff was on inquiry notice "of the facts forming the basis of the Complaint" as early as 2006, when it purchased the Bonds and was provided with the Monorail's 2005 financials, and by July 2009 at the latest, when the Second Tier Bonds defaulted. (Def.'s Mov. Br. 31). According to Citigroup, Plaintiff should have identified these events, as well as the publication of the aforementioned newspaper articles, as potential "storm warnings." As Plaintiff's Complaint was filed on September 23, 2011 – more than three years later – Citigroup argues that its NJUSA claim is untimely.

The inquiry notice standard, however, requires that Plaintiff have knowledge of the allegedly "fraudulent scheme," not just that the Monorail was experiencing financial difficulties. See In re NAHC, Inc. Sec. Litig., 306 F.3d at 1326. When Citigroup provided Plaintiff with the Monorail's 2005 financials, it also provided the Monorail's 2006 Budget (which predicted an improved financial outlook) and informed Plaintiff of the plans to extend the Monorail. Plaintiff's Complaint posits that it believed the Monorail could be successful based upon this information. Plaintiff further asserts that it believed the Monorail's gradual failure to be the honest failing of a complex business, rather than due to an alleged fraud. Thus, Plaintiff argues that it was not on inquiry notice until it learned of the Cox Report in late 2009.

As inquiry notice is a fact-based inquiry, the Court declines to dismiss Plaintiff's NJUSA claim at this time. Plaintiff has proffered sufficient allegations to demonstrate that the Monorail's gradual failure did not provide it with inquiry notice of Citigroup's allegedly culpable activity until late 2009. Moreover, the references to the Cox Report in a handful of local news articles are not sufficient to charge Plaintiff with inquiry notice as a matter of law. In

contrast to the facts presented in Benak, where numerous articles regarding the Enron collapse were published in widespread national publications such as *The Wall Street Journal, Fortune and the Economist*, the articles at issue here were not so widely disseminated that Plaintiff should be charged with knowledge of the Cox Report as a matter of law. Accordingly, the Court will not dismiss Plaintiff's NJUSA claim as time-barred.

**C. Negligent Misrepresentation**

Under New Jersey law, to state a claim for negligent misrepresentation, a plaintiff must allege "an incorrect statement, negligently made and justifiably relied on, which results in economic loss." Konover Constr. Corp. v. E. Coast Constr. Servs. Corp., 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (quotation omitted). Such a claim may be based on an affirmative misrepresentation or an omission. Highlands Ins. Co. v. Hobbs Group, LLC, 373 F.3d 347, 355 (3d Cir. 2004). For claims based upon an omission, New Jersey law does not require a plaintiff to plead the existence of a "special relationship" between the parties. See Goodman v. Goldman, Sachs & Co., No. 10-1247, 2010 WL 5186180, at *6 (D.N.J. Dec. 14, 2010) (citing Singer v. Beach Trading Co., Inc., 379 N.J.Super. 63, 73 (App. Div. 2005)). "[T]he required duty of disclosure may [] arise in any situation called for by good faith and common decency." Id. (quotation omitted). In contrast, New York law does require a plaintiff to plead a "special relationship." See id. (citing Glidepath Holding B.V. v. Spherion Corp., No. 04-9758, 2010 WL 1372553, at *11 (S.D.N.Y. Mar. 26, 2010)).

The parties dispute whether the law of New York or New Jersey should apply to Plaintiff's negligent misrepresentation claim. "Because New York law explicitly requires a plaintiff to allege a 'special relationship,' there is an actual conflict between New York and New Jersey law," and this Court must engage in a choice of law analysis. Id. As a federal district

court sitting in diversity, this Court must apply the choice of law rules of the forum state of New Jersey. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Warriner v. Stanton, 475 F.3d 497, 499–500 (3d Cir. 2007).

New Jersey generally applies the Restatement's "most significant relationship" test to tort claims. P.V. v. Camp Jaycee, 197 N.J. 132, 142–43 (2008). In applying the most significant relationship test, a court must first determine whether there is an actual conflict between the competing state laws. Nafar v. Hollywood Tanning Sys., Inc., 339 Fed.Appx. 216, 220 (3d Cir. 2009). Second, a court must weigh the factors enumerated in the Restatement section corresponding to the plaintiff's cause of action. Id. Section 148 of the Restatement (2d) Conflicts applies specifically to negligent misrepresentation claims. See id. at 220 (applying § 148 to misrepresentation claims); In re Mercedes–Benz Tele Aid Contract Litig., 267 F.R.D. 113, 124–25 (D.N.J. 2010) (discussing Nafar).

Restatement § 148 is comprised of two subsections. Subsection (1) applies only "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations *and* when the plaintiff's action in reliance took place in the state where the false representations were made and received." Restatement (2d) Conflicts, § 148(1) (emphasis added). Where those two elements are present in one state, "the local law of [that] state determines the rights and liabilities of the parties . . ." Id. Subsection (2) applies "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made . . ." In that instance, the court is to "consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties: (a) the place, or places, where the plaintiff acted in reliance upon the

defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." Restatement (2d) Conflicts § 148(2).

Because Plaintiff alleges that it relied on Defendant's misrepresentation in a different state (New Jersey) than the state in which the alleged misrepresentation was made (New York), the Court will apply the subsection (2) factors. Applying the subsection (2) factors to Plaintiff's Complaint, the Court finds that there are sufficient factual allegations to support application of New Jersey law at this juncture. As an initial matter, the Court notes that Plaintiff's principal place of business is in New Jersey. (Compl. ¶ 1.) "The location of Plaintiff's residence (or domicile) is an important contact favoring application of New Jersey law." Goodman, 2010 WL 5186180, at *21-22; see also Restatement § 148, Comments ("The domicile, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant."). In addition, although Citigroup made the alleged misrepresentations in New York, Plaintiff has pled that "Citigroup directed communications to, and ultimately sold the [Second Tier] Bonds at issue to, [Plaintiff] at its principal place of business in Jersey City, New Jersey." (Compl. ¶ 5). Accordingly, applying the Restatement factors, the Court finds that New Jersey law governs Plaintiff's negligent misrepresentation claim.

Examining the allegations in the Complaint, the Court finds that Plaintiff has adequately pled negligent misrepresentation under New Jersey law. Despite Citigroup's argument that Plaintiff's negligent misrepresentation claim should be dismissed because the parties are

counterparties to an arms-length transaction, Plaintiff has sufficiently pled that Citigroup owed a duty to disclose because it chose to provide certain information to Plaintiff in connection with the sale of the Second Tier Bonds. As such, the cases cited by Citigroup in that regard are inapposite. Plaintiff has sufficiently alleged that Citigroup owed a duty to disclose and made an incorrect statement that proximately caused Plaintiff's losses and on which Plaintiff reasonably relied. Such allegations are sufficient to plead a cause of action for negligent misrepresentation at this stage of the litigation.

## II. CONCLUSION

For the reasons set forth above, Citigroup's motion to dismiss is denied. An appropriate Order accompanies this Opinion.

**Dated: July 11, 2012**

**HON. CLAIRE C. CECCHI**
**United States District Judge**