John A. Azzarello (JAA 4363)
David W. Fassett (DWF 1636)
ARSENEAULT WHIPPLE FASSETT & AZZARELLO, LLP
560 Main Street
Chatham, New Jersey 07928
Telephone: (973) 635-3366

Michael P. Cillo
Valeri S. Pappas
Jennifer A. Tiedeken
DAVIS & CERIANI, P.C.
1350 17th Street, Suite 400
Denver, Colorado 80202
Telephone: (303) 534-9000
(admitted *Pro Hac Vice*)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE

| | |
|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., on behalf of its series Lord Abbett High Yield Municipal Bond Fund, a Maryland corporation | ELECTRONICALLY FILED |
| Plaintiff. | Civil Action No. 11-5550 (CCC) (JAD) |
| v. | |
| CITIGROUP GLOBAL MARKETS, a New York corporation | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Defendant. | |

Plaintiff Lord Abbett Municipal Income Fund, Inc., on behalf of its series Lord Abbett High Yield Municipal Bond Fund, a Maryland corporation, for its First Amended Complaint against Defendant Citigroup Global Markets, Inc., a New York corporation, states and alleges as follows:

{00424625.DOC; 4}

## PARTIES, JURISDICTION AND VENUE

1.      Lord Abbett High Yield Municipal Bond Fund is a series of the Lord Abbett Municipal Income Fund, Inc., a Maryland corporation, and mutual fund that, at all times pertinent to this Complaint, maintained its principal place of business at 90 Hudson Street, Jersey City, New Jersey 07302 (the "Lord Abbett Fund").   The Lord Abbett Fund became the successor-in-interest to the Lord Abbett High Yield Municipal Bond Fund, a series of the Lord Abbett Municipal Income Trust, a Delaware Statutory Trust, in November 2010.   Defendant Citigroup Global Markets, Inc. ("Citigroup") is a New York corporation that, at all times pertinent to this Complaint, maintained its principal place of business at 388 Greenwich Street, New York, NY 10013.

2.      The Lord Abbett Fund purchased $13 million in par value of the Director of the State of Nevada Department of Business and Industry, Las Vegas Monorail Project Revenue Bonds, Second Tier Series 2000 (the "Second Tier Bonds"), which are the subject of this Complaint, from Defendant Citigroup.

3.      Salomon Smith Barney, now known as Citigroup, was the lead underwriter for the issuance of the Second Tier Bonds in September 2000 and continued to make a secondary market in the Bonds.   Citigroup acquired the assets and liabilities of Salomon Smith Barney in 1998 and abandoned the Salomon Smith Barney name after the Monorail Bonds were issued. Citigroup offered and sold the Second Tier Bonds to Lord Abbett in four purchase transactions occurring between September 21, 2006 and October 4, 2006.   The wrongful conduct of Citigroup, as alleged throughout this Complaint, occurred in New Jersey as a result of Citigroup contacting representatives of Lord Abbett in Jersey City, New Jersey in September and October 2006 and both offering and selling the above-referenced monorail bonds to Lord Abbett.

4.       Venue of this action lies in this Court pursuant to 28 U.S. Code § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and the property that is the subject of this action is located in this District.  Specifically, Citigroup directed communications to, and ultimately sold the Bonds at issue to, the Lord Abbett Fund at its principal place of business in Jersey City, New Jersey.

5.       Jurisdiction exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332 as the matter and controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

**Summary of Complaint**

6.       The state of Nevada issued over $600 million in First, Second and Third Tier bonds in September 2000 (collectively the "Monorail Bonds") to finance the design, construction, and operation of a monorail system running over a 3.9 mile route behind seven hotels on the east side of the Las Vegas Strip (the "Monorail").  The principal security for the Second Tier Bonds that Citigroup offered and sold to the Lord Abbett Fund in 2006 was revenues generated by the Monorail.  The principal sources of revenue were fees paid by riders (sometimes referred to as "farebox revenues" and "ridership") and advertising revenue.

7.       Acting as an underwriter in 2000, Citigroup prepared an "Official Statement" ("OS") prospectus for the Bonds.  As an underwriter, Citigroup was required to form a reasonable basis for believing in the accuracy and completeness of the key representations of the promoter and developer of the project, the Las Vegas Monorail Company ("LVMC").  The key representations of LVMC included the factual basis underlying the fare-based revenue projections and the advertising revenue projections in the OS.

8.      Citigroup was aware that URS Greiner Woodward Clyde, Inc. ("URS") provided LVMC with ridership and revenue projections in 1999.  Citigroup knew as early as late 1999 that other transportation consultants had prepared reports challenging the economic feasibility of the monorail based upon their review of the projections prepared by URS for LVMC in 1999.

9.      Mandalay Bay and the Venetian are hotels, casinos and resorts in Las Vegas.  The Mandalay Bay, the Venetian and the Desert Inn Homeowners Association opposed the Monorail and the issuance of the Monorail Bonds.  Mandalay Bay hired Wendell Cox Consultancy ("Cox"), an Illinois-based transportation consulting firm, to analyze the revenue projections being used by LVMC with information available as of late 1999.  Cox's findings and the factual bases supporting those findings were initially addressed in a November 1999 report that was later supplemented in a forty-one page report with detailed Appendices dated June 6, 2000, titled "Analysis of the Proposed Las Vegas Monorail" (the June 6, 2000 Report is referred to hereinafter as the "Cox Report").  *See* Cox Report, attached as **Exhibit 1**.  The Cox Report was provided to Citigroup before the Monorail Bonds were issued in September 2000.

10.     On November 23, 1999, two Citigroup representatives, Greg Carey and Jerry Abrahams, received a telefax from monorail promoters, Broadbent & Walker, Inc.  The telefax provided Citigroup with a Las Vegas Sun article of the same date captioned, "Report:  Monorail Will Lose Millions" and the "Summary of Conclusions" section of the initial Cox Report. **Exhibit 2**.  The article addressed some of the conclusions in the initial Cox Report such as actual ridership on fixed guideway systems had historically fallen 70% below projections and ridership would be approximately 22,700 riders per day, not the 50,000+ riders ultimately projected by URS.  The Summary of Conclusions stated, "The general conclusion of this study is that it is

highly unlikely that the LLC Monorail will be able to achieve its ridership projections, revenue projections, or financial obligations."

11.     Bernard Malamud, a Professor of Economics at the University of Nevada Las Vegas, was commissioned by the Venetian Hotel to prepare a ridership forecast for the Monorail. (**Exhibit 3**, the "Malamud Report").  Professor Malamud was the author of several studies of the Las Vegas economy and, as of 1999, served on the Clark County Planning Commission. The Malamud Report is dated December 1, 1999 and was sent to a Citigroup investment banker, Dave Houston, via telefax on December 6, 1999.  Professor Malamud was, amongst other things, critical of the approach used by URS to project monorail ridership and concluded based upon his fact-based analysis that, "ridership at a $2 fare will total 9.4 million rides in 2003, the first year of the proposed system's operation."  This most likely forecast was less than half the 19.8 million rides projected by URS in a forecast it prepared for LVMC in October 1999.

12.     As of 1999, Thomas Rubin was a Certified Public Accountant who had been a consultant, auditor, author, and senior executive in governmental transportation and finance for almost a quarter century.  Rubin was engaged by the Desert Inn Homeowners Association and the Venetian to prepare a report on the monorail. (**Exhibit 4**, the "Rubin Report").  The Rubin Report is dated December 5, 1999, and was provided to Citigroup by the monorail promoter, Robert Broadbent, in or about December 19, 1999.  Rubin was critical of the approach used by URS to project monorail ridership and concluded based upon his fact-based analysis that:  "The ridership/revenue and advertising projections appear exceedingly high compared to all comparative enterprises that I have encountered."  As a result, Rubin stated his belief that there was a high risk that some or all of the revenue bonds would wind up in default with significant losses to bondholders.

13.     Rubin reached the historic fact-based conclusion that the "projected ridership and revenue are significantly higher than for any comparable system in this nation."   Rubin concluded that advertising revenues also appeared extremely high compared to the revenues of transit operators in similar-sized cities and the projected annual monorail advertising revenues were over 5 times the comparable Las Vegas Transit Bus advertising revenues.   Rubin supplemented his 3-page Report with a 70-page "MGM Grand-Balleys Monorail LLC Commentary on Proposed Monorail Extension and Financial Plan."   The commentary was critical of the assumptions and techniques used by URS to project ridership and revenues for LVMC.

14.     Cox proceeded to analyze updated and further inflated projections prepared by URS for LVMC in April 2000 and prepared the above described Cox Report dated June 6, 2000 . Cox conducted an extensive analysis of the Developer's projections and concluded in the Cox Report, for reasons that are alleged in more detail below, that the ridership and advertising revenue projections supporting the Monorail project were among the most aggressive in U.S. transit history and could emerge as the least accurate.

15.     Citigroup was provided with a final ridership study, titled "Forecasts of Ridership and Revenue for the Proposed Seven-Station Las Vegas Monorail System," dated August 23, 2000, which was prepared by URS Greiner Woodward Clyde, Inc. (the "URS Study") and was paid for by LVMC.   *See* URS Study, attached as **Exhibit 5**.   The URS Study was the last of a series of studies prepared for LVMC by URS.   The URS Study projected that in 2004, the Monorail's first year of expected operation, annual ridership would be about 35,000,000 and advertising revenue would be about $8.1 million, generating sufficient cash flow

to pay debt service on the Monorail Bonds.  The URS Study also projected that daily ridership would increase every year, including years with projected fare increases.

16.     The projections in the August 2000 URS Study were not materially different from the April 2000 projections evaluated by Cox.  The Cox Report projected maximum annual ridership of about 9.2 million (only 26 percent of the URS Study's projection) and a conservative estimate of about $3.3 million in advertising revenue.  Cox predicted ridership would drop in response to even modest increases in fares.  Cox predicted the Monorail could not generate sufficient revenue to make any meaningful amount of principal and interest payments on the Monorail Bonds.

17.     Cox, Malamud, Rubin and another consultant (Jon Twitchell) addressed their conclusions and the basis for their conclusions that the monorail was not economically feasible at a public hearing on the proposed issuance of tax-exempt revenue bonds by the director of the Department of Business and Industry of the State of Nevada on June 8, 2000 ("June 8, 2000 Hearing") that was attended by Citigroup investment bankers Dave Houston and Greg Carey.

18.     At the June 8, 2000 hearing, Cox made specific reference to the Cox Report, stating "I have published a report on the monorail and including a new second edition that was released within the last couple of days and is on the Internet at this point.

19.     The Nevada Department of Business and Industry decided to proceed with the issuance of the Bonds and the OS was circulated to potential investors.  The URS Study was attached to the OS for the Monorail Bonds.  The existence and content of the Cox Report, the Malamud Report and the Rubin Report, each of which seriously undermined the reliability of the projections in the URS Study, was not disclosed in the OS.

20.     The State of Nevada successfully issued the Monorail Bonds in September 2000, including the $13 million in par value of Second Tier Bonds that Citigroup offered and sold to the Lord Abbett Fund in 2006.

21.     As of 2000, it was expected that the Monorail would take over three years to build and would begin operations in January 2004.  The Monorail Bonds were issued with sufficient capitalized interest so that interest payments could be made on the Bonds during construction of the Monorail.

22.     LVMC encountered construction delays and did not begin monorail operations until mid-2004.  LVMC then encountered operational problems that resulted in the system being shut down for much of the remainder of 2004.  The first full year of unimpeded operations was 2005.

23.     The conclusions and basis for conclusions in the Cox Report , the Malamud Report and the Rubin Report  proved to be prophetic.  In 2005, the first full year of operation, the Monorail did not achieve anywhere near the level of ridership that had been projected in the URS Study.  Monorail ridership was about ten percent greater than the optimistic projection in the Cox Report, but was about half the ridership projection in the URS Study.  Advertising revenue was substantially less than the conservative estimate in the Cox Report.

24.     By mid-2006, Citigroup was not only fully aware of the existence and content of the Cox Report, the Malamud Report and the Rubin Report but also knew the projections in those Reports had proven to be far more accurate than those in the URS Study with respect to the Monorail's first full year of operations.  Citigroup also knew that, unlike the URS Study, the Cox Report, the Malamud Report and the Rubin Report each set forth a substantial amount of objective, factual data in support of the conclusions set forth in said Reports.

25.     LVMC increased its average fare by 45 percent in December 2005 and projected substantially increased fare-based revenues and advertising revenues for 2006.   LVMC announced that it was increasing its marketing budget seven fold and proposed extending the Monorail to McCarren Airport and down the west side of the Las Vegas Strip.   If this could be achieved, it would require the issuance of over a billion dollars in new bonds and could result in the pre-funding and ultimate repayment in full of the First and Second Tier Bonds.   Citigroup wanted to be retained as an underwriter for any such bond issue and wanted to use LVMC's new projections and plans as the basis for establishing a high secondary market trading price for the Second Tier Bonds.   Citigroup identified an institutional customer that wanted to sell Second Tier Bonds and contacted Lord Abbett in September 2006 to determine whether the Lord Abbett Fund would purchase Second Tier Bonds at a price in excess of par value.   Citigroup provided Lord Abbett with the 2000 OS (which had been prepared by Citigroup's predecessor, Salomon Smith Barney), the 2005 audited financial statements for LVMC and a "Presentation of the 2006 Budget," which contained the updated ridership and revenue projections.

26.     Citigroup provided Lord Abbett with the above information indicating that fare-based revenue, advertising revenue and bottom line revenue was projected to and could be increased to the levels projected in the OS.   Citigroup told Lord Abbett about the Developer's plans to pre-refund the Second Tier Bonds and extend the Monorail to McCarren Airport (thereby gaining access to the over 40 million in annual passengers, eighty percent of whom head directly for the Strip) and down the West side of the Strip.

27.     Lord Abbett viewed these plans as positive factors that justified the purchase of Monorail Bonds.   However, this was not an easy decision for Lord Abbett and any information

indicating substantially increased ridership revenue and advertising revenue could not be achieved would have caused Lord Abbett to not purchase any Monorail Bonds.

28.     Citigroup knew the Cox Report, the Malamud Report and the Rubin Report were even more reliable and more material in 2006 than they were in 2000 because they were not only based upon an extensive fact-based analysis, but had also been proven accurate.  As of 2006, the fact-based predictions in the Cox Report, the Malamud Report and the Rubin Report leading to the joint conclusion that the Monorail was doomed would be highly material to a reasonable investor because the said Reports indicated the ridership base was not sufficient, the price increase would result in a substantial drop in ridership and the increased advertising revenues could not be achieved.

29.     Despite having had the Cox Report, the Malamud Report and the Rubin Report in its possession since late 1999 and 2000, despite being fully aware of the factual basis for the opinions in said Reports and despite seeing that said Reports had been proven accurate and superior to the URS Study, Citigroup knowingly and intentionally provided Lord Abbett with the above information, but concealed both the existence and content of said Reports from Lord Abbett.

30.     The Lord Abbett Fund purchased $13 million in par value of the Second Tier Bonds from Citigroup in September and October 2006.  Had Lord Abbett been told about one or more of the Cox Report, the Malamud Report and/or the Rubin Report, and/or the factual basis for the conclusions in said Reports, it would not have purchased the Bonds.

31.     The Monorail was, in fact, doomed for the reasons set forth in the Cox Report, the Malamud Report and the Rubin Report.  The 2006 price increase resulted in a substantial drop in

ridership and the large projected increase in ridership revenue and advertising revenue never materialized.  LVMC filed for bankruptcy protection in 2010.

**The Las Vegas Monorail Company Sets About Obtaining Financing from the State of Nevada.**

32.     The Monorail was originally operated along a one-mile route between two hotels on the east side of the Las Vegas Strip – the MGM-Grand and Bally's.  It was initially owned by a joint venture between the two hotels.  The joint venture sought to expand the Monorail to service additional hotels and merged with a Nevada nonprofit corporation to form LVMC. LVMC set about arranging the financing needed to acquire and expand the existing Monorail track.

33.     LVMC hired URS Greiner Woodward Clyde ("URS") to prepare a study forecasting annual ridership and revenue levels for the proposed expanded Monorail System.  An initial study was prepared in 1999.

34.     After this study was prepared, the price to be paid for the existing Monorail System was increased 25 percent, the management fee to be charged by the management company increased 250 percent and expenses increased 44 percent.  The increased expenses were offset by projecting a 25 percent increase in average fares, resulting in a 31 percent increase in projected fare revenues. Fare increases of $0.25, which were to occur every four years, would now occur every three years, resulting in a projected $653 million increase in fare revenues between 2003 and 2030.  URS completed a second study based on these changes and information available as of about April 2000.

35.     LVMC's massive financing needs required the approval and participation of the Director of the State of Nevada Department of Business and Industry ("Nevada").  The State of

Nevada agreed to participate in the issuance of the Monorail Bonds and hired Citigroup to be the lead underwriter.

**The Mandalay Bay Hotel Hires Wendell Cox Consultancy to Prepare a Detailed Report Addressing the Feasibility of the Monorail Expansion.**

36.     There was serious opposition to construction of the Monorail.  The powerful Las Vegas taxi cab union was vehemently opposed to the issuance of the Bonds and a number of major hotels along the Strip, including the Venetian, were also opposed to the issuance of the Bonds.

37.     Mandalay Bay hired Wendell Cox Consultancy to prepare a detailed report addressing the feasibility of the Monorail expansion and financing.  As alleged above, Cox prepared two editions of its report.  The first report addressed LVMC's initial 1999 projections. The second edition, the Cox Report , is a detailed forty-one page report with appendices, dated June 6, 2000.  The Cox Report addressed the second study prepared by URS with its increased operating expense and revenue assumptions.

38.     The Cox Report was circulated in the summer of 2000 amongst the participants in the issuance of the Monorail Bonds, including Citigroup.  As alleged above, Citigroup already had the summary of conclusions to the initial Cox Report, the Malamud Report and the Rubin Report.

39.     URS issued the final version of its Study that was attached as "Appendix E" to the OS in August 2000.  The ridership and revenue projections in the URS Study did not differ materially from the projections analyzed in the June 2000 Cox Report.

**The Cox Report Concludes LVMC Was Unlikely to Achieve its Revenue Projections and Meet its Financial Obligations.**

*Cox Was Highly Critical of the Increased Revenue and Expense Assumptions Made by LVMC.*

40.     Cox concluded the above referenced cost increases were highly questionable and considered the projected revenue increases unachievable.   The Cox Report identified inconsistencies in the changed projections and called into question the seriousness and credibility of the analysis that produced the projections.

41.     Cox believed the LVMC ridership projections were among the most aggressive in U.S. transit history and could emerge as the least accurate.   The Cox Report noted that the Monorail was "projected to carry more passengers per route mile than the New York Subway, the London Underground and the Stockholm Metro, and more than double that of the most heavily used new rail systems in the United States."

42.     The Cox Report concluded it was not likely that such an intense level of ridership would be attracted.   Contrary to LVMC's projection of over 53,000 riders per day in the Monorail's first year of operation, Cox predicted that the Monorail would carry a maximum of between 18,500 and 26,600 riders per day.

43.     In light of the grim ridership and revenue projections, the Cox Report predicted that "[p]roject revenues are unlikely to be sufficient to pay project obligations during all but two years of operation, from 2003 through 2035."

44.     The conclusions in the Cox Report were based on a variety of factors, including: (1) the uniqueness of Las Vegas; (2) the historic unreliability of U.S. and international ridership projections; (3) the optimistic foundations of the Developer's ridership projections; (4) ridership response to fare increases (or "elasticity"); (5) a comparison to the Las Vegas Strip bus route;

(6) anticipated ridership attracted from the existing monorail, walking, and taxicabs; (7) a comparison to other local circulators; and (8) the advertising revenue generated by other public transit systems.  The conclusions reached by Malamud and Rubin in late 1999 were based on similar findings.

### *Several Factors that Made the Las Vegas Market Unique Indicated the Potential Market for the Monorail was Much Smaller Than Projected in the URS Study.*

45.     The Cox Report noted various factors that made the Las Vegas market unique. While some factors seemed to bode well for the Monorail, other factors called into question whether the Monorail could ever achieve the ridership and revenue projections in the OS.

46.     First, the gaming industry in general, is very competitive.  Because the Monorail would only directly serve certain casinos, the Cox Report expected the casinos that were not served to respond quickly and effectively to any threat of losing business to those casinos that were served by the Monorail.

47.     Second, although the existing market for transit along the Las Vegas Strip was large in relation to the Las Vegas Strip bus route, it was comparatively small in relation to the overall tourist travel market along the Strip.

48.     Third, the Las Vegas Strip is one of the most visually striking built environments in the world and is the locus of outdoor activity in the area.  As a result, walking represents by far the largest amount of tourist trips along the Strip.  Cox concluded that inasmuch as the Monorail was designed to operate behind the hotels on the east side of the Strip, it should not have been expected to draw as many walkers as was projected in the URS Study attached to the OS.

49.    Finally, the Las Vegas Strip does not have the land use patterns and employment base that generates much of the ridership demand in other more dense downtown areas where other public transit systems have historically operated.

50.    Cox expanded on these findings.

**Ridership Projections for Other US and International Public Transit Systems had Proven Unreliable.**

51.    The reliability of the ridership projections was crucial because the greatest portion of the Monorail's revenue was expected to come from fares paid by riders.  The Cox Report found ridership and revenue projections for other new fixed guideway systems had been consistently unreliable.  For example, with respect to federally financed projects opened during the 1980s, ridership averaged 59 percent below projections.  Some of the most inaccurate ridership projections were made in connection with local circulator projects that were similar to the Monorail.

52.    Miami's Metromover was projected to carry 41,800 riders daily by 1988 and missed that projection by nearly 75 percent.  By 1999, the Metromover was carrying an average of 13,400 riders per day – 68 percent below projection despite more than doubling the length of the Metromover's route.

53.    Jacksonville's downtown monorail was projected to carry 10,000 riders per day in its original alignment and 38,000 per day upon completion.  In 1996, the monorail was carrying fewer than 1,000 riders per day – 90 percent below projection.  The monorail's route has since been nearly tripled in length and ridership increased to 1,800 per day as of 2000.  As of the time of the Cox Report's publication, the Jacksonville monorail was expected to miss its projected daily ridership of 38,000 by more than 90 percent.

54.     Detroit's downtown people mover was originally projected to carry 67,700 daily riders in the late 1980s.  In 1996, the system carried fewer than 7,000 daily riders, approximately 90 percent below the projection.

55.     The Cox Report noted other fixed guideway projects that failed to come close to meeting their respective projected ridership, including Miami's metro rail system and Los Angeles' "Green Line."  Among high volume ridership projections, the average error was 72.2 percent and the smallest projection error was 27.7 percent for Washington, D.C.'s Metro.

56.     The Cox Report also noted that, unlike the Monorail, most of the other transit projects were funded in large part by government subsidies and relied very little upon passenger fares to fund their operating costs.  As such, the need for reliable ridership projections was less critical for those projects.  According to the Cox Report, transit ridership modeling as of 2000 was not designed to predict results in a manner that could reasonably be relied upon by private investors with money at risk.

### *The Developer's Ridership Projections Greatly Exceeded Actual Ridership for Much Larger Public Transit Systems.*

57.     The Cox Report compared the Monorail ridership projections to actual ridership in a number of heavily used metropolitan areas in the United States and internationally.  The Report concluded, for example, that the Monorail was projected to be 23.1 percent more intensively patronized than the New York City Subway system and 373 percent more intensively used than the Chicago Transit Authority's elevated system.  The Report further concluded that the Monorail projections portrayed it as being 177 percent more intensively used than Washington's Metro and 474 percent more intensively used than San Francisco's BART.  The Monorail's ridership intensity was also projected to be seven times or more greater than the

actual ridership for new light rail systems in St. Louis, San Diego and Portland, which were considered to be the most successful new light rail systems in the nation.

58.     The Cox Report concluded that the Las Vegas Monorail fixed guideway boarding's per-line-mile would rank Las Vegas fifth among systems in the highly automobile dependent countries of Western Europe, Australia, New Zealand, Canada and the United States with the Monorail ranking behind only Vienna, Paris, Rome and Milan.  The Monorail was projected to be 104 percent more intensively used than London's Underground and only 34 percent less intensively used than the Paris Metro.  The Cox Report also noted that, unlike New York, Boston, Philadelphia, Chicago and Washington, Las Vegas residents do not have a strong proclivity toward transit ridership.

59.     The Cox Report noted that the Monorail sponsors' ridership projections may have been the most aggressive ever produced in the U.S. transit industry and appeared to be indistinguishable from other high-volume transit system projections, which had historically been inaccurate.

60.     The Cox Report acknowledged that tourist usage in Las Vegas was substantial, representing approximately one-third of the Las Vegas Strip Bus Route, but concluded that city's robust tourism industry was not enough to compensate for the substantial difference between LVMC's projections and actual experience in other U.S. and international applications.

61.     The Cox Report calculated that as little as a 17 percent reduction in ridership relative to LVMC's projections would produce a net loss between 2003 and 2034 with Monorail revenues being insufficient to pay operating expenses and debt service.

***The Cox Report Predicted Ridership Would Drop Substantially When Fares Were Increased.***

62.     The Cox Report was based on the Developer's revised plans for the Monorail that projected the passenger fare would be increased 25 cents every three years, as opposed to the initial plan of once every four years.

63.     The LVMC projections assumed that for each 10 percent increase in fares there would only be a 2 percent reduction in ridership (-0.20 price elasticity).   The Cox Report revealed that this assumed level of price elasticity was barely one half of the public transit industry standard of -3.6 percent for each 10 percent increase in fares (-0.36 price elasticity) for urbanized areas with a population of more than one million.

64.     LVMC's decision to assume a lower level of price elasticity was significant.   If the Monorail's fare increases were to experience elasticity at the national average rate, the Monorail's ridership would be 12 percent lower, even if all other Monorail projections were met. This would cause net cash flow (the source of funds for making principal and interest payments on the Monorail Bonds) to be reduced by two-thirds (or $370 million from 2003 to 2035).

65.     The projections in the URS Study applied fare elasticity on an inflation-adjusted basis.   Cox determined this was incorrect and caused projected ridership to be overstated by 7 percent from 2003 to 2035.

66.     Unlike the optimistic ridership projections that did not account for significant lost ridership as a result of the first two fare increases, the Las Vegas Strip bus route (#301) had experienced decreased ridership in response to fare increases.   For example, in response to its most recent fare increase as of the time of the Cox Report, the ridership of the Las Vegas Strip bus route had decreased by 4.5 percent, despite the opening of three of the largest hotels in the world.

***Cox Predicted the Monorail Could Not Attract Nearly Double the Ridership of the Las Vegas Strip Bus Route.***

67.     According to the Cox Report, the Las Vegas Strip bus route (#301) was perhaps the most important indicator of demand for public transit in the Monorail's service area.  Route 301 carried approximately 30,000 passengers daily and roughly 10 million annually, making it one of the most successful bus routes in the nation.

68.     Despite the fact that the bus route was more than twice as long as the Monorail's planned route, the URS Study projected the Monorail could reasonably be expected to carry more than four times the ridership of Route 301 on a per route-mile basis.

69.     The average fare revenue per passenger on Route 301 was $1.10, whereas, upon commencement of operations, the Monorail was to charge an average fare of $2.50 or 125 percent higher than the average bus fare.

70.     Cox did not believe the Monorail ridership projections were credible, inasmuch as they assumed that the Monorail, the corridor for which was less than half the length of Route 301, would generate nearly double the ridership of the bus route at a fare that was more than twice as much as that charged on the bus route.

71.     The projections contained in the URS Study contemplated the Monorail attracting only one percent of its ridership from buses, or approximately 500 daily riders.  If that were the case, the Monorail would have to attract more than 53,000 riders per day from other modes of transportation, such as the existing monorail, taxicabs and walking.  The Cox Report considered it doubtful that there was such a large untapped market for transit service along the Las Vegas Strip.

***Cox Did Not Believe the Fare Based Monorail Could Retain the Historic Ridership Base for the Existing Monorail System That Did Not Change Any Fare.***

72.     The URS Study attached to the OS projected that one-third of the Monorail's ridership would come from the existing monorail.  The existing monorail ran between the MGM Grand Hotel and Bally's.  Its daily ridership was 12,800 and it did not charge a fare.  The Cox Report considered this projection to be unachievable for two reasons.

73.     First, to reach one-third of its projected ridership, the Monorail would need to attract nearly 18,000 passengers per day from the existing monorail, or 5,200 more (41 percent) than the full ridership of the existing monorail.  Second, the URS Study made this projection even though the Monorail would be charging an average fare of $2.50 as compared to no fare charged by the existing monorail.

74.     Cox concluded the projections in the URS Study failed to account for any price elasticity and were considerably overstated.  Taking into account some level of price elasticity – either that which was used in calculating the Monorail's projected ridership during years with fare increases or the national average – the Cox Report concluded that the existing monorail would contribute, at most, 15 percent of the projected 53,500 daily ridership – less than one-half of the 18,000 projected in the URS Study.

***Cox Did Not Believe the Monorail Could Attract One Third of its Projected Ridership From People that Would Otherwise Walk.***

75.     The URS Study projected that one-third of the Monorail's ridership (nearly 18,000) would come from persons who would otherwise have walked.  The Cox Report noted that walking is the most popular mode of travel for visitors to the Las Vegas Strip, estimating that there would be approximately 135,000 daily walking trips in the entire Las Vegas Strip in 2003.

76.     The Cox Report evaluated walkers in the area of the Las Vegas Strip in the context of the generally accepted "catchment" area around a public transit station.  In the transit industry, the catchment area is the maximum distance that most people are willing to walk to a transit stop.  It is generally accepted in the transit industry that the catchment area around a transit station is one-quarter mile.

77.     The Cox Report determined that for visitors beginning or ending their trips on the west side of the Las Vegas Strip, the Monorail stations would be a least a quarter of a mile walk away.  The Report concluded that as a result of these long walks, visitors beginning or ending their trips on the west side of the Strip would experience trip times that were only marginally better than the Las Vegas Strip Bus Route.  Walks to and from Monorail stations would also be made longer in both time and distance by the signalized crossings or pedestrian bridge crossings of Las Vegas Boulevard South and the generally circuitous walks through crowded casinos on the east side of the street.  The Cox Report provided several examples of this factor.

78.     The Cox Report referenced the Las Vegas Monorail "Stated Preference" Study, which found that approximately 59 percent of walking trips take less than 30 minutes.   For these shorter trips, the Monorail would provide virtually no time advantage over walking because of the extra time required to walk to and from the Monorail stations.

79.     The Stated Preference Study also found that approximately 12 percent of walking trips take from 30 to 50 minutes, indicating distances of approximately one to two miles.  The Cox Report concluded that either the Las Vegas Strip Bus Route or the Monorail would provide some time savings, but both required paying a fare.

80.     The Stated Preference Study also found that approximately 28 percent of walking trips take more than 50 minutes.  Although people walking for that period of time could save a

substantial amount of time by taking the Las Vegas Strip Bus Route, they historically had not done so.

81.     The Cox Report explained that for people walking these longer distances, it was possible that the purpose of the trip involved not only the destination but also the visually attractive streetscape of the Las Vegas Strip.  Accordingly, the Report concluded it was unlikely that many walkers in this category would use the Monorail.

82.     The Cox Report also noted that the Las Vegas Strip Bus Route makes possible point to point trips nearly as rapid as the Monorail, yet a far larger number of visitors walk than take transit.  Thus, the Report concluded it was unlikely the Monorail would attract the projected ridership from people who walk along the Strip.

### Cox Did Not Believe the Monorail Would Capture Substantial Ridership From Taxi Cabs.

83.     The Cox Report evaluated ridership that the Monorail could potentially attract from taxi cabs.  It was projected that the Monorail would attract approximately 20 percent of its ridership from taxi cabs (11,000 daily riders).  The Cox Report calculated that there was likely to be approximately 70,000 daily trips by taxi cab in the Las Vegas Strip in 2003, which meant that more than 15 percent of taxi passengers would be expected to switch to the Monorail.

84.     The Cox Report observed that, unlike the bus and Monorail, the taxi cab market was comparatively price-insensitive and that taxi cab fares between the locations that would be served by the Monorail ranged from $4.50 to $10.50, which was considerably more than the Monorail's fares.  In light of this price insensitivity, the Cox Report determined that it was unlikely that a large number of taxi cab passengers (who were already willing to pay between two and five times more than a one-way Monorail fare) would be attracted by the lower fare.

85.     The Cox Report also noted that taxi cabs generally pick up and drop off passengers closer to their destinations (such as at the front door of hotels) than the Monorail stations.  The Report further noted that taxi cabs were not restricted to heavily congested Las Vegas Boulevard South and could use less congested roadways such as Paradise Road and Industrial Boulevard.  As a result, the Cox Report concluded that the Monorail was not likely to provide any material time savings for taxi cab passengers.

86.     Finally, the Report noted that the Las Vegas taxi cab market was dynamic, not static, and could be expected to respond to any serious competitive threat posed by the Monorail.

***Cox Did Not Believe the Monorail Would be the Most Productive Local Circulator System in the Nation.***

87.     The Cox Report compared the Monorail to other local circulators and concluded the projections for the Las Vegas Monorail were so high that, if true, it would be by far the most productive local circulator system in the nation.

88.     After comparing the Monorail to existing local circulator routes in Miami, Seattle and Jacksonville, the Cox Report concluded that the Monorail was projected to have by far the highest average fare per passenger with substantially greater ridership projections.

89.     Cox concluded LVMC could not charge the higher fares and generate substantially greater ridership than other existing local circulator systems.

***Cox Did Not Believe the Monorail Could Generate the Projected Amount of Advertising Revenue.***

90.     The Cox Report evaluated the Monorail's projected revenue from advertising, noting that in its first full year of operation the Monorail was projected to earn $6.7 million in advertising revenue.  The Cox Report compared the Monorail advertising revenue projections to historic advertising revenues generated by other transit systems and concluded the Monorail

projections were very high for a system operating 36 or fewer rail cars.  For example, the Cox Report discussed the fact that the transit system in Washington D.C., which operated more than 600 rail cars and 1,100 buses, earned less than $4 million in advertising revenues.  The Cox Report also explained that transit systems in metropolitan areas of similar size to Las Vegas earned, on average, less than $600,000 in annual advertising revenues.

91.     Advertising revenue was particularly important to Second Tier bondholders because the First Tier Bondholders had priority with respect to payment of principal and interest from revenues generated by the Monorail.

92.     The Cox Report projected the Monorail could reasonably be expected to generate advertising revenue between $3.3 million in its "Conservative Ridership Projection" and $6.6 million in its "Optimistic Ridership Projections."  By the time the URS Study was issued in August 2000, LVMC had increased projected advertising revenue from the $6.7 million evaluated by Cox to $8.1 million.

**Mandalay Bay and the Venetian Withdraw their Objections to the Monorail After Learning Nevada Taxpayers Would not be at Risk.**

93.     Mandalay Bay and the Venetian's objections to the Monorail and the financing were based in part on their concern that Nevada taxpayers would end up paying for what they believed would be a failed system.

94.     Mandalay Bay and the Venetian dropped thier opposition and withdrew earlier threats to use lawsuits to block the project after private insurance was obtained for the First Tier Bonds and other safeguards were put in place to protect Nevada taxpayers from liability.

**Citigroup Attached the August 2000 URS Study to the Official Statement but Did Not Disclose the Existence or Content of the Cox Report.**

95.     The August 2000 URS Study attached to the OS projected daily ridership at 53,526 in 2004 (the anticipated first full year of Monorail operations), translating into a total projected annual ridership of 19,536,000 (versus a maximum of about 9 million in the Cox Report).   At an average one-way fare per passenger of $2.50, the URS Study projected annual farebox revenue of $48,840,000 (versus a maximum of about $22 million in the Cox Report). The URS Study projected non-farebox revenues, including revenue from advertising, sponsorships, and naming rights, at approximately $8.1 million in 2004 (versus a maximum of about $6.6 million in the Cox Report).

96.     In the URS Study, annual ridership and total revenues were projected to grow each year following 2004, including in years with fare increases.   Fares were projected to increase every three years.   Revenues were projected to be sufficient to pay all operating expenses and provide sufficient free cash flow to make all the required principal and interest payments on the Monorail Bonds.

97.     As the lead underwriter and as an offeror and seller of the Second Tier Bonds, Citigroup was responsible for the accuracy and completeness of the representations made to bond purchasers in the OS used during the initial public distribution of the Bonds in 2000.

98.     The Official Statement prepared by Citigroup attached the URS Study as Appendix "E" and stated that URS believed the assumptions contained in the Study were reasonable.   Citigroup did not disclose the existence of or the factual content and findings in the Cox Report, the Malamud Report or the Rubin Report.

**The State of Nevada Issues $600 Million in Monorail Bonds in September 2000.**

99.    On September 12, 2000, the State of Nevada issued $300 million in Las Vegas Monorail Project Revenue Bonds, First Tier Series 2000 ("First Tier Bonds") and $149,200,000 in Second Tier Bonds.  Nevada also issued $50,000,000 in Third Tier Bonds that were purchased by the Developers of the project.  The First Tier Bonds were senior to the Second Tier Bonds, were rated "AAA" and were insured by Ambac Financial Group, Inc.  The Second Tier Bonds were not rated or insured.

100.    The Second Tier Bonds were to be repaid solely from revenues generated through operation of the Monorail by LVMC.  Principal and interest on the Second Tier Bonds was payable from and secured by a pledge of "Senior Loan Repayments" to be made under a "Financing Agreement" between Nevada and LVMC.  Such payments could not be made, however, until after payment of operation and maintenance costs, debt service on the First Tier Bonds, payments required to replenish the debt service reserve fund for the First Tier Bonds, and payments to reimburse the provider of a surety bond.

101.    LVMC was obligated to make the Senior Loan Repayments to Nevada from "Net Project Revenues" which included all farebox revenues, advertising revenues, liquidated damages, proceeds of insurance (to the extent such proceeds were not used to repair or rebuild the Monorail), and certain investment earnings remaining after payment of operation and maintenance costs.  Farebox revenues and advertising revenues were the two primary sources of revenue that would be used to repay the Monorail Bonds.

102.    When the Bonds were issued in September 2000, the Trustee placed over $38.3 million into the capitalized interest account for the Second Tier Bonds.  The amount deposited plus the projected earnings on the amounts deposited into the capitalized interest account were

sufficient to enable the Trustee to pay interest on the Second Tier Bonds for the first fifty-two months after issuance of the Bonds (or through the January 2005 interest payment date).

103.    Citigroup retained ownership of a substantial portion of the Second Tier Bonds. Citigroup assigned an analyst to follow the Bonds and stay current on the financial performance of the Monorail.

**The Monorail Experiences Construction Delays and Operational Problems.**

104.    The Monorail was scheduled to be under construction through 2003 and was projected to be completed in January 2004.  However, due to construction delays, the Monorail did not open for public use until July 2004.

105.    The Monorail experienced operational problems from June until September 2004 and was shut down for repairs for the remainder of 2004.

106.    Calendar year 2005 was the first full year of operations for the Monorail and LVMC.

**The Monorail Fails To Achieve Ridership and Revenue Projections in the First Full Year of Operations.**

107.    As a result of the construction delays and operational problems, 2005 was the first full year of Monorail operations.

108.    The 2005 audited financial statements for LVMC were issued in about April 2006.  During 2005, the Monorail carried 10,264,000 riders (about 1 million more than the maximum predicted in the Cox Report and about 9.2 million less than projected in the August 2000 URS Study).  The Monorail generated $30,301,000 in revenue in 2005 (about $7.4 million more than the maximum in the Cox Report and about $18.5 million less than projected in the URS Study).  Advertising revenue for 2005 was approximately $2.3 million (about $1 million

less than the conservative estimate in the Cox Report and about $5.8 million less than projected in the URS Study).

**LVMC's 2006 Budget Projected Substantially Improved Performance Over 2005.**

109.    LVMC prepared a "Presentation of the 2006 Budget" in December 2005 and implemented a large fare increase in December 2005. As of December 2005, LVMC projected 2006 revenues at about $57 million (a 75 percent increase over 2005 and just $1 million less than that was projected in the URS Study for the second year of operations).   Advertising revenues were projected to increase to about $7.5 million in 2006.  LVMC projected an increase in net operating revenue from about $7.8 million in 2005 to over $29 million in 2006.

110.    In the 2006 budget, LVMC projected it would have enough revenue available to pay all of the required debt service on the First and Second Tier Bonds in 2006 without accessing the debt service reserve funds for those bonds.  As of the end of 2005, there was over $14 million in the debt service reserve fund for the Second Tier Bonds.

111.    LVMC had also asserted claims with respect to the operational problems suffered when the system began operations in 2004 and anticipated a recovery of $10 million on those claims in 2006.

112.    The revised fare schedule implemented by LVMC in December 2005 increased the 2006 "Estimated Average Per Ride" fare from $2.92 to 4.25 (a forty-five percent increase following the first full year of operations) while projecting ridership would increase from 10,490,000 in 2005 to 11,544,500 in 2006.  While projected ridership for 2006 (11,544,500) was about 40 percent less than what was projected for the second year of operations in the OS (19,935,000), the fare increase was projected to generate enough revenue to cover the reduced

ridership projection.   LVMC's 2006 budget projected $57 million for the second year of operations compared to $58 million in the OS.

113.   The ability of LVMC to increase revenues through a substantial rate increase without losing a substantial amount of both riders and revenues was highly dependent upon the "elasticity" of LVMC's market.   If LVMC's market was perceived to be highly sensitive (or "elastic") to price increases, then the December 2005 fare increase would be anticipated to have a substantial negative impact on both ridership and revenues.

114.   The Cox Report, the Malamud Report and the Rubin Report each demonstrated that the LVMC ridership base was very likely to drop substantially in the face of a price increase of this magnitude.

115.   Citigroup continued to gather information on the Monorail in the secondary market and obtained copies of the 2005 audited financial statements and the Presentation of the 2006 Budget.   Citigroup knew, based on the information in the Cox Report, the Malamud Report and the Rubin Report, that it was highly unlikely the Monorail would maintain its ridership base, much less increase it in the face of a forty-five percent increase in average fare, and knew it was highly unlikely LVMC could generate over $7 million in advertising revenue.

**LVMC Announces its Intention to Extend the Monorail to McCarren Airport and Down the West Side of the Strip.**

116.   In 2006, LVMC announced its plan to extend the Monorail to McCarren Airport and down the West side of the Strip.   It was anticipated that over a billion in bonds would be issued to extend the Monorail.   LVMC proposed pre-refunding the Monorail Bonds, including the Second Tier Bonds, in connection with obtaining financing for the proposed new extension of the Monorail.   Applicable interest rates were significantly lower in 2006 than they were in 2000, making a pre-refunding attractive from an interest rate standpoint.   If a pre-refunding

occurred, the Second Tier Bonds would be backed by U.S. Treasury securities, thereby making them an extremely attractive investment.

117.    Citigroup wanted to facilitate financing for the proposed extension, wanted to be selected as an underwriter for any issuance of new bonds and wanted to be paid what would be a very substantial underwriting fee.   To that end, Citigroup saw the need to establish a high secondary market trading price for the Second Tier Bonds.

118.    It was in this context that Citigroup offered and sold the Second Tier Bonds to the Lord Abbett Fund in September and October 2006.

**Citigroup Offers and Sells $13 Million in Par Value of the Second Tier Bonds To Lord Abbett Without Disclosing The Existence Of The Cox Report, the Malamud Report and the Rubin Report.**

119.    Citigroup contacted Lord Abbett in September 2006 to see if the Lord Abbett Fund was interested in purchasing $13 million in par value of Second Tier Bonds.

120.    As a secondary market offeror and seller of the Second Tier Bonds to the Lord Abbett Fund, Citigroup was responsible for making full and fair disclosure to Lord Abbett of all material facts that it was aware of at the time the Bonds were sold to the Lord Abbett Fund.

121.    The existence and content of the Cox Report, the Malamud Report and the Rubin Report were material facts as of September 2006 that Citigroup was aware of and was required to disclose to Lord Abbett.

122.    Citigroup provided Lord Abbett with the 2000 Official Statement with the URS Study, LVMC's 2005 audited financial statements and the Presentation of the 2006 Budget. Citigroup did not, however, disclose the existence or content of the Cox Report, the Malamud Report or the Rubin Report to Lord Abbett.

123.   Citigroup provided a PowerPoint presentation called "Las Vegas Monorail Proposed Airport Extension" to Lord Abbett in December 2006. The PowerPoint presentation offered reassuring explanations as to why the Monorail had not achieved its projected ridership early on. For example, the PowerPoint noted initial ridership estimates had assumed a "significant amount of marketing by connected hotels," and that joint marketing promotions were in the process of being developed. The PowerPoint stated that the initial ridership estimates assumed an "early and well-funded Monorail marketing program," which did not materialize at the level or in the timeframe originally anticipated. The PowerPoint stated that the marketing budget was being "increased almost seven-fold to address early shortcomings." The message conveyed by the PowerPoint was: an increased marketing budget, including joint marketing promotions with connected hotels, would put the Monorail ridership back on track.

124.   Citigroup representatives made oral representations to Lord Abbett consistent with the above allegations regarding LVMC's plans to increase revenues and extend the Monorail to McCarren Airport and down the west side of the Las Vegas Strip.

125.   At the time Citigroup made the decision to not disclose either the existence or the content of the Cox Report, the Malamud Report or the Rubin Report to Lord Abbett, Citigroup had a copy of the Cox Report, the Malamud Report and the Rubin Report and was fully aware of the Reports' conclusions, including the ultimate conclusions that the Monorail was not economically feasible. Citigroup was also fully aware of the factual bases underlying the Reports' conclusions. Citigroup knew the Cox Report's ridership and revenue projections had proven to be much more reliable and accurate than the projections in the URS Study attached to the OS. Given the 45 percent increase in average fares, Citigroup knew the predictions of Cox, Malamud and Rubin that even small fare increases would result in a substantial decline in

ridership could prove highly accurate and result in a substantial negative impact on revenue in 2007. Citigroup knew that, through the first half of 2006, the Monorail was not coming close to meeting the projections set forth in the 2006 Budget.  For example, the 2006 Budget projected a total of 11,544,500 rides, or approximately 31,628 single-fare rides per day.  By September 2006, Citigroup knew the Monorail was not on track to achieve anywhere near this level of ridership.

126.    Based on the information that was provided by Citigroup, but without the benefit of the Cox Report, the Malamud Report or the Rubin Report or financial data for 2006, Lord Abbett had to decide whether it was reasonable to expect LVMC to increase ridership and fares to an extent sufficient to repay the Monorail Bonds and had to decide how likely it was that LVMC would be able to extend the Monorail and refund the existing Monorail Bonds in the process of financing the extension.

127.    This was not an easy decision for Lord Abbett given the poor performance of the system in 2005, and a decision was almost made based on the recommendation of the Lord Abbett bond analyst to not purchase any Second Tier Bonds.

**Lord Abbett Purchased the Bonds in September and October Of 2006 in Reliance upon Citigroup's Misleading Statements.**

128.    Relying reasonably on the information provided by Citigroup, Lord Abbett purchased $13 million in par value of Second Tier Bonds from Citigroup in four transactions occurring between September 21, 2006 and October 4, 2006:

| Amount | Trade Date | Price | Amount Paid |
|---|---|---|---|
| $3,000,000 | September 21, 2006 | 103.390 | $3,101,700 |
| $3,000,000 | September 21, 2006 | 103.290 | $3,098,700 |

| $2,000,000 | September 27, 2006 | 104.400 | $2,088,000 |
| $5,000,000 | October 3, 2006 | 104.879 | $5,243,950 |

129.     These purchases by Lord Abbett represented at least half of the Second Tier Bond purchases during the timeframe in which Citigroup was promoting the pre-refunding of the Bonds and the extension of the Monorail.

**The Monorail Fails To Generate Sufficient Revenue to Meet Its Financial Obligations And Files For Bankruptcy.**

130.     Less than two weeks after the final purchase, Fitch announced its downgrade of the stand-alone credit rating for the First-Tier Bonds to CCC indicating a significant probability of default, but for the bond insurance.  On November 21, 2006, Moody's, another major credit rating agency, issued a similar downgrade of its stand-alone credit rating for the First-Tier Bonds.

131.     The Monorail carried just over 7 million riders in 2006, down from more than 10 million in 2005, and less than half of the roughly 20 million that had been projected.  Consistent with the "elasticity" analysis in the Cox Report, the 45 percent fare increase caused a 32 percent drop in ridership.  Farebox revenue increased over 2005 by about $2 million to $32.2 million, far below the $49 million projected in the 2006 Budget.  Consistent with the Cox Report, advertising revenue in 2006 was $5.3 million, about $2.2 million less than projected.

132.     The Monorail's revenues and cash reserves were, however, sufficient to cover debt service during 2006 and 2007.

133.     The Second Tier Bonds experienced an event of default when the debt service reserve fund was used to make the January 2008 interest payment.

134.    Lord Abbett sold $500,000 in par value of the Bonds at a price of 36.500 and a principal amount of $182,500 on February 20, 2008.

135.    Lord Abbett sold $2,500,000 in par value of the Bonds at a price of 35.000 and a principal amount of $875,000 on February 14, 2008.

136.    There was no further market for the sale of the Lord Abbett Fund's remaining holdings in the Bonds after February 14, 2008.

137.    The first payment default on the Second Tier Bonds occurred in July 2009 when the Debt Service Reserve was not sufficient to make required debt service payment in full.

138.    Lord Abbett did not learn of the existence of the Cox Report until November 2009 and did not learn of the existence of the Malamud Report or the Rubin Report until much later.

139.    LVMC filed for Chapter 11 bankruptcy protection in January 2010.   Ambac Financial Group, Inc., the company that insured the First Tier Bonds (but not the Second Tier Bonds), filed for bankruptcy protection in November 2010.

140.    The Lord Abbett Fund's bankruptcy recovery was minimal.   The Second Tier Bonds no longer exist.

141.    The Lord Abbett Fund has suffered damages as a direct and proximate result of the wrongful conduct of Citigroup.

### FIRST CLAIM FOR RELIEF
#### (Common Law Fraud)

142.    Lord Abbett repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

143.    Citigroup made material representations and omissions of presently existing or past facts, as more fully alleged above.

144.    Citigroup knew that the misrepresentations, and the impressions created by the material omissions, were false and misleading.

145.    Citigroup made the misrepresentations and omissions with an intent to induce Lord Abbett to purchase the Bonds.

146.    Lord Abbett was not aware of the omissions or that Citigroup's representations were false and misleading.

147.    Lord Abbett justifiably relied on the representations made by Citigroup.

148.    As a direct and proximate result of its reliance upon Citigroup's representations, Lord Abbett suffered damages.

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation)

149.    Lord Abbett repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

150.    Citigroup provided the above alleged information to Lord Abbett for it to rely upon and use in making an investment decision.

151.    As the secondary market seller of the Bonds to the Lord Abbett Fund, Citigroup owed a duty to Lord Abbett, to disclose all known material facts concerning the Bonds and the Monorail project.

152.    In connection with its sale of the Bonds to Lord Abbett, as more fully alleged above, Citigroup failed to exercise reasonable care in making and providing statements of presently existing or past fact, and negligently omitted material facts, which negated the truth of or rendered misleading the statements that Citigroup made and provided to Lord Abbett.

153.    Lord Abbett was a reasonably foreseeable recipient of the information from Citigroup.

154.    Lord Abbett justifiably relied on the incorrect statements.

155.    Lord Abbett sustained damages as a result of its reliance on Citigroup's incorrect statements.

### THIRD CLAIM FOR RELIEF
### (Violation of the New Jersey Securities Act)

156.    Lord Abbett repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

157.    As an underwriter participating in the distribution of the Bonds on the secondary market, Citigroup was a person offering the Bonds, a security, to members of the investing public, including Lord Abbett.  Citigroup offered and sold a security by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.    Citigroup also offered and sold the Bonds by employing device, scheme, or artifice to defraud, and by engaging in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

159.    At the time that it sold the Bonds to Lord Abbett, Citigroup knew of the untruths and omissions and intended to deceive Lord Abbett.

160.    At the time that it purchased the security from Citigroup, Lord Abbett was unaware of the untruth or omission of material fact in the information it received and relied upon from Citigroup.

161.    As a result of Citigroup's violation of N.J.S. § 49:3-71(a)(2), Lord Abbett has been damaged and is entitled to complete rescission and return of its investment, plus interest and costs, or, alternatively, is entitled to recover damages plus interest and costs.

## RELIEF REQUESTED

162.    Lord Abbett requests that the Court enter judgment in its favor against Defendant Citigroup on each of its Claims for Relief and award Lord Abbett:

       A.     Statutory damages or rescission;

       B.     In the alternative, out-of-pocket damages;

       C.     Prejudgment interest;

       D.     Costs;

       E.     Punitive damages;

       F.     Attorney's fees; and

       G.     Any other relief which the Court deems proper.

## DEMAND FOR JURY TRIAL

Lord Abbett hereby demands a jury trial with respect to all claims asserted in this Complaint.

Dated this 7th day of August, 2013.

              Respectfully submitted,

              ARSENEAULT WHIPPLE FASSETT & AZZARELLO, LLP

              By:  s/ John A. Azzarello_____

              DAVIS & CERIANI, P.C.

              By:  s/ Michael P. Cillo_____

              Attorneys for Plaintiff

**L.Civ.R. 11.2 Certification**

I certify that, to my knowledge, the matter in controversy is not the subject of any other action pending in any other court, or of any pending arbitration or administrative proceeding.

s/ John A. Azzarello_____

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of August, 2013, the foregoing was served via electronic delivery and/or U.S. Mail, addressed to the following:

Edwin A. Zipf
Bressler, Amery & Ross
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932

Marshall H. Fishman
Timothy P. Harkness
Cheryl L. Howard
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022

s/ John A. Azzarello_____