Edwin A. Zipf (EZipf@bressler.com)
**BRESSLER, AMERY & ROSS**
A Professional Corporation
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932
Telephone: (973) 514-1200
Facsimile: (973) 514-1660

Marshall H. Fishman (Marshall.Fishman@freshfields.com) (admitted *Pro Hac Vice*)
Timothy P. Harkness (Timothy.Harkness@freshfields.com) (admitted *Pro Hac Vice*)
Cheryl L. Howard (Cheryl.Howard@freshfields.com) (admitted *Pro Hac Vice*)
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., on behalf of its series Lord Abbett High Yield Municipal Bond Fund, a Maryland corporation,<br>Plaintiff,<br>v.<br>CITIGROUP GLOBAL MARKETS, INC., a New York corporation,<br>Defendant. | Civil Action No. 2:11-cv-05550-CCC-JBC<br>Oral Argument Requested<br>Return Date: February 17, 2015 |

**DEFENDANT CITIGROUP GLOBAL MARKETS INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 4

A. Lord Abbett Runs a High Yield Municipal Bond Fund ..... 4

B. The OS Discloses the Risks of the Bonds and the Public Debate Over Ridership and Revenue Projections ..... 5

C. Public Documents Confirm that the Monorail Badly Misses Its Ridership and Revenue Projections in 2005 and 2006 ..... 8

D. In Early 2006, Lord Abbett Considers and Decides Against Buying Second Tier Bonds ..... 10

E. Dan Solender Joins Lord Abbett in July 2006 and Lord Abbett Expresses Interest in Monorail Bonds ..... 11

F. Lord Abbett Decides to Buy Second Tier Bonds Even Though It Knows that the Monorail Was Not Achieving the Ridership or Revenue Projected In the OS ..... 12

G. CGMI Makes No Representations to Lord Abbett Prior to Lord Abbett's First Purchase of Second Tier Bonds ..... 13

H. Lord Abbett Consults Counsel After the Monorail Bonds Are Further Downgraded and Default ..... 15

PROCEDURAL HISTORY ..... 17

ARGUMENT ..... 18

I. THE CLAIMS FOR STATUTORY AND COMMON LAW FRAUD SHOULD BE DISMISSED ..... 19

A. Lord Abbett Has Not Established The Existence of a Material Untrue Statement or Omission ..... 20

1. CGMI Had No Duty to Disclose the Opposition Consultants' Reports in 2006 ........ 20

2. CGMI Had No Duty to Disclose the Opposition Consultants' Reports in 2000 ........ 24

3. The Outdated Opposition Consultants' Reports Were Not Material ........ 26

B. Lord Abbett Did Not Reasonably Rely on CGMI ........ 29

C. Lord Abbett Has Not Established Scienter ........ 33

D. Lord Abbett Has Not Established Loss Causation ........ 34

E. The Statute of Limitations Bars the NJUSA Claim ........ 36

II. THE NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED ........ 39

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alten v. Berman*,
Civil Action No. 87-8343, 1993 WL 541668 (E.D. Pa. Dec. 29, 2003) .......... 21

*Bramblewood Investors, Ltd. v. C&G Assoc.*,
262 N.J. Super. 96 (N.J. Super. Ct. Law Div. 1992) .......... 36

*Cioni v. Globe Specialty Metals, Inc.*,
Case No. 10-cv-01388 (DMC) (JAD), 2013 WL1844752 (D.N.J. Apr. 30, 2013) .......... 19

*Columbia Sav. & Loan Ass'n v. Forum Ins. Co.*,
Civ. A. No. 89-700, 1990 WL 235660 (D.N.J. Dec. 26, 1990) .......... 29, 32

*CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*,
940 F. Supp. 2d 141 (D.N.J. 2013) .......... 18, 19

*Cuccolo v. Lipsky, Goodkin & Co.*,
826 F. Supp. 763 (S.D.N.Y. 1993) .......... 38, 39

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
945 F.2d 1226 (2d Cir. 1991) .......... 28

*DeRobbio v. Harvest Cmtys. of Sioux Cty*,
Civil Action No. 01-1120 (MLC), 2002 WL 31947203 (D.N.J. Oct. 30, 2002) .......... 26, 33

*Farris v. Cnty. of Camden*,
61 F. Supp. 2d 307 (D.N.J. 1999) .......... 33

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007) .......... 29

*Greenberg v. Pro Shares Trust*,
Docket No. A-075801OT3, 2011 WL 2636990 (N.J. Super. July 7, 2011) .......... 32

*Hosiery Corp. of Am., Inc. v. Int'l Data Processing, Inc.*,
Civ. A. No. 89-115, 1991 WL 30015 (D.N.J. Feb. 28, 1991) .......... 26

*In re Discovery Labs Sec. Litig.*,
Case No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) .......... 26, 29

*In re Exxon Mobile Corp.*,
387 F. Supp. 2d 407 (D.N.J. 2005) .......... 37, 39

*In re House of Drugs, Inc.*,
251 B.R. 206 (Bankr. D.N.J. 2000) .......... 32

*In re Intelligroup Sec. Litig.*,
468 F. Supp. 2d 670 (D.N.J. 2006) .......... 28

*In re Kantor*,
Nos. 84-30402, 84-7116, 1986 WL 28904 (Bankr. S.D.N.Y. Oct. 1, 1986) .......... 31

*In re Nuveen Funds*,
No. C 08-4575 SI, C 09-1437 SI, 2011 WL 1842819 (N.D. Cal. May 16, 2011) .......... 4, 36

*In re Synchronoss Sec. Litig.*,
705 F. Supp. 2d 367 (D.N.J. 2010) .......... 21, 22

*In re Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992) .......... 25, 26

*Karu v. Feldman*,
119 N.J. 135 (1990) .......... 40

*Kaufman v. I-Stat Corp.*,
165 N.J. 94 (2000) .......... 30

*Lord Abbett Mun. Income Fund v. Asami*,
No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014) .......... 3, 31

*Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
253 F.R.D. 300 (D.N.J. 2008) .......... 38

*Love v. Alfacell Corp.*,
Civil Action No. 09-5199 (MLC), 2011 WL 4915874 (D.N.J. Oct. 17, 2011) ..... 33

*McCabe v. Ernst & Young LLP*,
494 F.3d. 418 (3d Cir. 2007) ..... 34, 35

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
No. Civ. 94-5522 (RBK), 2005 WL 3500032 (D.N.J. Dec. 20, 2005) ..... 34, 40

*Mill Bridge V, Inc. v. Benton*,
Civil Action No. 08-2806, 2009 WL 4639641 (E.D. Pa. Dec. 3, 2009) ..... 27, 28

*Mun. High Income Fund, Inc. v. Goldman, Sachs & Co.*,
21 Misc. 3d 1133(A), 2008 WL 4938280 (Sup. Ct. New York Cnty. Oct. 30, 2008) ..... 24, 38

*N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*,
725 A.2d 1133 (N.J. Super. 1998) ..... 21, 23

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*
135 F. 3d 266 (3d Cir. 1998) ..... 1

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) ..... 26, 27

*Pension Trust Fund for Operating Eng'rs v. Mort. Asset Securitization Transactions*,
Civil Action No. 10-898 (CCC) (JAD), 2012 WL 3113981 (D.N.J. July 31, 2012) ..... 37, 38, 39

*Premier Pork L.L.C. v. Westin, Inc.*,
Civil Action No. 07-1661, 2008 WL 724352 (D.N.J. Mar. 17, 2008) ..... 20

*Rand v. Cullinet Software, Inc.*,
847 F. Supp. 200 (D. Mass. 1994) ..... 28

*Roll v. Singh*,
Civil Action No. 07-cv-04136, 2008 WL 3413863 (D.N.J. Apr. 12, 2010) ........ 36, 37

*Ross v. Celtron Int'l, Inc.*,
494 F. Supp. 2d 288 (D.N.J. 2007) ........ 20

*Salovaara v. Jackson Nat'l Life Ins. Co.*,
66 F. Supp. 2d 593 (D.N.J. 1999) ........ 20, 21

*Shogen v. Global Aggressive Growth Fund*,
Civ. Action No. 04-5695 (SRC), 2007 WL 1237829 (D.N.J. Apr. 26, 2007) ........ 34

*Ward v. UBS Painewebber, Inc.*,
Civ. No. 02-3878 (JAP), 2003 U.S. Dist. LEXIS 24056 (D.N.J. Sept. 10, 2003) ........ 38

*WM High Yield Fund v. O'Hanlon*,
No. 04-3423, 2013 WL 3230667 (E.D. Pa. June 27, 2013) ........ 35

**STATUTES**

N.J.S.A. 49:3-71(g) ........ 36

NJUSA ........ *passim*

**OTHER AUTHORITIES**

Fed R. Civ. P. 56 ........ 18, 40

Local Civil Rule 56.1 ........ 1, 5

Defendant Citigroup Global Markets Inc. ("CGMI") respectfully submits this Memorandum of Law in support of its motion ("Motion") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the first amended complaint ("Complaint" or "Compl.") filed by Plaintiff Lord Abbett Municipal Income Fund, Inc. ("Lord Abbett" or "Plaintiff").

## PRELIMINARY STATEMENT

Lord Abbett, a sophisticated trader of high yield "junk" municipal bonds, seeks to make CGMI, a market maker[1] in Las Vegas Monorail Second Tier Bonds (the "Second Tier Bonds"), an insurer of profit after the default of those bonds. The Court should reject Lord Abbett's claims for common law fraud, negligent misrepresentation, and violations of the New Jersey Uniform Securities Law ("NJUSA") and grant CGMI summary judgment because the undisputed facts established in discovery show:

1. CGMI made no oral representations, and did not provide any documents, regarding the Second Tier Bonds on which Lord Abbett relied in purchasing the bonds.

2. Lord Abbett's analyst REDACTED both admitted that they knew, before Lord Abbett purchased the bonds, that the Las Vegas Monorail's (the "Monorail") actual ridership and revenues were "just over 50% of projected levels" and that "fare box revenues will not be sufficient to cover 1st Tier let alone 2nd Tier debt service."

---

1 "In a dealer market, market makers create liquidity by being continuously willing to buy and sell the security in which they are making a market." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.* 135 F. 3d 266, 268 (3d Cir. 1998).

3. Before Lord Abbett purchased the bonds in the fall of 2006, Lord Abbett's analyst warned management that, in March 2006, the Fitch rating agency "estimated . . . that the 2nd Tier bonds will face payment issues by the time of the July 1, 2008 debt service payment."

4. Before Lord Abbett purchased the bonds, Lord Abbett's analyst knew from the Official Statement for the Second Tier Bonds (the "OS"), dated September 1, 2000, "that there were other reports done by consultants retained by various parties that opposed construction of the Monorail" and chose not to request those reports.

5. The 1999 and 2000 reports by consultants hired by opponents of the Monorail ("Opposition Consultants") that questioned the financial viability of the Monorail – reports Lord Abbett contends CGMI should have disclosed both in the OS and again before Lord Abbett's 2006 purchases of the bonds – were the subject of national media coverage, were publicly available on the Internet, and were known to other traders in the market.

6. In 2008, more than three years before filing suit, Lord Abbett's portfolio manager inquired into the Second Tier Bonds' price drop, even consulting with counsel about Second Tier Bonds-related litigation.

These undisputed facts, established during discovery, entitle CGMI to summary judgment for a number of reasons.

*First*, CGMI had no duty to apprise Lord Abbett of the outdated and publicly available Opposition Consultants' reports it contends CGMI should have disclosed. As a market maker, CGMI had no responsibility to educate Lord Abbett, a billion-dollar bond fund investing in high yield "junk" bonds. Because CGMI had not elected to provide Lord Abbett with information before Lord Abbett bought the bonds, CGMI also had no duties arising out of any disclosure (because there was no such disclosure). Absent a duty, CGMI may not be held liable for any alleged

fraud by omission.

*Second*, even if CGMI had a duty to disclose the reports by the Opposition Consultants, the undisputed record reveals that CGMI did not make a representation upon which Lord Abbett relied.   Absent a false or incomplete statement, all of Lord Abbett's claims must be dismissed.   And, absent actual reliance on a false or incomplete statement, both of Lord Abbett's common law claims must be dismissed.

*Third*, it is now also beyond dispute that Lord Abbett knew of the actual financial condition of the Monorail from publicly available information.   The six-year-old financial projections from the OS – which Lord Abbett contends were misleading without specific reference to the Opposition Consultants' reports – therefore were stale and immaterial as a matter of law.   The lack of materiality dooms all of Lord Abbett's claims.

*Fourth*, Lord Abbett's knowledge of the Monorail's poor financial performance also makes any claimed reliance unreasonable as a matter of law.   As a California court held just months ago in a similar case brought by Lord Abbett, reliance on projections in an offering document is unreasonable when years of actual financial results, showing that the original projections made in an offering statement are not being met, are available. *See Lord Abbett Mun. Income Fund v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at *44 (N.D. Cal. July 11,

2014) ("No reasonable jury could find that Lord Abbett's reliance on the 2007 [offering memorandum] in making the 2010 bond purchases was justifiable under the circumstances."). The lack of reasonable reliance is an independent basis for dismissal of Lord Abbett's common law claims.

*Fifth*, the undisputed facts establish that Lord Abbett cannot prove loss causation. The market knew of the reports which Lord Abbett contends were concealed; REDACTED even had a copy of the report by Wendell Cox (the "Cox Report"), one of the Opposition Consultants, in its files. When the Associated Press reported about the Cox Report in 2007, the price of the Second Tier Bonds did not fall. As a court hearing a similar case brought by Lord Abbett's counsel has held, such undisputed facts doom claims like those here. *See In re Nuveen Funds*, No. C 08-4575 SI, C 09-1437 SI, 2011 WL 1842819, at *9 (N.D. Cal. May 16, 2011).

*Sixth*, because Lord Abbett indisputably knew of facts giving rise to inquiry notice no later than 2008, its state securities law claim is also time-barred.

For these reasons, CGMI respectfully submits that it should be granted summary judgment.

## STATEMENT OF FACTS

### A.   Lord Abbett Runs a High Yield Municipal Bond Fund

Lord Abbett's High Yield Municipal Bond Fund, the predecessor fund to

Plaintiff that purchased the Second Tier Bonds, was a sophisticated, high yield bond fund that, as of September 2006, managed over $1 billion. (Fact 1.)[2] The High Yield Municipal Bond Fund traded in below-investment grade "junk bonds"; "high-yield bonds" are "also known as 'junk bonds' or 'speculative bonds.'" (Fact 2.) These bonds have a "high default risk," and they "often pay a higher yield to compensate for greater risk." (Fact 3.) As Lord Abbett explained in a certified investors' report it filed with the Securities and Exchange Commission:

> [T]he risk that an issuer of a municipal bond may fail to make timely payments of principal or interest . . . is greater with municipal bonds rated below investment grade (sometimes called 'lower rated bonds' or 'junk bonds'). *High Yield invests a significant portion of its assets in such bonds . . . . Junk bonds are considered predominantly speculative by traditional investment standards*. In addition, the market for lower rated municipal bonds generally is less liquid than the market for higher rated bonds, subjecting them to greater price fluctuations which could result in losses.

(Fact 4, emphasis added.) As of September 30, 2006, Lord Abbett's High Yield Municipal Bond Fund had "lowered its average credit rating over the past year, as the Fund *increased its weighting of unrated bonds and below investment-grade bonds*." (Fact 5, emphasis added.)

### B. The OS Discloses the Risks of the Bonds and the Public Debate Over Ridership and Revenue Projections

In September 2000, the State of Nevada Department of Business and

---

[2] CGMI's Statement Pursuant to Local Civil Rule 56.1, filed herewith, identifies the evidence supporting CGMI's factual statements herein. Reference to facts from CGMI's Rule 56.1 Statement will be denoted as "Fact #."

Industry financed the construction of the Monorail by issuing bonds, which included investment grade, insured, and rated first tier bonds (the "First Tier Bonds"), and the Second Tier Bonds, which were uninsured, unrated, risky bonds offered only to institutional investors. (Facts 6-8.) Salomon Smith Barney, now part of CGMI, acted as an underwriter for the bonds. (Fact 9.) The OS disclosed that the "Underwriters have reviewed the information" in the OS but "do not guarantee the accuracy or completeness of such information." (Fact 10.)

The OS, dated September 1, 2000, disclosed that Second Tier Bond payments would be made from ridership revenue (*i.e.*, fees paid by Monorail riders) and advertising revenue. (Fact 11.) It further disclosed that the Las Vegas Monorail Company ("LVMC") had hired a transportation consultant, URS Greiner Woodward Clyde ("URS Greiner"), to make ridership and revenue projections based on disclosed assumptions. (Fact 12.) The OS contained 11 pages of risk disclosures relating to ridership and advertising revenue, including that the ridership and advertising projections: (i) were based on estimates and assumptions that may prove incorrect and, if that occurred, that the LVMC's bond payments could be materially affected; (ii) were "significantly higher" than comparable public transportation systems "in the United States or elsewhere"; and (iii) could vary materially from actual ridership and advertising results. (Fact 14.)

The OS also disclosed that there was a public debate about the feasibility of

the Monorail project and the accuracy of the ridership projections:

> At a hearing held on June 8, 2000 before the Issuer, the Monorail sponsor and various supporters and opponents made formal presentations and submitted additional written information. URS Greiner has reviewed these reports and presentations and they were considered in forming the basis of the conclusions set forth in its study.

(Fact 15 (OS at 69).) During the June 8, 2000 hearing, the Opposition Consultants (Wendell Cox, Bernard Malamud, Jon Twichell, and Thomas Rubin), who were hired by opponents of the Monorail to analyze an early draft of URS Greiner's projections, each spoke. (Fact 16.) They stated that they expected the Monorail's ridership and advertising revenues to be insufficient to cover bond payments. (Fact 18.) By February 2000, Mr. Cox had published a draft of his analysis of the Monorail's ridership and revenue projections on the Internet, and the Opposition Consultants' views were widely reported in the media. (Compl. ¶ 18; Facts 19-22.)

The OS also disclosed that, "[i]n the course of making its approvals for the issuance of the Bonds, the Issuer reviewed a number of studies and reports concerning the Monorail, including one from its Financial Advisor," Public Resources Advisory Group ("PRAG"). PRAG's report identified the Opposition Consultants, considered their views, and concluded that URS Greiner's ridership and revenue projections were reasonable. (Facts 23-29.)[3]

---

[3]    In finding that URS Greiner's projections were reasonable, PRAG considered a report by Wilbur Smith Associates ("WSA"), which CGMI had retained to review the projections. (Facts 31-33.) WSA received the Opposition Consultants' reports

### C.    Public Documents Confirm that the Monorail Badly Misses Its Ridership and Revenue Projections in 2005 and 2006

Even though the OS stated that the Monorail would begin operations in January 2004, it did not open until mid-2004, only to shut down shortly thereafter until December 29, 2004.  (Compl. ¶¶ 21, 22, 104-05; Fact 40.)

In March 2005, Moody's publicly downgraded the insured First Tier Bonds because "actual ridership levels for the first months of operations equal roughly 60% of the level projected by the original ridership study."  (Fact 43.)  Moody's stated that "[s]ignificant improvements in current ridership and revenues are needed to support operations and First-Tier debt service."  (Fact 44.)

The LVMC's 2005 audited financial statements (the "2005 Audited Financials") showed that the ridership and revenue for all of 2005 fell far below the projections in the OS:  in 2005, the Monorail carried approximately 9.2 million fewer riders, and generated approximately $18.5 million less in fare revenue, than the OS had projected; and the Monorail lost $45 million in 2005.  (Fact 42.)

The Monorail's poor performance and downgrades continued in 2006. (Facts 46-49.)  In February 2006, Fitch Ratings publicly downgraded the First Tier Bonds, in part because "significantly lower than anticipated fare revenue [was] not

---

and concluded that "[t]he revenue calculations emanating from [URS Greiner's] ridership forecasts are straightforward and appropriate."  (Fact 33.)  Deloitte & Touche, the advisor to Clark County, where the Monorail was built, also knew of the Opposition Consultants' reports.  (Fact 35.)

expected to be sufficient to pay debt service, even with the recent aggressive fare increase, requiring regular draws on internal liquidity to meet obligations." (Fact 46.) Fitch observed that the January 2006 fare increase caused a drop in ridership, and "[w]ith higher than expected sensitivity to the fare increase and an overall lower base of ridership, Fitch expect[ed] fare revenues to be insufficient to meet the monorail's debt service obligations." (Fact 47.) In addition, Fitch wrote in February 2006 and again in March 2006:

> With some ridership growth and periodic fare increases at around inflationary levels, Fitch estimates that fare revenues combined with internal liquidity should be sufficient to meet first-tier bonds debt service obligations for the next five to seven years, while *the second-tier bonds would encounter payment problems in less than two years*.

(Fact 48, emphasis added.)

Throughout the rest of 2006, the LVMC publicly reported its ridership and revenue numbers, which fell short of the projections made in 2000. (Fact 49.)

In June 2006, Mr. Cox, an Opposition Consultant later retained by Lord Abbett to testify as an expert in this case, reported on the Monorail on his blog:

> The saving grace with respect to the Las Vegas Monorail is that the losses will all be private – *investors who should have known better* – rather than the taxpayers, whose funding is involuntarily and frequently committed to unworthy projects.

(Fact 50, emphasis added.)

### D. In Early 2006, Lord Abbett Considers and Decides Against Buying Second Tier Bonds

Six years after the issuance of the OS, Lord Abbett considered purchasing the Second Tier Bonds. Lord Abbett's analyst, Joe Krist, analyzed the Second Tier Bonds for Lord Abbett in early 2006. (Fact 51.) Mr. Krist testified that he had long had a negative view of all of the Monorail bonds, dating back to their original issuance in 2000, when he first reviewed the OS. (Fact 52.)

Mr. Krist testified that, based on the OS's disclosure, he was "aware that there were other reports done by consultants retained by various parties that opposed construction of the Monorail back in 2000." (Fact 53.) He did not ask to see those reports because he "reached [his] own conclusions about the likelihood of success or failure, taking into account all of the information [he] had at hand, and based upon the level of skepticism [he] had about essentially all feasibility studies regardless of who sponsored them. [He] take[s] all of them with a significant grain of salt." (Fact 54.)

Further, in early 2006, Mr. Krist knew of the March 2005 ratings downgrade, and he understood that, if the Monorail could not support its operations and the first-tier debt service, as Moody's suggested, the Monorail also would "have difficulty covering second-tier" debt service. (Facts 44-45.) In addition, around March 2006, Mr. Krist became aware of the Fitch downgrade, which confirmed for him "that ridership was not reaching levels that were

projected and that the concern that ridership would be at a level that wouldn't support that service appeared to be coming true." (Fact 56.) Lord Abbett decided not to purchase Monorail bonds in early 2006. (Fact 57.)

### E. Dan Solender Joins Lord Abbett in July 2006 and Lord Abbett Expresses Interest in Monorail Bonds

Lord Abbett considered the bonds again after it hired Dan Solender as a portfolio manager in July 2006. (Fact 58.) REDACTED

In August 2006, Mr. Krist wrote a report in which he alerted Mr. Solender to Fitch's opinion that the Second Tier Bonds "will face payment issues by the time of the July 1, 2008 debt service payment." (Fact 62.) The report mentioned the Monorail's "initial operating difficulties" and stated that "[r]idership has been just over 50% of projected levels and actually peaked in July, 2005." (Fact 63.) It also noted that "[o]perating costs are running 20% above projections" and that "demand has proved to be quite elastic." (Fact 64.) Nevertheless, sometime thereafter, Lord Abbett's portfolio manager, Scott Smith, asked CGMI to alert him if anyone

---

4 REDACTED

holding Monorail bonds wanted to sell bonds. (Fact 65.)

Franklin Funds was looking to sell Second Tier Bonds that it owned. (Fact 66.) CGMI salespersons, including CGMI's Dan Mulligan, acting as a market maker, sent a standard email to potential purchasers on September 21, 2006, including Lord Abbett, informing them that Second Tier Bonds were for sale and at what price. (Fact 66.) REDACTED

### F. Lord Abbett Decides to Buy Second Tier Bonds Even Though It Knows that the Monorail Was Not Achieving the Ridership or Revenue Projected In the OS

After receiving CGMI's message about the availability of the bonds, but prior to purchasing them, Mr. Solender received two emails from his staff, each highlighting a different local Las Vegas newspaper article. (Fact 70.) CGMI did not send these e-mails, or the news articles they forwarded. (Fact 71.)

First, Mr. Solender received an email from Mr. Smith, which forwarded a link to an article from the Las Vegas Review-Journal titled, "Monorail riders

18,963 per day during summer." (Fact 72.) The article stated that the Monorail's ridership from June through August 2006 had dropped 38 percent from the same months in 2005; that, at the time of the Monorail's opening, proponents of the Monorail had expected more than 50,000 riders a day; and that the "privately financed monorail has not turned a profit since opening in mid-2004." (Fact 73.)

REDACTED

The email had been sent to Mr. Smith by another Lord Abbett analyst, Cindy Brown, who predicted that "they will wrap this deal into a refunder for the higher coupon outstanding debt," and Mr. Smith forwarded both Ms. Brown's comment and the article to Mr. Solender. (Fact 75.)

Mr. Krist admitted that he would not "approve the [Second Tier Bonds] credit for purchase." (Fact 76.) Notwithstanding Mr. Krist's analysis and recommendation against Lord Abbett's purchase, REDACTED Lord Abbett's purchase of Second Tier Bonds, which was completed within four hours of receiving CGMI's email informing Lord Abbett of the bonds' availability. (Fact 84.) REDACTED

**G. CGMI Makes No Representations to Lord Abbett Prior to Lord Abbett's First Purchase of Second Tier Bonds**

REDACTED

REDACTED Mr. Smith died in 2010. (Fact 91.) REDACTED

Mr. Krist also could not recall a single thing CGMI said or wrote about the bonds prior to Lord Abbett's purchases. (Fact 96.) Lord Abbett's Ms. Brown, who was on emails relating to the Second Tier Bonds, was unable to identify any oral representation by CGMI about the bonds. (Fact 97.)

After Lord Abbett purchased the bonds on September 21, 2006, a CGMI employee e-mailed Mr. Krist the 2006 Budget, which the LVMC had issued publicly in December 2005. (Fact 98.) Mr. Krist testified that he did not rely on the 2006 Budget, and no other Lord Abbett witness recalls even seeing it.[5] (Fact 100.) The 2006 Budget showed that the LVMC projected 2006 ridership to be more than 40% lower than the OS projections for the same year. (Fact 103.)

Lord Abbett purchased Second Tier Bonds again on September 27, 2006 and October 3, 2006. (Fact 105.) In total, Lord Abbett purchased $13 million of the

[5] An email produced in discovery shows that Ms. Brown received a copy of the 2006 Budget in March 2006. (Fact 101.) Ms. Brown did not recall ever reading, let alone relying upon, the 2006 Budget. (Fact 102.)

Second Tier Bonds between September 21, 2006 and October 3, 2006. (Fact 106.) *Lord Abbett witnesses could not identify a single representation made by CGMI in 2006 upon which they relied in making these purchases.* (Facts 86, 92-97, 100.)

**H. Lord Abbett Consults Counsel After the Monorail Bonds Are Further Downgraded and Default**

Less than two weeks after Lord Abbett's final purchase, Fitch further downgraded the First Tier Bonds to a rating of CCC, "indicating a significant probability of default, but for the bond insurance." (Compl. ¶ 130; Fact 107.) On November 21, 2006, Moody's issued another similar downgrade of its stand-alone credit rating for the First Tier Bonds. (Compl. ¶ 130; Fact 109.)

In July 2007, Fitch further downgraded the First Tier Bonds, indicating that "default of some kind appears probable," and REDACTED

That same month, a newspaper and the Associated Press discussed Mr. Cox's report from 2000, including its prediction that the ridership projected by URS Greiner in 2000 would not be met. (Fact 111.) No Lord Abbett witness could identify any discussions, in 2006 or 2007, regarding whether Lord Abbett should sell the Second Tier Bonds. (Fact 117.)

REDACTED

REDACTED

A few days later, Lord Abbett sold $3 million in par value of Second Tier Bonds for a loss. (Fact 124.)

In July 2008, Mr. Krist corresponded with Lord Abbett's in-house counsel regarding Lord Abbett's "portfolio holdings" of Second Tier Bonds, generating 29 separate documents between July 3, 2008 and July 18, 2008. (Fact 127.) Lord Abbett asserts attorney work product as to 13 of these documents. (Fact 128.) In July 2009, the Second Tier Bonds had their first payment default, and Lord Abbett and other Second Tier bondholders began corresponding with Lord Abbett's outside counsel in this action (although only Lord Abbett chose to sue). (Fact 129.) Approximately six months later, in January 2010, LVMC filed for Chapter 11 bankruptcy protection. (Compl. ¶ 139; Fact 130.)

In June 2011, Mr. Cox gave a radio interview and stated that "private bondholders" "could have gone to the internet and looked at my report in June of 2000 and seen what I said. They could have looked at the transcript of the state hearing held in North Las Vegas. They didn't, so buyer beware. I suppose we shouldn't be losing a lot of sleep over that." (Fact 131.) Three months later – and more than two years after the Second Tier Bonds defaulted and Lord Abbett first consulted counsel – Lord Abbett commenced this action. (Fact 132.)

## PROCEDURAL HISTORY

In   December   2011,   CGMI   moved   to   dismiss   the   initial   complaint.[6]

Accepting Lord Abbett's allegations as true solely for purposes of that motion, this

Court denied the motion to dismiss based on the following:

- The Court held that the publication of the Cox Report in a "handful" of "regional news sources" did not render the Cox Report publicly available, nor did it put Lord Abbett on inquiry notice (Op. at 8-9, 17);

- The complaint alleged that CGMI provided Lord Abbett with the OS, the 2005 Audited Financials, and the 2006 Budget.  Relying on these allegations, the Court held that "unlike the cases cited by Citigroup, this is not a situation in which no disclosures were made" (Op. at 10);

- Accepting Plaintiff's allegations as true, the Court's opinion accepted for the purpose of the motion that the Cox Report would have cast doubt on the 2006 Budget, which predicted an improved financial outlook for the Monorail in 2006, as compared to 2005 (Op. at 11);

- Similarly, the Court also accepted as true for the purposes of the motion that "despite possessing the Cox Report since 2000 and witnessing the Monorail's financial turmoil, Citigroup intentionally provided Lord Abbett with information, including the URS Greiner Study, while concealing the existence and content of the Cox Report" (Op. at 13);

- And, the Court accepted for the purposes of the motion that Lord Abbett had pled reasonable reliance (Op. at 14).

The Court held that Lord Abbett's allegations were sufficient "for purposes

of surviving a motion to dismiss." (*See, e.g.*, Op. at 10.)  Discovery, however, has

disproved each of the key allegations that this Court relied upon in denying

CGMI's motion to dismiss:

---

[6]   The initial complaint only alleged a failure to disclose the Cox Report, so CGMI's motion to dismiss only addressed the Cox Report.

- The Opposition Consultants' views were published in national publications before and after Lord Abbett purchased the Second Tier Bonds, the Cox Report had been available on the Internet since 2000, the Opposition Consultants' views were the subject of a public hearing, and the Cox Report was downloaded from the Internet by the Nuveen analyst who worked for Mr. Solender (Facts 15-16, 19-22, 60-61, 111-12);

- Lord Abbett's own analyst knew that there were reports by Opposition Consultants and chose not to request or review them because he viewed all projections with skepticism (Facts 53-54);

- Contrary to the allegations in the Complaint, CGMI did not provide the Lord Abbett employees involved in the trade with the OS, the 2005 Audited Financials, or the 2006 Budget before Lord Abbett first decided to purchase the Second Tier Bonds (Facts 92-93, 98);

- Lord Abbett's own analyst stated in an August 2006 memo – written after the 2006 Budget was issued and before Lord Abbett purchased the bonds – that Fitch estimated that the Second Tier Bonds would "face payment issues by the time of the July 1, 2008 debt service payment" (Fact 62);

- The CGMI employees involved in the transaction at issue in 2006 were not aware of the Opposition Consultants or their reports (Fact 87);

- Lord Abbett's analyst testified expressly that he did not rely on the projections in the OS, on the 2006 Budget, or on anything that CGMI said (Facts 54, 96, 100).

Accordingly, there are no genuine issues of material fact, Lord Abbett cannot prove the elements of its claims, and the Court should grant CGMI's motion for summary judgment dismissing the Complaint.

## ARGUMENT

The facts established during discovery show that "there is no genuine dispute as to any material fact" and that CGMI is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *CPS MedManagement LLC v. Bergen Reg'l Med.*

*Ctr., L.P.*, 940 F. Supp. 2d 141, 149-50 (D.N.J. 2013). The defendant bears the initial burden of "showing that no genuine issue of material fact exists," and where the plaintiff cannot "set forth specific facts showing that there is a genuine issue for trial," summary judgment is appropriate. *See id.* at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Lord Abbett "'may not rest upon the mere allegations or denials of [its] pleading' to satisfy this burden, but must produce sufficient evidence to support a jury verdict in [its] favor." *Cioni v. Globe Specialty Metals, Inc.*, Case No. 10-cv-01388 (DMC) (JAD), 2013 WL 1844752, at *1 (D.N.J. Apr. 30, 2013). Further, to defeat summary judgment on Lord Abbett's fraud claims, Lord Abbett has the "'burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud.'" *CPS MedManagement*, 940 F. Supp. 2d at 159.

## I. THE CLAIMS FOR STATUTORY AND COMMON LAW FRAUD SHOULD BE DISMISSED

Claims I and III of the Complaint assert claims for common law fraud and violation of the NJUSA. Lord Abbett cannot prove each element of its fraud claims by any standard, let alone by clear and convincing evidence.[7] In addition, the NJUSA claim is barred by the governing two-year statute of limitations.

---

[7] This Motion analyzes the claims for common law fraud and violation of the NJUSA together because the elements of these claims are the same, except that the NJUSA does not require reliance.

### A. Lord Abbett Has Not Established The Existence of a Material Untrue Statement or Omission

Lord Abbett's fraud claims, based on an alleged failure of CGMI to disclose the Opposition Consultants' reports, fail. (Compl. ¶¶ 29, 121.) CGMI had no duty to provide these stale reports, even if they had been material. Moreover, the stale reports were not material in 2000, let alone six years later in 2006.

#### 1. CGMI Had No Duty to Disclose the Opposition Consultants' Reports in 2006

Where a fraud claim is based on an alleged omission, there can be no liability for fraud unless the defendant had a duty to disclose the allegedly omitted information. *See Premier Pork L.L.C. v. Westin, Inc.*, Civil Action No. 07-1661, 2008 WL 724352, at *12 (D.N.J. Mar. 17, 2008) (common law fraud claim failed where plaintiff did not sufficiently allege that any defendant owed it a duty to disclose the information); *see also Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 299 (D.N.J. 2007) (in context of federal securities claim, "[o]missions, however, can give rise to liability only where the defendant had an affirmative duty to disclose the information in question"). "Where a claim for fraud is based on silence or concealment, 'New Jersey courts will not imply a duty to disclose . . . .'" *Salovaara v. Jackson Nat'l Life Ins. Co.*, 66 F. Supp. 2d 593, 602 (D.N.J. 1999). For three independent reasons, CGMI did not have a duty to apprise Lord Abbett of the outdated and publicly available Opposition Consultants' reports.

First, only three categories of relationships give rise to a duty to disclose, none of which is alleged to exist here.[8] CGMI and Lord Abbett were counterparties to this trade, with CGMI acting only as a market maker. (*See*, *e.g.*, Compl. ¶ 118; Fact 66.) Because "[t]he sale was an arms length transaction between parties experienced in the volatile debt securities market," CGMI had no duty to disclose the Opposition Consultants' reports and, therefore, is not liable for any such omission. *Salovaara*, 66 F. Supp. 2d at 602; *see also Alten v. Berman*, Civil Action No. 87-8343, 1993 WL 541668, at *9 n.7 (E.D. Pa. Dec. 29, 2003) (defendant bank employees did not owe duty to plaintiff borrowers where plaintiffs failed to prove that relationship was not arms' length, and "many of the investors represented themselves as being sophisticated").

Second, a duty to disclose may arise where there was "an inaccurate, incomplete or misleading disclosure [requiring a corrective statement]." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 404 (D.N.J. 2010). CGMI had no duty to correct any previous disclosure because, not surprisingly in the world of sophisticated trading, it made no representation to Lord Abbett; Lord Abbett's

[8] These three categories are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Salovaara*, 66 F. Supp. 2d at 602; *see also N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Super. 1998).

witnesses could not identify a single representation made by CGMI before Lord Abbett first purchased the Second Tier Bonds. (Facts 86, 92-97, 100.)

Moreover, discovery has disproved Lord Abbett's allegation that "Citigroup provided Lord Abbett with the 2000 Official Statement with the URS Study, [the 2005 Audited Financials] and [LVMC's 2006 Budget]" (Compl. ¶ 122). Lord Abbett obtained the OS, which attached URS Greiner's projections, and the 2005 Audited Financials from publicly available municipal securities information repositories, *not* from CGMI. (Fact 93.)

REDACTED

After Lord Abbett's initial $6 million purchase of Second Tier Bonds, a CGMI employee e-mailed Mr. Krist the 2006 Budget, but this single e-mail did not give rise to a duty to disclose with respect to Lord Abbett's remaining Second Tier Bond purchases. (Fact 98.) The duty to disclose "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so 'incomplete as to mislead.'" *Synchronoss Sec. Litig.*, 705

F. Supp. 2d at 419-20 (citing *Winer Family Trust v. Queen*, 503 F. 3d 319, 330 (3d Cir. 2007)). There was nothing "incomplete" about the 2006 Budget that required CGMI to disclose six-year-old projections.[9]

Not only is Lord Abbett unable to identify any documents that CGMI provided to Lord Abbett prior to Lord Abbett's first purchase, but no Lord Abbett witness who participated in the purchases has identified any oral representation made by anyone at CGMI upon which they relied. (Facts 95-96.)

REDACTED

Mr. Krist, likewise, could not identify any specific conversations with any CGMI employee about the bonds prior to Lord Abbett's purchase. (Fact 96.)

Third, the Opposition Consultants' views were publicly available, and therefore, CGMI had no obligation to make an independent disclosure of them. (Fact 22); *see N.J. Econ. Dev. Auth.*, 725 A.2d at 1139 ("[W]here information is equally available to both parties, neither party has a duty to disclose that

[9] In fact, Mr. Krist testified that he saw the 2006 Budget in *early* 2006, which was before he wrote his August 2006 memo stating that the Second Tier Bonds would face "payment issues" by 2008. (Fact 99.) Mr. Krist also testified that he did not rely on the 2006 Budget, and no other Lord Abbett witness recalls even seeing it (and thus could not have relied on it). (Fact 100.) REDACTED

information to the other."). Mr. Cox published a draft of his report on the Internet no later than February 22, 2000. (Fact 19.) He then testified about his report – and about its availability on the Internet – at a public hearing in June 2000. (Fact 20.) At least nineteen articles discussing the Opposition Consultants and/or their reports were published in local and national newspapers between 1999 and September 21, 2006. (Fact 22.) In fact, Lord Abbett's own expert, Mr. Cox, acknowledged the widespread availability of his 2000 report on his blog just weeks before Lord Abbett's purchases, which undermines Lord Abbett's claim.[10] (Fact 50); *see Mun. High Income Fund, Inc. v. Goldman, Sachs & Co.*, 21 Misc. 3d 1133(A), 2008 WL 4938280, at *5 (Sup. Ct. New York Cnty. Oct. 30, 2008) (rejecting similar case brought by Lord Abbett's current counsel because "the law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring").

**2. CGMI Had No Duty to Disclose the Opposition Consultants' Reports in 2000**

The Court should reject any attempt by Lord Abbett to litigate now decisions

[10] Further, Mr. Krist testified that he read the OS disclosure in 2000 that "reports prepared by consultants retained by various parties that oppose construction of the Monorail," that he was aware that there were Monorail-related reports that he had not seen, and that he chose not to request them. (Facts 53-54.)

REDACTED

made by CGMI in 2000 regarding the drafting of the OS.  CGMI was acting solely
as a market maker in the transactions at issue (Fact 66), and any attempt to litigate
CGMI's role as an underwriter amounts to an impermissible fraud by hindsight
claim.  As the Court explained in *In re Trump Casino Sec. Litig.*, 793 F. Supp. 543
(D.N.J. 1992), a case in which issuers and underwriters were accused of providing
overly optimistic projections in a prospectus, courts should be "wary, too, of the
dangers raised by claims of 'fraud by hindsight.'  Monday morning quarterbacking
cannot present actionable securities fraud claims.  'The fact that a projection or
estimate turned out to be incorrect, standing alone, does not even raise an inference
that the statement was fraudulent when made.'"  *Id.* at 556 (citations omitted).

The disclosure decisions made in 2000 are not at issue in this case; Lord
Abbett did not bring any underwriting claims against CGMI.  But even if they
were, CGMI would be entitled to summary judgment as to the disclosure that was
made, particularly where, as here, the allegedly omitted information was publicly
known at the time and generated by third parties.  The *Trump* court considered a
prospectus that did not mention a third-party report that "differed markedly" from
the projections in the prospectus.  "[A]s it turned out," the third-party report that
was not mentioned in the prospectus "mirror[ed] more accurately the actual
economic performance of the [casino that issued bonds]."  *Id.* at 567.
Nevertheless, the *Trump* court dismissed the claims, explaining that "Management

is not required by the securities fraud laws to disclose other companies' papers. Compliance with the disclosure requirements, if such a burden were imposed, would border on the impossible." *Id.* at 567.

### 3. The Outdated Opposition Consultants' Reports Were Not Material

A misrepresentation or omission is not actionable as fraud under New Jersey law unless such misrepresentation or omission is "material." *Hosiery Corp. of Am., Inc. v. Int'l Data Processing, Inc.*, Civ. A. No. 89-115, 1991 WL 30015, at *7 (D.N.J. Feb. 28, 1991) (fraud claim requires *material* misrepresentation of presently existing or past fact); *see also DeRobbio v. Harvest Cmtys. of Sioux Cty*, Civil Action No. 01-1120 (MLC), 2002 WL 31947203, at *5 (D.N.J. Oct. 30, 2002) (element of NJUSA claim is "an untrue material statement or omission"). "Generally, undisclosed information is considered material if 'there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having '*significantly altered* the '*total mix' of information'* available to that investor.'" *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (emphasis added). Moreover, an omission is not material where the allegedly omitted "information was already available in the marketplace." *In re Discovery Labs Sec. Litig.*, Case No. 06-1820, 2006 WL 3227767, at *10 (E.D. Pa. Nov. 1, 2006).

Here, any alleged deficiency in the disclosure of the Opposition Consultants' reports prior to Lord Abbett's purchase of the Second Tier Bonds cannot constitute

a material omission or misrepresentation because the reports would not have "significantly altered the 'total mix' of information" available to Lord Abbett. *Oran*, 226 F.3d at 282. The primary conclusion of Mr. Cox's report was that the "Monorail is unlikely to achieve its ridership projections, revenue projections, or financial obligations." (Fact 17.) The fundamental conclusion of the other Opposition Consultants' reports was similar. (Fact 18.)   REDACTED

Mr. Krist testified that he recommended against Lord Abbett's purchase of the Second Tier Bonds because he did not believe the ridership and revenue would reach the levels projected in the OS; Mr. Krist also testified that disclosure of the Opposition Consultants' reports would not have altered his view. (Facts 82-83.)

Further, by September and October 2006, the Opposition Consultants' reports, which were six- and seven-years-old, were not material because they were stale. *See Mill Bridge V, Inc. v. Benton*, Civil Action No. 08-2806, 2009 WL 4639641, at *20 (E.D. Pa. Dec. 3, 2009) (granting motion to dismiss because a

*two-year-old* valuation was not "even remotely" material). The *Mill Bridge* court rejected the plaintiff's assertion that the defendants' failure to disclose an October 2002 valuation (the "Kwok Li valuation") during a December 2004 sale of stock in the Philadelphia Stock Exchange could form the basis for the plaintiff's fraud claim. *Id.* In dismissing the complaint, the court held that:

> [T]he Kwok Li valuation was performed . . . more than two years prior to the trade at issue . . . . Plaintiff fails to allege how such a valuation, *particularly in the face of subsequent events including demutualization, could even remotely be material two years later.*

*Id.* (emphasis added).

Likewise, Lord Abbett cannot demonstrate that the alleged omission of the Opposition Consultants' reports – which were drafted long before the Monorail began operating and actual financial data became available – could be material to its junk bond acquisition in 2006, particularly given the actual operating history that Lord Abbett possessed. *See In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 699 (D.N.J. 2006) ("[S]tale information is immaterial as a matter of law") (citing *In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954, 1995 WL 590624, at *5 (S.D.N.Y. Oct. 4, 1995)); *see also Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1240 (2d Cir. 1991) ("stale" financial projections in February 1982 report would not have been material for purposes of June 1983 balance sheet); *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 210 (D. Mass. 1994) (statements about company's prospective business were not material seven

*months* later, especially where financial information was publicly available).[11]

The three bond analysts who were deposed as fact witnesses confirmed the immateriality of the Opposition Consultants' reports:

- Lord Abbett's Mr. Krist testified that none "of the other studies mentioned in – on page 69 of the official statement, were . . . relevant to [his assessment] of the creditworthiness of the bond once [he] had actual data in 2006." (Fact 115.)
- REDACTED
- CGMI's Susan Rhudy testified that, in 2006, she would not have "looked at an article from 1999 . . . because it's not relevant" once she "had actual operating data to look at." (Fact 116.)

**B. Lord Abbett Did Not Reasonably Rely on CGMI**

To state a claim for common law fraud, a plaintiff also must demonstrate that it reasonably relied on the alleged misrepresentation or omission. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (New Jersey fraud claim requires allegation of reasonable reliance); *see also Columbia Sav. & Loan Ass'n v. Forum Ins. Co.*, Civ. A. No. 89-700, 1990 WL 235660, at *5 (D.N.J. Dec. 26, 1990) (cross-claimant "cannot demonstrate reasonable reliance on [cross-defendant's]

---

[11] Additionally, the alleged omission of the Opposition Consultants' reports was not material as a matter of law because both the existence and content of those reports were available and widely reported in the public marketplace. (Fact 22.) *Discovery Labs Sec. Litig.*, 2006 WL 3227767, at *10 (omissions immaterial where "the information was already available in the marketplace"); *see supra* at 23-24.

investigation, an essential element of a misrepresentation claim"). Lord Abbett is unable to demonstrate reasonable reliance on the alleged omission.

First, the undisputed facts established in discovery show that there was no reliance. Lord Abbett's analyst, Mr. Krist, testified that he did not rely on the projections in the URS Greiner Study or the OS and that he did not need the Opposition Consultants' reports to analyze whether the URS Greiner projections were reasonable. (Facts 54-55.) REDACTED

None of the Opposition Consultants' reports analyzed ridership and revenue for an expansion of the Monorail to the airport. (Fact 89.) Therefore, any purported reliance on representations concerning an expansion to the airport cannot possibly relate to alleged deficiencies in the OS or a failure to disclose the Opposition Consultants' reports. *See Kaufman v. I-Stat Corp.*, 165 N.J. 94, 100, 109-10, 118 (2000) (fraud and negligent misrepresentation claims dismissed where plaintiff did not actually rely on any misrepresentation or omission).

Second, other courts examining substantially similar allegations brought by Lord Abbett have dismissed similar claims on the ground that reliance on outdated

projections is not justifiable. *See Lord Abbett Mun. Income Fund v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at *12 (N.D. Cal. July 11, 2014). In *Asami*, Lord Abbett purchased, in 2007 and 2010, bonds issued to finance a school expansion. *Id.* at *4-5. After the school failed to pay the bonds, Lord Abbett alleged, *inter alia*, negligent misrepresentation in the 2007 offering memorandum related to enrollment projections. *Id.* at *5. With respect to the 2010 bond purchases, the court granted summary judgment against Lord Abbett, holding that Lord Abbett could not have justifiably relied on projections in the 2007 offering memorandum, since it had received "specific, detailed information about [the school's] current financial situation and prospects in the form of the 2008 and 2009 financial statements and the June 2009 Bloomberg message about enrollment prior to its 2010 bond purchases." *Id.* "No reasonable jury could find that Lord Abbett's reliance on the 2007 [offering memorandum] in making the 2010 bond purchases was justifiable under the circumstances." *Id.* at *44. The same holds true for Lord Abbett's 2006 purchase of the Second Tier Bonds. *See also In re Kantor*, Nos. 84-30402, 84-7116, 1986 WL 28904, at *6 (Bankr. S.D.N.Y. Oct. 1, 1986) (bank's failure to obtain updated financial statements rendered "unreasonable the Bank's reliance on the outdated financial statements it held [from two years prior] at the time the loan was approved").

Third, courts have held that a party cannot demonstrate reasonable reliance

where that party undertook its own investigation into the facts at issue. *Columbia Sav. & Loan Ass'n*, 1990 WL 235660, at *5 ("[W]hen a party investigates a state of facts for himself, 'he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he should have discovered by a reasonable investigation.'"); *see also In re House of Drugs, Inc.*, 251 B.R. 206, 211 (Bankr. D.N.J. 2000) ("A party that elects to make an independent investigation, however, will be accountable for everything such party could have discerned by employing reasonable diligence."). As the undisputable facts established in discovery show, Lord Abbett conducted its own due diligence, including a review of accurate and actual financial results for the LVMC for 2005 (Fact 77), which resulted in a recommendation by Lord Abbett's own analyst *not* to purchase the bonds. (Compl. ¶ 127.) Accordingly, as a matter of law, the Complaint fails to allege the requisite reliance. *See, e.g.*, *Columbia Sav. & Loan Ass'n*, 1990 WL 235660, at *5 (cross-claimant "cannot demonstrate reasonable reliance on [cross-defendant's] investigation, an essential element of a misrepresentation claim," where cross-claimant performed own due diligence).

Fourth, the extensive disclosures in the OS further negate any claim by Lord Abbett of reasonable reliance. *See Greenberg v. Pro Shares Trust*, Docket No. A-075801OT3, 2011 WL 2636990, at *8 (N.J. Super. July 7, 2011) (affirming lower court decision finding absence of reasonable reliance in light of available

prospectus and information contained therein); *see also Love v. Alfacell Corp.*, Civil Action No. 09-5199 (MLC), 2011 WL 4915874, at *12 (D.N.J. Oct. 17, 2011) (dismissing securities fraud claim because "[a] reasonable investor would, instead, have considered such predictions in light of the repeated disclaimers regarding its inability to provide accurate forecasts and, as such, would not have made investment decisions based upon those forecasts"). Indeed, as discussed above, the OS detailed the risks related to the purchase of the Second Tier Bonds. *See supra* at 6. Accordingly, Lord Abbett cannot establish the requisite reliance.

### C. Lord Abbett Has Not Established Scienter

Both of Lord Abbett's fraud claims require Lord Abbett to demonstrate by clear and convincing evidence that CGMI acted with scienter, *i.e.*, that CGMI had "(1) knowledge of the falsity of the representation; and (2) 'an intention to obtain an undue advantage therefrom.'" *Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 345 (D.N.J. 1999); *see also id.* (claim for common law fraud requires proof of scienter); *DeRobbio*, 2002 WL 31947203, at *3 (claim under NJUSA requires plaintiff to plead scienter). It is indisputable that the three individuals at CGMI who were involved in the Monorail bond trades with Lord Abbett were not aware of the Opposition Consultants or their reports. (Fact 87.) Even if CGMI were required to provide Lord Abbett with the Opposition Consultants' reports (which it was not, *see supra* at 20-29), there is no evidence of "an actual intention to

deceive." *Shogen v. Global Aggressive Growth Fund*, Civ. Action No. 04-5695 (SRC), 2007 WL 1237829, at *13 (D.N.J. Apr. 26, 2007) (to prevail on a common law fraud claim, plaintiff "must be able to show an actual intention to deceive on the part of the Defendants, rather than mere recklessness"). Thus, Lord Abbett cannot show that CGMI had the requisite scienter to sustain a fraud claim.

### D.   Lord Abbett Has Not Established Loss Causation

To state a claim for violation of the NJUSA and common law fraud, a plaintiff must show loss causation. *See, e.g.*, *McCabe v. Ernst & Young LLP*, 494 F.3d. 418, 439 (3d Cir. 2007) ("[F]or the same reasons that the [] Plaintiffs failed to create a genuine issue as to loss causation (as required for their § 10(b) claim), they also failed to create a genuine issue as to proximate causation (as required for their common law fraud and negligent misrepresentation claims).") (citation omitted); *McKowan Lowe & Co., v. Jasmine, Ltd.*, No. Civ. 94-5522 (RBK), 2005 WL 3500032, at *6 (D.N.J. Dec. 20, 2005) (granting summary judgment on NJUSA claim for failure to demonstrate loss causation). It is not enough to just allege "transaction causation" "i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security." *McCabe*, 494 F.3d at 425. Rather, a plaintiff must show that "the fraudulent misrepresentation or omission actually caused the economic loss suffered." *Id.*

Lord Abbett cannot demonstrate loss causation because there is no evidence

that the alleged omission in the OS artificially inflated the price it paid for the Second Tier Bonds. Even after the media ran articles in 2007 reporting that the Opposition Consultants' reports from 2000 had "predicted woes for the Las Vegas Monorail," the Second Tier Bonds continued trading above or near par. (Facts 113-114.) The value of the Second Tier Bonds did not significantly decline until January 2008, REDACTED There is no factual basis, therefore, to conclude that the loss Lord Abbett alleges was caused by a failure by CGMI to warn a sophisticated junk bond fund in 2006 that the Monorail might miss projections made in 2000. *McCabe*, 494 F.3d at 425 (loss causation requires proof that the omission actually caused the economic loss suffered).

Lord Abbett also fails to offer any expert testimony of what the value of the Second Tier Bonds would have been but for the alleged omission. (Fact 125.) Other courts in this circuit have dismissed securities claims where the plaintiff failed to support its claim of loss causation with expert evidence. *See, e.g.*, *WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2013 WL 3230667, at *12 (E.D. Pa. June 27, 2013) (in federal securities case, "[p]laintiffs' evidence d[id] not provide a sufficient evidentiary basis to create triable disputes as to loss causation or damages" where plaintiffs did not submit expert event study or something similar, because it was not "shown that the decline in market price was due to the

[defendant's] fraud").[12]

### E. The Statute of Limitations Bars the NJUSA Claim

Lord Abbett's NJUSA claim is untimely and should be dismissed for the additional reason that it was filed more than two years after Lord Abbett was on inquiry notice of its claims. *See* N.J.S.A. 49:3-71(g) (plaintiff alleging violation of NJUSA must file complaint within two years of either sale or having received inquiry notice of claim); *see Bramblewood Investors, Ltd. v. C&G Assoc.*, 262 N.J. Super. 96, 101–02 (N.J. Super. Ct. Law Div. 1992) (dismissing NJSUA claim where "defendants knew or should have known of the existence of a cause of action, if any" more than two years prior to filing the complaint).

Under the inquiry notice standard, the limitations period "begins to run from when the plaintiff[s] discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against the defendant." *Roll v. Singh*, Civil Action No. 07-cv-04136, 2008 WL 3413863, at *14 (D.N.J. Apr. 12, 2010) (securities claims were time-barred for failure to comply with limitations period). The objective test focuses on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm

---

12 A similar case brought by Lord Abbett's counsel was dismissed for the same failing. *See In re Nuveen Funds*, No. C 08-4575 SI, C 09-1437 SI, 2011 WL 1842819, at *9 (N.D. Cal. May 16, 2011) ("[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent . . . . [T]o establish loss causation, the market must learn of and react to those particular practices themselves.").

warning." *Pension Trust Fund for Operating Eng'rs v. Mort. Asset Securitization Transactions*, Civil Action No. 10-898 (CCC) (JAD), 2012 WL 3113981, at *4 (D.N.J. July 31, 2012) (Cecchi, J.). "Plaintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period; instead, the period begins to run from the 'time at which plaintiff[s] should have discovered the general fraudulent scheme.'" *Roll*, 2008 WL 3413863, at *14 (citations omitted). Further, "[o]nce the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable diligence, but were unable to discover their injuries." *Id.* at *15.

Here, discovery has proved that Lord Abbett was on inquiry notice over four years before it filed suit:

- Prior to 2006, Lord Abbett's own analyst knew about reports other than the URS Greiner Study and he chose not to request them. (Facts 53-54); *see In re Exxon Mobile Corp.*, 387 F. Supp. 2d 407, 417 (D.N.J. 2005) ("Information that may be held to constitute inquiry notice includes . . . any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions have been made").

- In June 2006, an article about the Monorail that Lord Abbett's expert, Mr. Cox, wrote, was posted on a third party's website, and the posting appeared to also include a link to Mr. Cox's original report. (Fact 50.) *See, e.g.*, *Pension Trust Fund*, 2012 WL 3113981, at *4 ("Investors . . . are 'charged with knowledge of publicly available news articles and analyst's reports to the extent that they constitute storm warnings sufficient to trigger inquiry notice.'").

- When Lord Abbett purchased the Second Tier Bonds in 2006, it knew that the actual ridership and revenue results for 2005 and the first part of

2006 were "just over 50% of projected levels and actually peaked in July, 2005." (Facts 63, 80.) The great disparity between the Monorail's projected performance and its actual performance put Lord Abbett on notice of the possibility of a claim. *See Ward v. UBS Painewebber, Inc.*, Civ. No. 02-3878 (JAP), 2003 U.S. Dist. LEXIS 24056, at *18 (D.N.J. Sept. 10, 2003) (plaintiff was on inquiry notice when it was clear that, based on actual results, the stock would not rise to the levels projected by defendant's analyst); *In re Mun. High Income Fund, Inc.*, 2008 WL 4938280, at *5 (plaintiff municipal bond mutual funds, which brought claims seven years after purchase of bonds, were on inquiry notice, where actual performance of bonds was much lower than results that had been projected).

REDACTED

- The Cox Report was widely reported again in 2007, when numerous newspapers – including the Associated Press – cited to its earlier projections. (Facts 111-12.) *See Pension Trust Fund*, 2012 WL 3113981, at *5, 7 (case time-barred where publicly available information, including news articles, constituted sufficient "storm warnings" to trigger inquiry notice).

REDACTED

- Lord Abbett consulted with counsel regarding the Second Tier Bonds no later than July 2008 and generated 13 pieces of attorney work product which is, by definition, created in "anticipation of litigation." (Fact 128); *see Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008). Accordingly, Lord Abbett was seeking litigation advice concerning the Second Tier Bonds in July 2008, which definitively establishes that it was on inquiry notice because it was, in fact, making inquiry. *See Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 771 (S.D.N.Y. 1993) (plaintiffs who retained counsel with respect to investment in 1987 had their fraud cause of action lapse no

later than 1989).

- Further, Lord Abbett and the other Second Tier bondholders (none of whom chose to sue) consulted with counsel in this case in July 2009. (Fact 129.) This is further evidence of Lord Abbett being on inquiry notice. *Cuccolo*, 826 F. Supp. at 771.

These undisputed facts leave no doubt that a "reasonable investor of ordinary intelligence" would have "recognized [these events] as a storm warning'" prior to September 23, 2009. *See Pension Trust Fund*, 2012 WL 3113981, at *4. Lord Abbett cannot make a showing, as it must given the summary judgment record, "that [it] exercised reasonable due diligence and yet [was] unable to discover [its] injuries," *id.*, because the undisputed facts establish that Lord Abbett went 15 months after purchasing the Second Tier Bonds without updating the credit report relating to the Monorail position (Fact 126), REDACTED [13]

Lord Abbett's NJUSA claim therefore is barred by the statute of limitations.

## II. THE NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED

Plaintiff's negligent misrepresentation claim should be dismissed for many of the same reasons as its other claims: there is no genuine issue of fact regarding

[13] Moreover, Lord Abbett has not demonstrated that it was unable to discover its injuries, nor could it: at least two other Second Tier Bond purchasers learned of the Cox Report no later than 2007. (Fact 113); *see In re Exxon Mobile Corp.*, 387 F. Supp. 2d at 419 (where similar suit by other plaintiff was filed in March 2004, the same information was available to current plaintiff, and as a result, "an investor of ordinary intelligence, in the exercise of reasonable diligence, would have discovered the basis of the claims asserted in this case prior to March 2004").

the existence of a material untrue statement or omission because CGMI had no duty to disclose the publicly available and outdated Opposition Consultants' reports, and any alleged omission was not material. *See supra* at 20-29. And the Complaint fails to adequately allege reasonable or justifiable reliance and loss causation. *See supra* at 29-36. Any one of these failings requires dismissal. *See McKowan Lowe & Co.*, 2005 WL 3500032, at *5 ("[C]laims for 'negligent misrepresentation under New Jersey common law require substantially the same showing of causation as required for a § 10(b) claim . . .'"); *Karu v. Feldman*, 119 N.J. 135, 147 (1990) (same).

## CONCLUSION

As set forth above, CGMI respectfully submits that, pursuant to Fed R. Civ. P. 56, the Complaint should be dismissed with prejudice.

Newark, NJ
December 5, 2014

BRESSLER, AMERY & ROSS, P.C.

By: /s/ Edwin A. Zipf
Edwin A. Zipf

Edwin A. Zipf (EZipf@bressler.com)
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932

Marshall H. Fishman (Marshall.Fishman@freshfields.com)
Timothy P. Harkness (Timothy.Harkness@freshfields.com)
Cheryl L. Howard (Cheryl.Howard@freshfields.com)
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, NY 10022
*Attorneys for Defendant Citigroup Global Markets Inc.*