**\*FILED UNDER SEAL\* NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 11-5550 (CCC) |
| v. | : | |
| | : | **OPINION** |
| CITIGROUP GLOBAL MARKETS, INC., | : | |
| | : | |
| Defendant. | : | |

**CECCHI, District Judge.**

## I.    INTRODUCTION

This matter comes before the Court by way of Defendant Citigroup Global Markets, Inc.'s ("CGMI" or "Defendant") motion for summary judgment against Plaintiff Lord Abbett Municipal Income Fund, Inc. ("Lord Abbett" or "Plaintiff"), pursuant to Federal Rule of Civil Procedure 56(a).  (ECF No. 62).  The Court also addresses two motions related to the summary judgment submissions: (1) Defendant's "motion to strike portions of Plaintiff's opposition to Defendant's motion for summary judgment and its motion in limine to exclude inadmissible evidence and declarations of Plaintiff's purported experts," (ECF No. 113, "motion to strike"); and (2) Plaintiff's "motion to supplement the declaration of Michael P. Cillo," a declaration filed in opposition to the summary judgment motion.   (ECF No. 126, "motion to supplement").   After reviewing the submissions made in support of and opposition to the instant motion,[1] as well as the arguments made on the record during oral argument on November 13, 2015 (ECF No. 145), and based on the

---

[1] The Court considers any new arguments not presented by the parties to be waived.  See Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991).

1

reasons that follow, the Court DENIES Defendant's motion for summary judgment; and DENIES as moot Defendant's motion to strike and Plaintiff's motion to supplement.

The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II.     BACKGROUND

### A.     Factual Background

The parties have submitted briefs, statements of facts pursuant to Local Civil Rule 56.1, declarations, and exhibits reflecting the following factual background.[2]

Plaintiff brings this action under New Jersey common law fraud, negligent misrepresentation,[3] and the New Jersey Uniform Securities Act ("NJUSA"), N.J.S. § 49:3-71(a)(2).  (ECF No. 40 ("Compl.") ¶¶ 142-161).  In essence, Plaintiff claims Defendant committed fraud by omission in 2006 when it sold Plaintiff municipal bonds to fund the expansion of a Las Vegas monorail train system without first disclosing several reports from 2000 that predicted the monorail would never achieve the ridership or revenue needed to be economically viable.

### 1.     Parties and Other Relevant Entities

Plaintiff's predecessor-in-interest, Lord Abbett High Yield Municipal Bond Fund (for simplicity, the Court will refer to this entity as "Plaintiff"), was a fund that, in and around the year 2006, regularly bought and sold high-yield bonds—bonds that pay a higher yield to compensate for greater risk and are not considered "investment grade."  (ECF No. 63 ("Def.'s 56.1") ¶¶ 1-4).

---

[2] Defendant's motion to strike (ECF No. 113) challenges the admissibility of some of the factual information Plaintiff has submitted, as well as Plaintiff's compliance with Rule 56.1 in providing its statement of material facts in dispute (ECF No. 75).  Defendant also opposed (ECF No. 131) Plaintiff's motion to supplement its materials in opposition to the summary judgment motion.  In this section, the Court relies on certain facts that Defendant has challenged, and addresses those objections where appropriate.

[3] The Court has held New Jersey law applies, (ECF No. 24 ("MTD Opp.") at 7 n.4), and the parties do not appear to dispute this now.

In September 2000, the State of Nevada Department of Business and Industry (the "NDBI") issued bonds to finance the construction of the Las Vegas Monorail. (Def.'s 56.1 ¶ 6). The First Tier Bonds were insured, and were rated "investment grade" by credit ratings agencies; the subordinate Second Tier Bonds were uninsured, unrated, and offered to institutional investors only. (Id. ¶¶ 7-8). Defendant's predecessor-in-interest, Salomon Smith Barney (for simplicity, "Defendant") was an underwriter for both tiers of bonds. (Id. ¶ 9). Gregory Carey and David Houston were Defendant's bankers on the transaction. (ECF No. 75 ("Pl.'s 56.1") ¶¶ 17, 18).

The NDBI hired the Public Resources Advisory Group ("PRAG") as its financial advisor. (Pl.'s 56.1 ¶ 2). PRAG reviewed the feasibility of the monorail and its financing, including all ridership and feasibility studies. (Def.'s 56.1 ¶¶ 24-25). The Las Vegas Monorail Company ("LVMC") was formed in May 2000 to operate the monorail. (Pl.'s 56.1 ¶ 1).

### 2.    Preparation for Bond Issuance

Several parties studied the feasibility of the monorail prior to the bonds' issuance. LVMC hired URS Greiner Woodward Clyde ("URS Greiner") to issue a feasibility report. (Pl.'s 56.1 ¶ 12). Wendell Cox, Thomas Rubin, Jon Twichell, and Bernard Malamud (the "Opposing Consultants"), were hired by parties opposed to the monorail, and wrote reports concluding that the monorail was not economically feasible (the "Opposing Reports"). (Id. ¶ 18; Def.'s 56.1 ¶ 16).

URS Greiner produced a number of drafts of its report, some of which Defendant's banker Carey reviewed prior to the final draft. (Pl.'s 56.1 ¶ 17). In 1999, Carey and Houston received an article via fax, which discussed an early draft of Cox's report and quoted Cox as saying "actual ridership of fixed guideway systems falls an average of 70 percent below projections."[4] (Id. ¶ 18).

_____

[4] Defendant's hearsay objection (see ECF No. 116 ¶ 18) is overruled, as Plaintiff appears to use the Opposition Reports for the non-hearsay purpose of showing Defendant's knowledge of competing projections before it made representations to Plaintiff about the bonds, and what information critical of URS Greiner could have been disclosed. See Fed. R. Evid. 801(c)(2).

The fax also included a draft summary of Cox's conclusions, including: (1) potential riders likely would not switch from other modes of transportation to the monorail; (2) an error of 17% or more in URS Greiner's ridership projections would render the monorail incapable of meeting its financial projections; and (3) the monorail would have substantial negative net income between 2003 and 2034 under both Cox's "highly optimistic" and "more probable" revenue projections. (Id. ¶¶ 20, 22, 23). Houston admits he likely asked for and received the entire Cox report after seeing this fax. (Id. ¶ 24). Houston also received and reviewed a December 6, 1999 fax containing Malamud's Opposition Report, which predicted that monorail ridership in 2003 would be less than half of what the report claims URS Greiner had forecasted in October 1999. (Id. ¶¶ 31, 33).

On December 13, 1999, PRAG recommended that Defendant hire a second consultant to review URS Greiner's findings. (Pl.'s 56.1 ¶ 36). Defendant hired the consultant firm Wilbur Smith, which produced a report in May 2000. (Id. ¶¶ 36-37). Wilbur Smith reported that it lacked sufficient information to agree with certain of URS Greiner's assumptions about the monorail's projected ridership and expressed reservations about the URS Greiner report's revenue forecasts. (Id. ¶¶ 36-39). Carey and Houston discussed Wilbur Smith's report and understood that the report did not agree with all of URS Greiner's assumptions. (Id. ¶¶ 39-40).

Cox posted a draft of his report on his blog on February 22, 2000. (Def.'s 56.1 ¶ 19, 21). Cox produced a second version of his report on June 6, 2000, predicting the monorail would produce only half the revenue projected by URS Greiner. (Pl.'s 56.1 ¶ 44).

PRAG issued a report dated July 12, 2000, and sent a copy to Carey and Houston. (Pl.'s 56.1 ¶ 45). Among other things, the PRAG report named the four Opposing Consultants and discussed their conclusions for two pages, including Cox's projection that ridership would be significantly lower than URS Greiner projected, and Twichell's prediction that the monorail should

4

expect to earn revenue equal to 42% of the operating costs. (Id. ¶¶ 46-49). Carey and Houston read this information in the PRAG report. (Id. ¶¶ 57-58). The PRAG report also purported to consider Wilbur Smith's report. (Def.'s 56.1 ¶ 31). The PRAG report concluded that the URS Greiner report's assumptions were reasonable, as was LVMC's belief it could build and operate the monorail while meeting its obligations under the bonds it planned to issue. (Id. ¶¶ 28-29).

On June 8, 2000, the NDBI held a public hearing, at which all four Opposition Consultants criticized the URS Greiner report and the monorail's feasibility. (Def.'s 56.1 ¶ 16). Cox stated his report was available on the internet. (Id. ¶ 20). Houston attended, received the reports of Cox, Malamud, and Twichell, recalls speaking with Cox and Malamud, and recalls he may have heard Rubin speak. (Pl.'s 56.1 ¶ 59). Houston also recalls reviewing all of the Opposition Reports except Rubin's. (Id. ¶ 60). Houston understood the Opposition Reports said the monorail was not feasible and could never repay the bonds from rider revenue. (Id. ¶ 61). Carey also attended, listened to all four Opposition Consultants' presentations, and concluded none was credible. (Id. ¶ 62).

### 3.   Official Statement Prospectus

Defendant prepared an Official Statement prospectus ("OS") for the bonds, dated September 1, 2000. (Def.'s 56.1 ¶¶ 10-11). The OS indicated the "Underwriters have reviewed the information" therein, but "do not guarantee the accuracy or completeness of such information." (Id. ¶ 10). The OS indicated LVMC had hired URS Greiner to project ridership and revenue based on disclosed assumptions, and included those projections. (Id. ¶¶ 12-13). The OS warned that the assumptions and projections may prove incorrect, and the ridership predictions were significantly higher than comparable public transportation systems in other cities. (Id. ¶ 14). Moreover, the OS indicated that supporters and opponents of the monorail had given formal presentations about the feasibility of the project at the June 8, 2000 hearing, and that URS Greiner reviewed and considered

5

this information in reaching its projections. (Id. ¶ 15). The OS further stated that NDBI had reviewed and considered "a number of studies and reports concerning the Monorail, including one from its Financial Advisor," PRAG, (id. ¶ 23), as well as "reports prepared by consultants retained by various parties that oppose construction of the Monorail." (Pl.'s 56.1 ¶ 72). The OS attached a final ridership and revenue report from URS Greiner dated August 23, 2000. (Def.'s 56.1 ¶ 39).

The OS did not mention the Wilbur Smith report, or give the names of the Opposing Consultants. (Pl.'s 56.1 ¶ 73). Plaintiff contends Defendant withheld the identities and conclusions of the Opposing Consultants because Defendant was paid between $10-12 million to underwrite the bonds and hoped to earn another fee by underwriting further financing of the monorail in the future. (Id. ¶ 80, 83). Indeed, Houston, Defendant's banker, had participated in discussions of financing the extension of the monorail to downtown Las Vegas and the airport since 1999. (Id. ¶ 85).

Plaintiff also contends that, at some point before the final OS was released, Defendant directed URS Greiner to change its assumptions to yield a higher revenue projection than was given in earlier drafts of the feasibility report. (Pl.'s 56.1 ¶ 28). An email from a PRAG representative dated December 3, 1999, reflects that URS Greiner's new farebox estimates "were prepared by URS at the direction of [Defendant. Defendant] needed higher revenues due to: (1) increased interest rates and (2) O&M costs such as property tax . . . being higher than before. They say further adjustments may be needed to show higher coverage." (Cillo Decl. Ex. 7). The August 1999 URS Greiner report assumed a starting fare of $2.00 and an increase of $0.25 every four years, while the OS projections assumed a starting fare of $2.50 and an increase of $0.25 every three years. (Pl.'s 56.1 ¶ 13). As a result, revenue projections from fares increased by 24.5% from the August 1999 report to the OS. (Id. ¶ 14).

6

4.    Early Monorail Operations

The monorail missed its projected January 2004 opening and operated for only a few months in mid-2004 due to operational difficulties.  (Def.'s 56.1 ¶ 40).  Its first full year of operations was 2005.  (Id. ¶ 41).

Moody's rating agency publicly downgraded the First Tier Bonds in March 2005, stating that ridership for the first months of operation was only 60% of what had been projected.  (Def.'s 56.1 ¶ 43).  Moody's stated that significant improvement in ridership and revenue were needed to support operations and the payment of First Tier Bonds.  (Id. ¶¶ 44-45).  Joseph Krist, one of Plaintiff's analysts who was involved in purchasing the bonds at issue in this case, knew about the Moody's downgrade and understood this statement to mean the monorail would also have difficulty paying Second Tier Bonds.  (Id.).  Ratings agency Fitch publicly downgraded the First Tier Bonds in February 2006, citing lower-than-anticipated revenue and the negative impact on ridership of a January 2006 fare increase.  (Id. ¶ 46).  Fitch predicted the Second Tier Bonds would face payment problems within two years.  (Id. ¶ 48).  On May 3, 2006, LVMC released its 2005 audited financials showing that, in its first year, the monorail fell far short of the OS's projections for ridership, fare revenue, and advertising revenue, and lost $45 million for the year.  (Id. ¶ 42).

Between 1999 and September 21, 2006, 19 different newspaper articles were published in which one or more of the Opposing Consultants and their views on the Monorail were discussed; of these, most were local papers, but one was published in the Seattle Times—a national paper— on February 18, 2001.  (Def.'s 56.1 ¶ 22; Harkness Decl. Ex. 28(xviii)).

5.    Refunding Project

By late 2004, certain employees of Defendant, including the banker Houston, were working on "refunding" the outstanding bonds, that is, refinancing the existing bonds and issuing new

bonds at lower interest rates backed by U.S. Government Securities. (Pl.'s 56.1 ¶¶ 92-93, 97). The bonds were to be refinanced using revenue from ride tickets. (Id. ¶ 94). In January 2005, Houston shared the refunding analysis with LVMC. (Id. ¶ 98). In May and June 2005, Defendant's employees, including Houston, analyzed the possibility of refunding the bonds, which would buy time to improve the ridership and technical operations of the monorail. (Id. ¶¶ 105-06). In August 2005, Houston and another of Defendant's employees, Frank Chin, discussed how refunding the bonds would result in significant savings on debt service. (Id. ¶ 108). In October 2005, Houston told Chin he had made progress gathering support to finance an extension of the monorail to the airport and the west side of the Las Vegas Strip. (Id. ¶ 110). In December 2005, Defendant made a presentation to the LVMC regarding the refunding and the expansion of the monorail. (Id. ¶ 111).

Between 2000 and 2006, Houston also communicated often with one of Defendant's analysts, Susan Rhudy. (Pl.'s 56.1 ¶ 115). Rhudy's role at Defendant included speaking to Defendant's bankers about marketing new deals, often in anticipation of calls with investors, because she had a relationship with the analysts working for several potential investors. (Id. ¶ 117). Indeed, on December 14, 2005, Rhudy emailed Houston saying she anticipated "a few questions/concerns from investors" in the monorail bonds due to the most recent revenue and ridership statistics, and she wanted to "get something out" to investors, "so we can head off any major concerns." (Id. ¶ 116). Houston responded he "would be in later today if you want to discuss." (Id.). In February 2006, Rhudy participated in a call about the monorail between LVMC representatives and Defendant's sales force, and later circulated a written recap of the call. (Pl.'s 56.1 ¶ 119). According to the recap, LVMC management planned to improve operations and discussed, among other things, ridership, revenue, a fare increase, increased advertising, and expansion to the Las Vegas Strip and the airport. (Id. ¶¶ 120-24).

On March 14, 2006, Rhudy sent Plaintiff's analyst, Cynthia Brown, a copy of the LVMC's 2006 Budget. (Pl.'s 56.1 ¶ 135). At some point in the first quarter of 2006, Plaintiff's analyst, Joseph Krist, analyzed the Second Tier Bonds to determine whether Plaintiff should purchase them. (Def.'s 56.1 ¶ 51). Krist had held a negative view of the monorail bonds since first reviewing the OS when it was issued in 2000, and was aware from reviewing the OS that other reports were done in 1999 and 2000 by consultants hired by parties who opposed construction of the monorail. (Id. ¶¶ 52-53). Krist did not ask for any reports produced in opposition to the construction of the monorail because he was able to reach his own conclusions about whether the monorail was likely to succeed. (Id. ¶ 54). Plaintiff did not purchase bonds in the first quarter of 2006. (Id. ¶ 57).

In June 2006, Cox, one of the Opposition Consultants, wrote an article that was posted on the internet, containing a hyperlink to his original Opposition Report and indicated that the losses on the monorail would be borne by "investors who should have known better." (Def.'s 56.1 ¶ 50).

### 6.   Plaintiff Purchases the Bonds

Plaintiff reconsidered purchasing Second Tier Bonds after it hired Dan Solender as a portfolio manager in July 2006. (Def.'s 56.1 ¶ 58). Four of Plaintiff's employees were involved in the purchase of Second Tier Bonds: portfolio managers Solender and Scott Smith, and analysts Brown and Krist. (Id. ¶ 90). Krist wrote a report in August 2006 informing Solender that ridership was just over 50% of predicted levels and that operating costs were running 20% above projections, and predicting the Second Tier Bonds would face payment issues by July 1, 2008. (Id. ¶¶ 62-64).

On September 21, 2006, Dan Mulligan, Defendant's salesperson, sent Plaintiff and other potential purchasers an email informing them that an investor, Franklin Funds, was looking to sell its Second Tier Bonds to another investor through Defendant, and listing the price. (Def.'s 56.1

¶ 66).  Although the parties agree that Mulligan made no other written statements to Plaintiff about the bonds prior to Plaintiff purchasing them, Solender recalls phone conversations with Mulligan about the bonds.  (Id. ¶ 68; ECF No. 74 ("Pl.'s Counter-56.1") ¶ 68).  Solender does not recall the exact substance of these conversations, but recalls speaking to Mulligan almost every day and learning that the monorail was "behind," that there was a "slow start up," and that Defendants thought there was much more they could do to increase revenue, including marketing to hotels and increasing advertising.  (Pl.'s 56.1 ¶¶ 208-09).  Solender testified Plaintiff would not have purchased the bonds on September 21, 2006 without speaking to one of Defendant's employees, most likely Mulligan.  (Id. ¶ 209).[5]  Solender also recalls discussing with Defendant the monorail's possible extension to the airport, but could not recall with whom he spoke.  (Pl.'s 56.1 ¶ 212).

Prior to Plaintiff purchasing bonds, Plaintiff's analyst, Brown, emailed Plaintiff's portfolio manager, Smith, a February 2006 article from the Las Vegas Sun addressing LVMC's plan to extend the monorail to the airport and the west side of the Las Vegas Strip.  (Pl.'s 56.1 ¶ 190).  In the email, Brown stated, "they will wrap this into a refunder for the higher coupon outstanding debt." (Id.).  Brown testified that she was referring to how LVMC would finance its expansion by refunding or refinancing the outstanding bonds, but did not remember where she learned about this.  (Id. ¶¶ 192-93).  The article itself does not mention refunding or refinancing existing bonds.  (See Puckett Decl. ¶¶ 4-6 and Ex. 1).  Smith forwarded this email to Solender.  (Def.'s 56.1 ¶ 70).  Solender understood the reference to "a refunder" to mean "the analyst gives the opinion there's a possibility those bonds could be refunded as part of a deal to bring the money to expand the Monorail to the airport."  (Pl.'s 56.1 ¶ 194).  Smith also sent Solender an e-mail attaching an article

---

[5] Defendant's challenge to this testimony as "speculation" is overruled.  It appears at this stage that this evidence, that Plaintiff ordinarily would have spoken to an employee of Defendant immediately before purchasing bonds, may be admissible as a routine business practice pursuant to Fed. R. Evid. 406, to prove that it occurred on September 21, 2006.

from the Las Vegas Review-Journal, which stated the monorail's ridership from June to August 2006 had dropped 38% from the same months in 2005, and the monorail had not been profitable since mid-2004. (Def.'s 56.1 ¶¶ 72-73). Plaintiff knew on September 21, 2006 that the monorail was not on track to achieve anywhere near the level of ridership projected in the 2006 Budget. (Id. ¶ 79).

Plaintiff purchased $6 million in par value of the Second Tier Bonds between 2:08 and 2:10 p.m. on September 21, 2006. (Pl.'s 56.1 ¶ 198). Solender claims Plaintiff purchased the bonds "based on 'general themes' of plans to increase marketing and in the hopes that the Monorail would be extended to the airport and the bonds would be refunded." (Def.'s 56.1 ¶ 86). Solender could not identify any specific documents he read prior to purchasing the bonds. (Id.). Solender did not ask anyone at Plaintiff to find the Opposition Reports referenced in the OS. (Id. ¶ 88).

Shortly after Plaintiff purchased bonds on September 21, 2006, Defendant's analyst, Rhudy, sent Plaintiff a copy of the LVMA's 2006 Budget. (Pl.'s 56.1 ¶ 203). However, Krist testified that he did not rely on the 2006 Budget when deciding whether to purchase more bonds, and no other witness from Plaintiff recalls seeing this document at this time. (Def.'s 56.1 ¶ 100). The 2006 Budget projected ridership to be more than 40% lower than what the OS from 2000 had predicted. (Id. ¶ 103).

Twice more, Plaintiff purchased more Second Tier Bonds: $2 million on September 27, and $5 million on October 3, 2006. (Pl.'s 56.1 ¶¶ 204, 206). Plaintiff paid more than par value in both transactions. (Id.). Of the three individuals at Defendant who were directly involved in the bond trades with Plaintiff—analyst Rhudy, salesperson Mulligan, and trader Andrew Goodwin— none knew of the existence of the Opposition Reports. (Def.'s 56.1 ¶ 87).

7.    Subsequent Failure of the Bonds

Fitch downgraded the First Tier Bonds on October 17, 2006.  (Pl.'s 56.1 ¶ 227).  Solender received notice of the downgrade in October.  (Def.'s 56.1 ¶ 107).  At that point, Plaintiff did not sell the Second Tier Bonds because it believed the expansion of the monorail and the refunding could lead to the bonds becoming more valuable.  (Pl.'s 56.1 ¶¶ 229-30).  Moody's downgraded the First Tier Bonds on November 21, 2006.  (Def.'s 56.1 ¶ 109).  Fitch downgraded them further in July 2007, stating that default appeared likely.  (Id. ¶ 110).

Also in July 2007, the Las Vegas Review-Journal and the Associated Press each published an article discussing Cox's Opposition Report from 2000, including Cox's prediction that URS Greiner's ridership projections would not be met.  (Def.'s 56.1 ¶ 111).  The Los Angeles Times in September 2007 and The Guardian in February 2008 published similar articles referencing Cox's predictions.  (Id. ¶ 112).  Defendant's analyst, Rhudy, received three of these four articles but never learned about the Opposing Consultants or their reports until Plaintiff filed this lawsuit.  (Pl.'s 56.1 ¶ 254).  Even after these articles were published, the Second Tier Bonds traded at or near par value throughout 2007.  (Def.'s 56.1 ¶ 114).  Plaintiff notes that Defendant's expert witness, Thomas Kenny, agrees the bonds held their value because a refunding was still possible.  (Pl.'s 56.1 ¶ 251).

In January 2008, the monorail bonds defaulted, Moody's downgraded the First Tier Bonds again, and the Second Tier Bonds began to draw on the debt service reserve fund to meet their payment obligations.  (Def.'s 56.1 ¶¶ 118-19).  Shortly thereafter, the price of the Second Tier Bonds fell.  (Id. ¶ 120).  Solender was surprised to learn via email that the Second Tier Bonds hit the debt service reserve, which "started triggering some more emails to understand things better." (Id. ¶ 119).  In July 2008, Krist corresponded with Plaintiff's in-house counsel regarding Plaintiff's

holdings of Second Tier Bonds. (Def.'s 56.1 ¶ 127). In July 2009, Plaintiff began corresponding with outside counsel after the Second Tier Bonds defaulted for the first time. (Id. ¶ 129).

Plaintiff had actual knowledge of the Cox Report for the first time on November 19, 2009, when Solender received a copy of the report. (Pl.'s 56.1 ¶ 259). Solender testified that he would not have purchased the bonds had he known of the Cox Report. (Id. ¶ 263). In his testimony, Solender cited Cox's opinions about comparative transportation systems and their ability to reach ridership projections, the effects of fare price on ridership, and the criticisms of URS Greiner's projections. (Id. ¶ 262).

The monorail operator, LVMC, filed for Chapter 11 bankruptcy on January 13, 2010. (Pl.'s 56.1 ¶ 266). Between 2006 and 2008, ridership was half or less than half of what the OS had predicted. (Id. ¶ 264). Of the $13,532,350 Plaintiff spent on the bonds, it recovered $1,057,500 from sales in 2008 and $77,050[6] from the LVMC's bankruptcy. (Id. 270-71).

### B.     Procedural History

Plaintiff filed suit on September 23, 2011. (ECF No. 1). The Court denied Defendant's motion to dismiss for failure to state a claim. (ECF Nos. 24, 25). Plaintiff thereafter filed an amended complaint. (ECF No. 40). The present motions followed. Defendant moves for summary judgment on several grounds set forth below, see infra Part IV. Defendant also moves to strike portions of Plaintiff's Supplemental Statement of Material Facts on grounds of evidentiary admissibility and for violating federal and local rules of civil procedure. (ECF No. 113). This

---

[6] Defendant objects to this fact because it comes from a document that was not produced in discovery despite being responsive to a discovery request. (ECF No. 113-1 at 1). Even if this is true, the Court may rely on documents not produced in discovery if the failure to produce is harmless. Fed. R. Civ. P. 37(c)(1). Here, the Court does not see how Defendant is prejudiced by evidence of the exact monetary amount Plaintiff recovered from the monorail's bankruptcy, which proceedings are a matter of public record. See In re Las Vegas Monorail Co., No. 10-10464 (Bankr. D. Nev.). Therefore, the objection is overruled.

motion also purports to move in limine to exclude expert testimony and evidence. (Id.). Plaintiff opposes, (ECF No. 122), and has filed a motion to supplement its Supplemental Statement of Material Facts. (ECF No. 126). Defendant opposes the motion to supplement. (ECF No. 131).

## III.   LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Luian v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); Big Apple BMW. Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed the 'mere scintilla' threshold . . . ."). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty

14

Lobby Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Under New Jersey law, "allegations of fraud must be proved by clear and convincing evidence." Alexander v. CIGNA Corp., 991 F. Supp. 427, 435 (D.N.J. 1998) (citing Fox v. Mercedez-Benz Credit Corp., 281 N.J. Super. 476, 484 (App. Div. 1995)). For this reason, to defeat a motion for summary judgment on a common law fraud claim, plaintiff must put forth sufficient evidence by which a jury could find clear and convincing proof of fraud. Id.

## IV. DISCUSSION

In New Jersey, common law fraud requires showing "(1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). Negligent misrepresentation requires showing "an incorrect statement, negligently made and justifiably relied on, which results in economic loss." Konover Constr. Corp. v. E. Coast Constr. Servs. Corp., 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (quotation omitted). The NJUSA creates a cause of action against a defendant who "[o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)[.]" N.J.S.A. 49:3-71(a)(2). A plaintiff suing under the NJUSA must show the

15

defendant "knew of the untruth or omission and intended to deceive the buyer[,]" and the buyer "suffered a net loss with respect to that sale . . . taking into account all transactions by [the buyer] in the same security or any security convertible into that security within one year before or after the sale . . . which is the basis of the claim."  N.J.S.A. 49:3-71(b)(1)-(2).

Defendant argues Plaintiff cannot meet several of the elements of common law fraud, negligent misrepresentation, and/or the NJUSA.  The Court discusses these arguments in turn.

### A.      Duty to Disclose

Defendant argues it had no duty to disclose the Opposition Reports—the extremely pessimistic reports from 2000 predicting the monorail would be infeasible—because (1) Defendant had no special relationship with Plaintiff mandating disclosure when Defendant sold Plaintiff the bonds; (2) Defendant made no incomplete representations to Plaintiff that would require further disclosure so as not to be misleading; (3) the Opposition Reports were equally available to both parties; and (4) Plaintiff cannot hold Defendant responsible for failure to disclose publicly available, third-party documents in its 2000 OS.  (Def.'s Br. at 20-26).

Even absent a special relationship between parties, a defendant's misleading omission may constitute a material misrepresentation of fact for purposes of fraud or negligent misrepresentation. See Voilas v. Gen. Motors Corp., 170 F.3d 367, 378 (3d Cir. 1999) (quoting Strawn v. Canuso, 271 N.J. Super. 88 (App. Div. 1994)); Highlands Ins. Co. v. Hobbs Grp., LLC, 373 F.3d 347, 355 (3d Cir. 2004) (citing Strawn v. Canuso, 140 N.J. 43 (1995)); N.J.S.A. 49:3-71(a)(2).

Viewing the evidence in the light most favorable to Plaintiff, in opposition to this motion, Plaintiff has created an issue of fact as to whether Defendant gave Plaintiff a misleading impression about the bonds it sold Plaintiff in 2006, and thus should have disclosed the Opposition Reports.

First, there is an issue of fact as to whether Defendant represented to Plaintiff that there was a viable plan to increase revenue from ridership and advertising, extend the monorail, and refund or refinance the Second Tier Bonds. Plaintiff has put forth three of Defendant's statements that, if proven at trial, would collectively make this representation:

- Defendant sent Plaintiff the 2006 Budget in March 2006 and again on September 21, 2006, before Plaintiff's second and third purchase of bonds. (Pl.'s 56.1 ¶¶ 135, 203). The 2006 Budget made certain projections regarding ridership and revenue increases, (Cillo Decl. Ex. 110 at 14, 17-18), which Plaintiff contends "indicat[ed] there was a plan in place to improve operating revenues." (Pl.'s Opp. Br. at 25).

- Before purchasing the bonds, Solender—Plaintiff's portfolio manager—recalls (1) discussing with Defendant's salesperson the plans to increase revenue from ridership and advertising, and (2) discussing the extension to the airport with Defendant. (Pl.'s 56.1 ¶¶ 208-09, 212).

- There is also circumstantial evidence that Defendant told Plaintiff's analyst, Brown, about the possibility of refunding the Second Tier bonds, which Brown relayed to Plaintiff's portfolio manager, Smith. (Pl.'s 56.1 ¶¶ 190, 192-93; see supra Part II.A.6).

Second, there is an issue of fact as to whether this representation was misleading in light of Defendant's failure to disclose the Opposition Reports, which, as described above, were very pessimistic on the viability of any such plan. See City of Millville v. Rock, 683 F. Supp. 2d 319, 333-34 (D.N.J. 2010) (where defendants induced plaintiff to loan defendants money to save defendants' business, question of fact as to whether Defendants should have disclosed they were already contemplating bankruptcy). Thus, a reasonable jury could conclude Defendant had a duty to disclose the Opposition Reports to correct the misleading representation it had made.

Contrary to Defendant's contention, there is at least a question of fact as to whether the Opposition Reports were "equally available" to both parties. (Def.'s Br. at 23). Defendant has only identified one national newspaper article discussing the Opposition Consultants—an article from the Seattle Times published February 28, 2001, which mentions only one of the consultants by name, for two sentences. (Harkness Decl. Ex. 28(xviii)). The Court finds this single reference

17

in a single article is not sufficient for summary judgment on the issue of whether the Opposition

Reports were equally available to both parties. See also United States v. Royer, 549 F.3d 886, 897

(2d Cir. 2008) ("The fact that information may be found publicly if one knows where to look does

not make the information 'public' for securities trading purposes unless it is broadly disseminated,

or the like.").[7]

Thus, summary judgment on this ground is not appropriate.

**B.    Materiality**

Defendant next argues its alleged failure to disclose the Opposition Reports to Plaintiff in

2006 was not a material omission because the information was stale and did not significantly alter

the total mix of information available to the investor. (Def.'s Br. at 26-29).

Generally, undisclosed information is considered material if "there is a substantial

likelihood that the disclosure would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information available to that investor." In re Lucent Tech.,

Inc. Sec. Litig. 217 F. Supp. 2d 529, 543 (D.N.J. 2002).[8]   Materiality is a mixed question of law

and fact.   In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir. 1990).   "Only when the

disclosures or omissions are so clearly unimportant that reasonable minds could not differ should

the ultimate issue of materiality be decided as a matter of law." Id. Staleness of information, as it

_____

[7] Because the Court finds there is an issue of fact as to whether in 2006, Defendant made misleading representations that gave rise to a duty to disclose the Opposition Reports, the Court need not consider whether failure to disclose these reports in the OS also gives rise to such a duty, or whether Defendant had a duty to disclose by virtue of a special relationship with Plaintiff. (See Def.'s Br. at 20-26).   The Court makes no finding as to the relevance of securities rules and regulations to Defendant's duty to disclose information. (See Pl.'s Br. at 21-24).

[8] Very little New Jersey case law addresses materiality in the context of investing in securities, and the Court is unable to find a useful definition.   The parties appear to agree that federal securities law on materiality is instructive; indeed, both parties cite to federal securities case law.   Therefore, the Court evaluates materiality in this case with reference to this case law.

bears on the materiality of a fraudulent statement or omission, is a question of fact.  In re JWP Inc. Sec. Litig., 928 F. Supp. 1239, 1270 (S.D.N.Y. 1996).

Plaintiff contends that the Opposition Reports were not stale and thus still material in 2006 because of the stark contrast between their pessimistic projections and Defendant's and LVMC's purported optimism about the plan to extend the monorail to the airport, find untapped sources of advertising and fare revenue, and refund the bonds.  The Court agrees there is an issue of fact as to whether enough of the criticisms in the Opposition Reports were still material in 2006.

For example, all four of the Opposition Consultants questioned the monorail's assumptions about price elasticity, that is, the market's tolerance for fare increases without offsetting loss of customers.  (See Cillo Decl. Ex. 8 at 6, 8, 11-12 (Malamud); Id. Ex. 17 at 20-21 (Cox); Id. Ex. 2 at 7 (Twichell and Rubin)).  The 2006 Budget projects a fare increase from $3.00 to $5.00, arguably making the Opposition Consultants' price elasticity analysis still material.   Likewise, two Opposition Consultants questioned the fundamental assumptions underlying the effectiveness and value of monorail advertisements when criticizing URS Greiner's advertisement revenue projections.  (See id. Ex. 10 at 4, 7-8 (Rubin); id. Ex. 17 at 32-33 (Cox)).  Because there is a question of fact as to whether Defendant made representations about finding untapped potential advertising revenue, this analysis was arguably still material.  Finally, both Rubin and the joint report of Rubin and Twichell predicted a high likelihood of default on some or all of the investment bonds (See id. Ex. 2 at 17; Ex. 10 at 3), which arguably remained material in 2006 because the bonds had yet to default.  These and other analyses by the Opposition Reports directed at the long-term viability of the monorail raise a question of fact as to the materiality of their omission in 2006.

Thus, summary judgment on this ground is not appropriate.

### C.    Reliance

Defendant makes two different arguments regarding the element of reliance.[9]

#### 1.    Actual Reliance

Defendant contends that Plaintiff did not actually rely on any of Defendant's statements before purchasing the bonds.  (Def's Br. at 29-30).  But, as Defendant admits, Plaintiff relied on "'general themes' of plans to increase marketing and in the hopes that the Monorail would be extended to the airport and the bonds would be refunded."  (Id. at 30; Def.'s 56.1 ¶ 86).  As discussed above, supra Part IV.A, Plaintiff has presented evidence sufficient to raise an issue of material fact as to whether Defendant represented to Plaintiff that these plans existed.  A reasonable jury could thus find that Plaintiff relied on these plans once Plaintiff was told about them.

#### 2.    Reasonable Reliance

Defendant argues that, even if Plaintiff did rely on any of Defendant's statements, such reliance was not reasonable in light of more recent available information, Plaintiff's investigation of the bonds, and the disclosures in the OS.  (Def.'s Br. at 30-33).  The Court disagrees.

As discussed above, supra Part IV.A, Plaintiff's evidence raises an issue of fact as to whether, in the discussions leading up to Plaintiff's first purchase of the bonds on September 21, 2006, Defendant represented that there was a viable plan to increase revenue from ridership and advertising, extend the monorail, and refund the bonds.  Defendant has identified no information that Plaintiff received after these alleged representations were made that would have rendered Plaintiff's reliance on them unreasonable.[10]

---

[9] Reliance is not an element of the NJUSA claim.  Kaufman v. i-Stat Corp., 165 N.J. 94, 112-13 (2000) ("The Legislature . . . eliminated reliance as an element of securities fraud entirely in favor of a system in which privity establishes causation.").  Thus, these arguments only need to be addressed with respect to the common law fraud and negligence claims only.

[10] Rather, Defendant's argument appears to be that the OS, URS Greiner report, and

Nor has Defendant identified a basis for the Court to find Plaintiff relied on its own due diligence such that relying on Defendant's representations is unreasonable. Although "[i]n instances in which a party undertakes an independent investigation and relies on it, there can be no reliance[,]" the fact that an investigation took place "does not resolve the question of whether [the party] relied on the result of th[e] investigation and not on the alleged assurances" of the party alleged to have committed fraud. Byrne v. Weichert Realtors, 290 N.J. Super. 126, 137 (App. Div. 1996). Here, Defendant points to the diligence analysis of Plaintiff's analyst, Krist, of the bonds generally and the financial state of the monorail in 2006. (Def.'s 56.1 ¶ 77). But Plaintiff's claim is not that Defendant misrepresented the then-existing financial state of the monorail, such that Krist's diligence would preclude reliance on any representation to the contrary. Rather, Plaintiff's claim is that Defendant misrepresented the likelihood of success with respect to increasing fare and advertising revenue, expansion, and refunding the bonds. See supra Part IV.A.1. Defendant has not identified any independent investigation by Plaintiff into that aspect of the investment.[11]

---

Opposing Reports themselves were outdated because there was more recent information about the monorail's performance. But the question here is what information may have come to light after Defendant made the representations upon which Plaintiff relied, and whether the new information made it unreasonable for Plaintiff to have relied on the representations. The case Defendant cites is not to the contrary. See Lord Abbett Muni. Income Fund, Inc. v. Asami, No. C-12-3964 (DMR), 2014 WL 3417941, at *12 (N.D. Cal. July 11, 2014) (plaintiff could not rely on older projections when it had received updated information about the investment's current financial situation).

[11] Defendant argues (Def.'s Br. at 31-32) when "a party to whom representations are made nevertheless chooses to investigate the relevant state of facts for himself, he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he could have discovered by a reasonable investigation." See DSK Enters., Inc. v. United Jersey Bank, 189 N.J. Super. 242, 251 (App. Div. 1983). Defendant misreads DSK Enterprises and its progeny. It is not correct that a plaintiff who investigates any fact is charged with knowledge of all facts that every reasonable investigation might uncover. See Limpit Acquisition, LLC v. Fed. Fin. Grp., Inc., No. 04-3884 (JAG), 2006 WL 288076, at *3 (D.N.J. Feb. 6, 2006). Indeed, the court in DSK Enterprises concluded the plaintiff did not rely on the defendant's alleged misrepresentation because plaintiff had its own experts review all of the information that was the subject of the alleged misrepresentation. 189 N.J. Super. at 251.

Finally, the risk disclosures in the OS do not preclude reasonable reliance.   Although "cautionary statements included in [a] document may render . . . predictive statements or opinions immaterial as a matter of law[,]" they do so only if they are "substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig., 7 F.3d 357, 371-72 (3d Cir. 1993).[12]  Here, Plaintiff's claim is based at least in part on representations made not in the OS but by Defendant's employees in 2006 regarding the new plan to increase revenue from ridership and advertising, extend the monorail, and refund the Second Tier Bonds.  See supra Part IV.A.  Unsurprisingly, the 2000 OS did not specifically address these 2006 plans.  See supra Part II.A.3.

Thus, summary judgment on this ground is not appropriate.

### D.    Scienter

Defendant argues Plaintiff cannot show Defendant intended to deceive Plaintiff because Defendant's three employees who sold Plaintiff the bonds did not know about the Opposing Consultants or their reports.  (Def.'s Br. at 33-34).  The Court disagrees that this fact warrants summary judgment because there is an issue of fact about Defendant's banker David Houston's knowledge of the Opposing Reports and his intent to deceive.[13]

Plaintiff has put forth evidence tending to show that Houston (1) knew about the Opposing Consultants and their reports, and appreciated the extent to which they criticized the more optimistic projections upon which Defendant relied, see supra Part II.A.2; (2) was heavily involved

---

[12] In securities case law, cautionary statements in a prospectus bear on whether a projection or prediction is material, not whether Plaintiff was reasonable to rely on it.  See In re Trump Casino Sec. Litig., 7 F.3d at 371 (discussing the effects of "meaningful cautionary statements" on "the 'total mix' of information" provided to investors).  The Court addresses this argument here, however, because Defendant treats it as a reliance argument.  (Def.'s Br. at 32-33).

[13] Knowledge and intent are not required for the negligent misrepresentation claim.  See Konover Constr. Corp., 420 F. Supp. 2d at 370.

from 2004-2006 in the push to expand the monorail and refund the bonds, see supra Part II.A.5;

and (3) discussed with Defendant's analyst Rhudy in December 2005 how best to placate investors

worried about the monorail bonds' performance up to that point, see id. Plaintiff has also adduced

evidence tending to show that (1) Defendant's bankers influenced URS Greiner to make their

projections more optimistic (see Pl.'s 56.1 ¶¶ 13, 14, 17, 28); (2) the OS intentionally downplayed

the significance of the Opposing Consultants' views, see supra Part II.A.3; and (3) Defendant stood

to gain financially from continuing its role as underwriter for the monorail bonds, including issuing

new bonds after a potential refunding (see Pl.'s 56.1 ¶¶ 80-83).  Taken together, a reasonable jury

could conclude that Houston, through Rhudy, instructed Defendant's sales staff to tell investors

about the plan to expand the monorail and refund the bonds, but consciously did not mention the

Opposing Consultants or their reports—which might have cast doubt on the viability of these

plans—because Defendant wanted to maintain the marketability of the Second Tier Bonds.  The

sales staff need not have known the disclosures were misleading, because there is evidence tending

to show that Houston did know.  See Kaufman, 165 N.J. at 108 ("Indirect reliance allows a plaintiff

to prove a fraud action when he or she heard a statement not from the party that defrauded him or

her but from that party's agent or from someone to whom the party communicated the false

statement with the intention that the victim hear it, rely on it, and act to his or her detriment.").

Thus, summary judgment on this ground is not appropriate.

### E.    Causation

Defendant contends Plaintiff cannot show causation because "there is no evidence that the

alleged omission in the OS artificially inflated the price it paid for the Second Tier Bonds," and

because the bonds' price remained high even after news articles in 2007 discussed the Opposition

Reports' predictions about the monorail's failure.  (Def.'s Br. at 34-36).  Defendant also contends

Plaintiff cannot prove causation without expert testimony about the effect of the alleged fraudulent misrepresentation on the price of the bonds. (Id. at 35 (citing WM High Yield Fund v. O'Hanlon, No. 04-3423, 2013 WL 3230667, at 12 (E.D. Pa. June 27, 2013)). The Court disagrees.

In New Jersey common law fraud and negligent misrepresentation claims, the alleged misrepresentation must be a proximate cause, i.e., a "substantial contributing factor" causing the plaintiff's losses. McCabe v. Ernst & Young, LLP, 494 F.3d 418, 438 (3d Cir. 2007) (citing 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478 (App. Div. 1994)). When sale of securities is the basis of the claim, this standard is "similar to" the "loss causation" standard articulated in § 10(b) federal securities fraud cases. Id. at 439. The loss causation standard requires showing "that it was the very facts about which the defendant lied which caused its injuries." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006) (quoting Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997)). In other words, this inquiry "typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." Id. (quoting Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001)).

Here, a reasonable jury could find that the bonds ultimately decreased in value because the plan to expand ridership and advertising revenues failed, which Plaintiff would have known was likely had Defendant disclosed the Opposition Reports. Under this theory, the "subject" of the fraudulent omission was the information suggesting the plan would fail, and Plaintiff's loss "foreseeabl[y]" occurred when that withheld information turned out to be correct, rendering the bonds nearly worthless. See Berckeley, 455 F.3d at 222.

Defendant's arguments to the contrary fail.

24

First, Defendant seeks to apply a causation standard more appropriate for a fraud-on-the-market case. (See Def.'s Br. at 34-36). For causation, however, the Third Circuit has been careful to distinguish between "typical" fraud-on-the-market cases and atypical cases involving private investments based on direct misrepresentations. See EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000). The typical case is one in which "some announcement emanating from the company . . . fraudulently represented the actual state of affairs" and caused Plaintiff to purchase securities at "a price that was artificially inflated, only to suffer a loss when the true situation was made known." Id. In such cases, Plaintiff must show the misrepresentation caused the price to be inflated by showing how much it dropped once the truth was publicly disclosed. See Semerenko v. Cendant Corp., 223 F.3d 165, 184-85 (3d Cir. 2000). By contrast, in cases involving private securities transactions or inefficient markets—markets that do not necessarily react to information in the same way public securities markets do—this type of proof is not applicable or necessary. See EP Medsystems, 235 F.3d at 884-85; McCabe v. Ernst & Young, LLP, No. 01-5747, 2006 WL 42371, at *7-8 (D.N.J. Jan. 6, 2006) (affirmed by McCabe, 494 F.3d 418).

This case, involving the private, direct sale of securities in an inefficient market, is not a fraud-on-the-market case, so the causation analysis typical in such cases does not apply here. See EP Medsystems, 235 F.3d at 884-85. Thus, it is not dispositive that the bonds' price did not immediately drop after news articles in 2007 discussed the Opposition Reports' predictions about the monorail's failure because that is not the only way to show the price of the bonds was "artificially inflated." (See Def.'s Br. at 34-36). Nor must plaintiff demonstrate a "factual basis [for a jury] to conclude that the loss [Plaintiff] alleges was caused by a failure by CGMI to warn [it] in 2006 that the Monorail might miss projections made in 2000." (Id. at 35). Rather, the

general standard for proximate cause, articulated above, is appropriate. Under that standard, it is the information omitted—not Defendant's act of omitting that information—that must be connected to the losses alleged. See McCabe, 494 F.3d at 436-37 (examining whether omitted information about securities registration defaults proximately caused the stock price to drop).

Moreover, the case Defendant cites to show expert testimony is required, WM High Yield Fund, is distinguishable because it is a fraud-on-the-market case, for which expert testimony was necessary to isolate the effect of the fraudulent statement on the stock price from other public market factors. 2013 WL 3230667, at *13. This case does not raise similar concerns.

As for the NJUSA claim, neither proximate cause in the common law sense nor loss causation in the securities fraud sense is an element. See Roll v. Singh, No. 07-cv-4136, 2008 WL 3413863, at *17 (D.N.J. June 26, 2008); see also Kaufman, 165 N.J. at 112-13 ("[P]rivity establishes causation."[14]). Rather, Plaintiff must show it "suffered a net loss with respect to that sale . . . taking into account all transactions by [the buyer] in the same security or any security convertible into that security within one year before or after the sale . . . which is the basis of the claim." N.J.S.A. 49:3-71(b)(2). It has done so here by demonstrating its losses with respect to the 2006 bond purchases. See supra Part II.A.7.

Thus, summary judgment on this ground is not appropriate.

**F.    NJUSA Statute of Limitations**

Defendant argues Plaintiff's NJUSA claim is barred by the statute of limitations because Plaintiff was on inquiry notice of its claims more than two years before this case was filed, due to various storm warnings. (Def.'s Br. at 36-39). The Court disagrees.

---

[14] Defendants do not appear to dispute privity. (MTD Opp. at 16).

26

The NJUSA provides, "[n]o person may bring an action . . . more than two years after the contract of sale . . . or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later." N.J.S.A. § 49:3-71(g). New Jersey courts view the latter portion of this provision as articulating a "discovery rule." See Bramblewood Inv'rs, Ltd. v. C&G Assocs., 262 N.J. Super. 96, 100 (Law Div. Union Cty. 1992) ("[T]he time to file suit is triggered when the plaintiff 'learns, or reasonably should learn, the existence of a state of facts that may equate in law with a cause of action.'" (quoting Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426 (1987)); Petruzzi v. Kobrin, 241 N.J. Super. 439, 442 (Law Div. Middlesex Cty. 1989); see also Fagan v. Fischer, No. 14-7013, 2016 WL 347318, at *7 (D.N.J. Jan. 28, 2016) (applying the NJUSA). Thus, the Court applies the discovery rule, rather than the inquiry notice rule that Defendant contends should apply. (Def.'s Br. at 36-39).[15]

---

[15] Defendant cites Roll, 2008 WL 3413863, at *14, for the proposition that the Court should use an inquiry notice standard. (Def.'s Br. at 36). But Roll only held that this standard applied to Plaintiff's federal securities law claim. Id. The Court in Roll found the NJUSA claim was time-barred based on Plaintiff's actual notice of the facts giving rise to his claim. Id. at *17. Thus, Roll is not instructive on the appropriate standard to apply to the NJUSA claim.

In applying the discovery rule, the Court is guided by the Third Circuit's discussion of the difference between the inquiry notice rule and the discovery rule in the federal securities context. See Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., 730 F.3d 263 (3d Cir. 2013). Under the discovery rule, a claim accrues "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first." Id. at 273 (quoting Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 637 (2010) (internal quotation omitted)). Inquiry notice, by contrast, may occur before "the point at which the plaintiff would already have discovered . . . facts constituting the violation." Id. (quoting Merck & Co., 559 U.S. at 651 (internal quotation omitted)). In applying the discovery rule, therefore, although "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating[,]" storm warnings do not themselves trigger the statute of limitations before "the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation." Id. at 275 (quoting Merck & Co., 559 U.S. at 653 (2010)); see also Fagan, 2016 WL 347318, at *7 (in NJUSA case, holding plaintiffs should have begun investigating potential fraud when they learned of the misrepresentations at issue).

The sale in question took place more than two years before this action was filed on September 23, 2011. Therefore, the Court looks at when Plaintiff knew or should have known of the existence of facts giving rise to this cause of action to determine whether the claim is barred.

Plaintiff contends the claim accrued no earlier than when Solender, Plaintiff's portfolio manager, received Cox's Opposition Report for the first time on November 19, 2009, because this is when Plaintiff learned not only of the bonds' losses but of the allegedly fraudulent omission of the Opposition Reports in Defendant's sales pitch. (Pl.'s Br. at 45-46). Defendant counters that Plaintiff reasonably should have known about the alleged fraud earlier, based on: (1) Plaintiff's analyst Krist's knowledge in 2006 that other reports besides the URS Greiner report existed; (2) Cox's June 2006 internet article; (3) Plaintiff's knowledge that the monorail had underperformed projections in 2005; (4) Plaintiff's knowledge of the Fitch downgrade in October 2006; (5) the publication of four articles in 2007 and 2008 discussing the Cox Report; (6) Solender's testimony that Plaintiff sent various emails discussing the fact that the Second Tier Bonds hit the debt service reserve; (7) Plaintiff's consultation with counsel in July 2008 regarding the bonds, which generated work product; and (8) Plaintiff's consultation with counsel in July 2009 regarding potential legal action. (Def.'s Br. at 37-39).

The Court finds, viewing the facts most favorably to Plaintiff, that these events, individually or collectively, did not start the statute of limitations clock prior to November 19, 2009. First, Krist's knowledge of the URS Greiner report did not put him on notice of what the Opposition Reports said or their import, because both the URS Greiner report and the OS omitted the names of the Opposition Consultants and, arguably, greatly downplayed the extent to which they disagreed with URS Greiner's assumptions and projections. See supra Part II.A.3. Second, although the monorail's poor performance in 2005 and the bonds' poor performance in 2006-2008

28

(including hitting the debt service reserve) may have indicated that Defendant's alleged representations in 2006 were overly optimistic, "stock losses[ are] of such a nature that the losses would not necessarily be indicia in and of themselves of fraud or wrongdoing." Petruzzi, 241 N.J. Super. at 443.  Third, there is no evidence Plaintiff's 2008 or 2009 consultations with counsel did or should have put Plaintiff on notice of the alleged fraud at issue here.  Fourth, although Cox's 2006 internet post and the four articles from 2007 and 2008 are perhaps relevant indicators that the Opposition Reports existed, there is no indication Plaintiff read these articles, and the Court questions whether, considering the types of publications they were, their existence necessarily would have triggered an investigation into Defendant's alleged fraudulent scheme.

Ultimately, the Court does not find plaintiff knew or should have known all the elements it would need to plead a NJUSA action before November 19, 2009.  This appears to be the first time Plaintiff learned about Cox's report, and thus may have learned that Defendant knew and intentionally omitted the Opposition Reports from its sales pitch to Plaintiff regarding the Second Tier Bonds.

Therefore, summary judgment is not appropriate on statute of limitations grounds.

### G.    Motion to Strike and Motion to Supplement

Because the Court has a sufficient basis to reject all of Defendant's grounds for summary judgment, and has only relied on evidence that (1) is not the subject of the motion to supplement; and (2) either is not the subject of the motion to strike or is properly before the Court despite Defendant's objections, see, e.g., supra notes 4-6, it is not necessary to adjudicate fully either motion.  Moreover, to the extent Defendant's motion to strike contains a motion in limine to preclude expert testimony at trial, the Court finds this is more appropriately adjudicated in separate motions, because none of the expert testimony bears on the present motion for summary judgment.

Therefore, Plaintiff's motion to supplement (ECF No. 126) and Defendant's motion to strike (ECF No. 113) are denied as moot, and Defendant's motion in limine (ECF No. 113) is denied without prejudice to be re-raised prior to trial.

## V.   **CONCLUSION**

Defendant's motion for summary judgment (ECF No. 62) is **DENIED**.  Defendant's motion in limine (ECF No. 113) is **DENIED WITHOUT PREJUDICE**.  Defendant's motion to strike (ECF No. 113) is **DENIED**.  Plaintiff's motion to supplement (ECF No. 126) is **DENIED**.

An appropriate Order accompanies this Opinion.

_____
**CLAIRE C. CECCHI, U.S.D.J.**

Date: August 4, 2017